# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| MICHAEL MCKENZIE, individually and doing business as AMERICAN IMAGE ART, an unincorporated dba, ) ) ) ) Plaintiff, ) ) v. ) ) JAMES W. BRANNAN, as personal ) representative of THE ESTATE OF ROBERT ) INDIANA, and AARON M. FREY, only in his ) official capacity as Attorney General of the ) State of Maine ) ) Defendants. ) | Civil Action No.: 2:20-cv-00262-NT |

## DEFENDANT JAMES W. BRANNAN'S TRIAL BRIEF

Pursuant to Local Rule 16.4(b), Defendant James W. Brannan ("Defendant," "the Estate," or "Brannan") hereby submits its pretrial memorandum or trial brief as follows:

## Procedural Background

When the First Circuit remanded the case, it stated as follows:

> [W]e remand so the district court can tackle the fact-intensive question (whether the parties agreed to arbitrate arbitrability of the merits dispute), which will require resolution of the intertwined concepts driving this case: *whether the 2019 Term Sheet is a superseding contract that terminated the 2008 Agreement and extinguished its arbitration provision and the obligation to continue the New York arbitration. See, e.g., Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1, 5 (1st Cir. 2008) (explaining that a "trial court may summarily enforce [a settlement] agreement, provided that there is no genuinely disputed question of material fact regarding the existence or terms of that agreement"; but, when there are genuine disputes about material facts regarding "the existence or terms of [a settlement] agreement," "the court should hold a hearing and resolve the contested factual issues"); *see also In re Estate of Snow*, 99 A.3d 278, 282, 284 (Me. 2014) (quoting *Muther v. Broad Cove Shore Ass'n*, 968 A.2d 539, 541 (Me. 2009)) (observing that "[s]ettlement agreements are analyzed as

> contracts, and the existence of a binding settlement is a question of fact"; so "in circumstances where litigants dispute whether an enforceable settlement was reached outside the presence of the court, findings of fact regarding the terms of the agreement and the parties' intent may be required"); *Marie v. Renner*, 946 A.2d 418, 420 (Me. 2008) (reasoning that the ambiguity of the record necessitated an evidentiary hearing so it could be determined whether an enforceable settlement agreement existed).

Opinion (dated November 22, 2021), at 26 (emphasis added). The First Circuit continued:

> Indeed, all of this goes to the very "conundrum" the district court identified: does the 2019 Term Sheet supersede the 2008 Agreement and specifically extinguish the arbitration provision; or is it an unenforceable writing that could not have terminated either the 2008 Agreement or its arbitration agreement? . . . Given our earlier analysis, the "conundrum" now falls to the district court to navigate.

*Id.* at 29-30.

**<u>Factual Statement</u>**

The arbitration provision in the 2008 Original HOPE Agreement, (the "Original HOPE Agreement"), has not been extinguished because there is no enforceable contract superseding that agreement. The 2019 Term Sheet is, at most, a textbook example of an "agreement to agree." It cannot be considered a full or final resolution of the dispute underpinning this action because, among other reasons, it is shot through with ambiguous terms that are not resolved within the four corners of the document and the document's very language requires that two additional agreements be negotiated before it becomes enforceable.

Moreover, Plaintiff Michael McKenzie ("Plaintiff" or "McKenzie") clearly did not think that, or act as though, he was bound by the 2019 Term Sheet. His communications in the days and months after the mediation that yielded the Term Sheet, both with the other parties and with his own attorneys, show that neither he nor his counsel thought the Term Sheet was a binding or enforceable agreement.

Finally, as Plaintiff clearly admitted in his June 9, 2022, deposition the Original HOPE Agreement is still in effect, thus foreclosing any colorable argument that the 2008 Agreement's arbitration provision was not in effect. Even if the 2019 Term Sheet were an enforceable contract, which it is not, Plaintiff has long since repudiated the Term Sheet by, among other things, violating its confidentiality and non-disparagement provisions, violating its art production provisions, and violating the general release provision.

All of these factors clearly establish that there is no binding or enforceable agreement that supersedes the Original HOPE Agreement. Thus, the 2008 Agreement's arbitration provision has *not* been extinguished, and this case should be referred back to the Arbitration Panel.

**2008 Agreement (Original HOPE Agreement)**

In 2008, McKenzie and Robert Indiana entered an Agreement for Art Editions ("the Original HOPE Agreement"), which contained the following arbitration provision:

> Any disputes will be settled by arbitration through the American Arbitration Association, governed by the laws of the State of New York.

J. Ex. 1, at 6. Indiana and McKenzie operated under the Original HOPE Agreement until Indiana died on May 18, 2018.

At about the same time as Indiana's death, arose a dispute arose between McKenzie and the Estate of Robert Indiana ("the Estate") initially in federal court for the Southern District of New York, but the parties subsequently agreed their claims should be referred to arbitration before an American Arbitration Association ("AAA") panel in New York.

**Mediation on November 25 and 26, 2019**

There was a mediation in Portland, Maine on November 25 and November 26, 2019. There were a number of parties (and their counsel) who attended the mediation, including the

3

Estate, Morgan Art Foundation, Jamie Thomas, Star of Hope, Inc. and the Maine Attorney General's Office; Michael McKenzie also attended the mediation, but he was not accompanied by his attorney, John Simoni. At the end of the second day (November 26, 2019), the attorneys for the Estate and McKenzie started to put together a term sheet. The first draft of the term sheet was circulated at 4:17 pm on the afternoon of November 26. J. Ex. 10. There were comments provided to the draft term sheet, including remotely by McKenzie's attorney, John Simoni.

**The Term Sheet**

Later that evening, Michael McKenzie (on behalf of himself and American Image Art) and James Brannan (on behalf of the Estate) executed a document entitled "Confidential and Binding Term Sheet" ("2019 Term Sheet"). This term sheet provided that:

- AIA and the Estate will enter into a new agreement ("Production Agreement") that will permit AIA the exclusive right to publish and sell authorized HOPE prints and sculptures. Features of the Production Agreement will include:

    - Duration of 10 years
    - AIA will pay the Estate 25% of AIA's gross proceeds from sales of works produced under the Production Agreement
      * * *
    - The Estate will retain certain control and information rights, including:
      * * *
        - The Estate will be notified: (a) at least ten days before a sculpture or print run is about to begin, (b) within ten days of completion of a sculpture or print run, (c) that a work has been consigned to a gallery or dealer, and (d) that work has been sold.
        - The Estate will retain itemized quarterly accountings of sales and any works in inventory

    - All works produced will be consigned as joint property of the Estate and American Image and will remain the joint property of the Estate and American Image until sold . . .
    - The Estate's rights and obligations under the Production Agreement will be transferrable to the Star of Hope, Inc. ("SOH")
    - AIA may not assign its rights or obligations
    - Other appropriate terms from the Original HOPE Agreement.

- AIA agrees that the Original HOPE Agreement is terminated.
  * * *

4

- . . . If the Expert determines that a non-HOPE work is not authentic, or that authenticity cannot be determined, such work cannot be sold and must be destroyed or delivered to the Estate.
- The Estate will take no position regarding the authenticity of BRAT . . .

* * *

- AIA and the Estate mutually release all claims against each other. AIA agrees to release any claims against James Brannan in his individual capacity and as personal representative of the Estate . . .
- The arbitration between the Estate and AIA pending in the AAA will be dismissed with prejudice.
- The Estate will provide an agreement of indemnification and defense of AIA of any and all claims against AIA by Morgan Art in the pending lawsuit . . .

* * *

- The agreement is subject to normal and customary terms of settlement, including confidentiality and non-disparagement.
- This term sheet is intended to be binding, and will be replaced by a more formal Settlement Agreement and Production Agreement. Payments, releases, dismissals and other consideration under this term sheet will be made after a more formal Settlement Agreement and Releases and Production Agreement are executed.

J. Ex. 2, at 1-3.

**The Day After The Mediation**

On the next day (November 27), Attorney Edward Boyle, counsel for the Estate, wrote to the AAA and stated: "We are pleased to report that the parties have signed a term sheet that resolves all claims and counterclaims in this action. The parties request a one-month adjournment of the December 6 telephone conference with the Panel, to allow time for the preparation and execution of the settlement agreement and related documentation." J. Ex. 14.

**McKenzie's Press Release**

On December 5, 2019, only nine (9) days after the execution of the 2019 Term Sheet, Michael McKenzie issued a press release entitled "Estate of Robert Indiana Names American Image Art Exclusive Worldwide Publisher, Fabricator and Distributor of HOPE." The press release provided, in relevant part:

> The Estate of Robert Indiana has awarded American Image Art, Robert Indiana's longtime collaborator, the worldwide Exclusive as Publisher/Fabricator and Distributor of Hope. The Estate and

5

> Star of Hope CEO, Jamie Thomas, has authenticated the monumental Indiana sculpture BRAT, as well as the seminal work WINE, two important projects Robert Indiana collaborated with American Image Art on which continue his legacy of four letter words.
>
> * * *
>
> This settlement retracted American Image Art's $30,000,000 lawsuit against The Estate and continues the collaboration between The Artist and Publisher conceived to be Art History's most powerful production ever including books, films, sculptures, prints, multiples, events, museums shows, products, licenses and international media coverage. The 25 year collaboration included numerous works of Indiana's most famous masterpieces, LOVE and HOPE, which are well positioned to be remembered as Art's most powerful messages in two different centuries.

J. Ex. 16, at 2-3. In his emails to the various recipients of the press release, including journalists, McKenzie's email subject lines were "finally the dirtbags lose" and "finally the truth comes out." *Id.*, at 1. Given that the term sheet expressly provided for a confidentiality provision and that "[t]he Estate will take no position regarding the authenticity of BRAT," the Estate demanded "a retraction email satisfactory to the Estate . . . sent to all recipients of Michael's press release by 7 p.m. [on December 6, 2019]." J. Ex. 18, at 2. Almost three (3) days later (on December 9), McKenzie sent the following: "The press release I sent you last week was premature and I am retracting it. Please disregard it. I will update you accordingly." J. Ex. 20.

**The Production Agreement and Settlement Agreement**

As set forth in the 2019 Term Sheet, the parties were required to draft both a Production Agreement and a Settlement Agreement. J. Ex. 2, at 3. On December 6, 2019, Pat Coughlan, the mediator, informed McKenzie:

> My records indicate that you, AIA and the Estate of Robert Indiana signed a "CONFIDENTIAL AND BINDING TERM SHEET" at the mediation which contemplated the preparation of a more "formal" Settlement Agreement and Production Agreement. These documents take time, and I would expect both parties to make a

6

> good faith effort to prepare such documents in a timely fashion.
>
> * * *
>
> I suggest that parties take a step back, and start drafting the necessary papers.

J. Ex. 17. Thereafter, about ten (10) days later, on December 16 and 17, 2019, Attorney Ed Boyle circulated a draft settlement agreement and a draft production agreement for McKenzie's (and his counsel's) comments. J. Ex. 25 and 26.

**<u>Plaintiff's Statements Demonstrating That The Term Sheet Was Not A Contract</u>**

There were numerous statements by both McKenzie and his counsel demonstrating that the 2019 Term Sheet was not an enforceable contract, including the following:

- "I wish you would wait until the relationship begins . . . instead of trying to convince the AG and Star of Hope now before you sign and get the indemnity protection and hopefully the Rosenbaum money and the proper chance for 10 more years of income." John Simoni, Esq. on December 17, 2019 (J. Ex. 27, at 1.)

- "[M]y guess is Morgan has agreed with Estate to wait until the settlement is finalized or collapses." John Simoni, Esq. on December 26, 2019 (J. Ex. 31, at 2.)

- "[The Estate's attorneys] purposely fail to complete a contract which as of November 26 was approximately 18 red inked in words away from completion and while delaying this likely looking to incite a problem." Michael McKenzie on December 13, 2019 (J. Ex. 24, at 2.)

- "[Y]ou wrote the entire document in 10 minutes, made a series of corrections at 5 minutes a clip and all that was left was the few here in red -- how does this take 17 days?" Michael McKenzie on December 12, 2019 (J. Ex. 22)

- "If I do not have the space to undo all the slander on my reputation all of which is based on TOTAL PROVABLE LIES this isn't an agreement; it is a swindle . . ." Michael McKenzie on December 17, 2019 (J. Ex. 28)

- "Here it appears that the 'binding agreement' can have unlimited changes and no one steps in so that means it has ZERO validity and I need to make my 1200 changes." Michael McKenzie on December 18, 2019 (J. Ex. 29 at 1.)

- McKenzie's deposition testimony on June 9, 2022 that the Original HOPE Agreement is still in effect, that the Original HOPE Agreement remains in effect until new agreements

7

are signed, and that new agreements have not been signed. *See* June 9, 2022, Deposition of Michael McKenzie ("McKenzie Dep.") 330:25-332:13.

**McKenzie's Admission That The Original HOPE Agreement Had To Remain In Place**

In his deposition, McKenzie insisted that the new Production Agreement was required to have the exact same terms as the Original HOPE Agreement. *See* McKenzie Dep. 116:4-24. Of course, the Original HOPE Agreement contained the operative arbitration provision. J. Ex. 1, at 6.

**McKenzie Refused To Agree To New Production and Settlement Agreements**

After the Estate's attorney circulated drafts of the Settlement Agreement and Production Agreement on December 16 and 17, 2019, McKenzie began a campaign dedicated to opposing express provisions contained in the 2019 Term Sheet, including that (1) the Estate would take no position on the authenticity of the BRAT work sold to Johnsonville Holdings, and (2) a neutral expert review process would be established to determine the authenticity of any "non-HOPE" works. When McKenzie's counsel finally sent a revised draft of the Settlement Agreement (almost two months after they received it), the Estate's attorney, Ed Boyle, responded on February 14, 2020:

> Your draft deviates in extreme ways from the settlement term sheet that your client McKenzie/American Image signed. You have rejected terms that were expressly required under the signed term sheet, and have added terms and language that are totally unacceptable . . . The Estate sees no option but to proceed with the arbitration.

(J. Ex. 56, at 1-2). In his response, McKenzie's attorney, John Simoni, did not dispute that the revised settlement agreement contained materially different terms than the 2019 Term Sheet. (J. Ex. 56, at 1).

## McKenzie's Conduct Rejecting/Repudiating The Term Sheet

Even if the 2019 Term Sheet could be considered an enforceable contract, McKenzie (or his agents and/or attorneys) continually conducted himself in such a fashion as to reject and repudiate any agreement represented in the Term Sheet by:

- Representing on April 7, 2020 to the Arbitration Panel that it had "jurisdiction to decide all claims and defenses asserted in [the] arbitration" J. Ex. 57, at 39.

- Attempting to assert additional claims in April-May, 2020 against James W. Brannan (who was provided a release in the 2019 Term Sheet), including slander of title, tortious interference with contract, and prima facie tort in the federal court for the Southern District of New York. *See* J. Exs. 58, 59, 60, 61.

- In January 2020, demanding discovery from the Estate and, if not responded to by February 5, 2020, threatening to "proceed aggressively with its multiple plenary actions against Kevin Lipson, James Brannan and possibly Jamie Thomas." J. Ex. 45, 51.

- Producing and selling new HOPE works without providing any notice or royalties to the Estate. See McKenzie Dep. 328:24-330:12.

- Insisting that McKenzie, not the Estate, owned the copyrights in HOPE. *See* J. Ex. 52.

In fact, McKenzie has made clear his understanding that the Original HOPE Agreement was and is in effect. *See* McKenzie Dep. 330:25-332:13.

## Statement of Law[1]

Plaintiff, the party seeking to enforce the Term Sheet, has the burden to prove the contract's existence. *Butler v. Hardy*, 576 A.2d 202, 204 (Me. 1990); *see Amica Mut. Ins. Co. v. Kingston Oil Supply Corp.*, 21 N.Y.S. 3d 318 (2015); *Kramer v. Greene*, 36 N.Y.S. 3d 448 (2016).

---

[1] The choice-of-law issue is governed by whether the Original HOPE Agreement, which provides that "[a]ny disputes will be . . . governed by the laws of the State of New York," is still in effect. If the Original HOPE Agreement is still operative, New York law controls; if not, the Court should rely on Maine law. However, from a practical perspective, on the relevant contract law principles, New York law and Maine law are similar, and Defendant has provided citations to the laws of both states.

9

**Elements of a Binding Contract**

In order to establish a contract, there must be a meeting of the minds, and an offer, proposal, or application from one side and an acceptance "conforming to the terms of the offer" on the other side and, in some cases, the contract must be in writing. *Tourtlott v. W. Bangor & Hermon Mut. Fire. Ins. Co.*, 136 A. 481, 482 (1927); *see Kasowitz, Benson, Torres & Friedman, LLP v. Reade*, 950 N.Y.S. 2d 8, 9 (2012). When courts are tasked with analyzing settlement agreements as contracts, "the existence of a binding statement is a question of fact." *Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, ¶6, 968 A.2d 539, 541-42 ; *see also McClare v. Rocha*, 2014 ME 4, ¶16, 86 A.3d 22 ("Whether a contract exists ... [is a] question [ ] of fact."); *Jabczynski v. Advanced Drying & Restoration*, 32 N.Y.S. 3d 407, 408 (2016).

**Distinction Between "Agreement to Agree" and Binding Agreement**

Courts have recognized the "distinction between a preliminary 'agreement to agree' and a binding settlement agreement." *In re Estate of Snow*, 2014 ME 105, ¶12, 99 A.3d 278, 282 (quoting *Muther*, 2009 ME 37, ¶6, 968 A.2d 539); *see generally Trolman v. Trolman, Glaser & Lichtman, P.C.*, 981 N.Y.S. 2d 86 (2014); *Pittsford Canalside Prop., LLC v. Vill. of Pittsford Zoning Bd. of Appeals*, 120 N.Y.S. 3d 533 (2020). In particular, the parties' preliminary negotiations about the terms in a future agreement do <u>not</u> constitute a contract. *McClare v. Rocha*, 2014 ME 4, ¶20, 86 A.3d 22; *Carr v. Sheehan*, 51 N.Y.S. 3d 293, 295 (2017). But, "[w]hether the parties are merely negotiating the contract, or entering into a present contract, is purely a question of intention." *McClare*, 2014 ME 4, ¶20, 86 A.3d 22*; see also Gator Hillside Vill., LLC v. Schuckman Realty, Inc.*, 73 N.Y.S. 3d 86, 87-88 (2018) (existence of a binding contract depends on the "objective manifestations of intent of the parties" rather than subjective intent of the parties). When considering the intention of parties to enter into a binding contract,

the court may consider "the language of any agreement, viewed in the light of the circumstances under which it was made, including the words 'offer' and 'acceptance.'" *In re Estate of Snow*, 2014 ME 105, ¶12, 99 A.3d 278, 282 (quoting *McClare*, 2014 ME 4, ¶21, 86 A.3d 22); *see generally Zheng v. City of New York*, 950 N.Y.S. 2d 301, 307-08 (2012) (court considers the language of program documents to ascertain the parties' contractual intent). The court may also consider

> the extent to which an express agreement has been reached on all terms to be included; whether the contract is a type that is usually put in writing; whether it needs formal writing for its full expression; whether it is a common or unusual contract; whether a standard form of contract is widely used in similar transactions; and whether either party takes any action in preparation for performance.

*McClare*, 2014 ME 4, ¶21, 86 A.3d at 29; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. c. New York's requirement of definiteness ensures that the courts cannot impose contractual obligations when parties did not actually intend to conclude a binding agreement. *Kolchins v. Evolution Markets, Inc.*, 73 N.Y.S. 3d 519, 524 (2018) (quoting *Cobble Hill Nursing Home V. Henry & Warren Corp.*, 548 N.Y.S. 2d 920 (1989)).

**Proof of a Binding Contract**

Plaintiff must establish that there was a "meeting of the minds between the parties- or 'mutual assent to be bound by all the material terms' of the contract." *Tobin v. Barter*, 2014 ME 51, ¶9, 89 A.3d 1088 (quoting *Sullivan v. Porter*, 2004 ME 134, ¶13, 861 A.2d 625); *DCR Mortg. VI Sub I, LLC v. Peoples United Fin., Inc.*, 50 N.Y.S. 3d 986, 987-88 (2017). A court might not find a settlement agreement binding if there is not a "mutual intent of the parties to be bound by terms sufficiently definite to enforce." *In re Estate of Snow*, 2014 ME 105, ¶ 11, 99 A.3d 278 (quoting *Muther*, 2009 ME 37, ¶6, 968 A.2d 539); *see Reznick v. Bluegreen Resorts*

*Mgmt., Inc.*, 62 N.Y.S. 3d 460, 463 (2017). Specifically, in situations where litigants dispute the enforceability of a settlement reached outside of court, findings of fact regarding the agreement's terms and the intent of the parties is required. *Muther*, 2009 ME 37, ¶6, 968 A.2d 539, 541-42.

"A manifestation of mutual assent, express or implied, is essential to the formation of a contract." *McClare*, 2014 ME 4, ¶20, 86 A.3d at 29 (quoting *Forbes v. Wells Beach Casino, Inc.*, 307 A.2d 210, 216 (Me.1973)); *DCR Mortg. VI Sub I, LLC v. Peoples United Fin., Inc.*, 50 N.Y.S. 3d 986, 987-88 (2017). A contract is considered enforceable if each party communicated a "distinct and common intention" to the other. *Barr v. Dyke*, 2012 ME 108, ¶13, 49 A.3d 1280, 1286 (quoting *Stanton v. Univ. of Me. Sys.*, 2001 ME 96, ¶13, 773 A.2d 1045).

**Ambiguous Terms in Contracts**

The determination of whether a contract's language is ambiguous is a question of law for the Court to consider. *See Portland Valve, Inc. v. Rockwood Sys. Corp.*, 460 A.2d 1383, 87 (Me. 1983); *Ames v. County of Monroe*, 80 N.Y.S. 3d 1724, 1725-26 (2018) (quoting *South Rd. Ass'n LLC. v. Int'l Bus. Machs. Corp.*, 793 N.Y.S. 2d 835 (2005)). Once the contract's terms have been found to be ambiguous, the meaning of ambiguous terms is a question of fact for the factfinder to determine. *InfoBridge, LLC v. Chimani, Inc.*, 2020 ME 41, ¶13, 228 A.3d 721, 725; *Scott v. Fall Line Condominium Ass'n*, 2019 ME 50, ¶6, 206 A.3d 307; *Pozament Corp. v. Aes Westover, LLC*, 812 N.Y.S. 2d 154 (2006).

A court must find a contract's language ambiguous when it is "reasonably susceptible of different interpretations." *Scott v. Fall Line Condominium Ass'n*, 2019 ME 50, ¶6, 206 A.3d 307 (quoting *Farrington's Owners' Ass'n v. Conway Lake Resorts, Inc.*, 2005 ME 93, ¶9, 878 A.2d 504); *Williams v. Village of Endicott*, 936 N.Y.S. 2d 759 (2012); *New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 809 N.Y.S. 2d 70 (2006). According to the

Restatement, courts interpret the language of a contract by "its generally prevailing meaning." RESTATEMENT (SECOND) OF CONTRACTS § 202(3)(A); *see Guilford Transp. Indus. v. Pub. Util. Comm'n*, 2000 ME 31, ¶16, 746 A.2d 910; *Edwards v. Poulmentis*, 763 N.Y.S. 2d 677, 679 (2003).

If ambiguity is found, the court may then introduce extrinsic evidence to show the intention of the parties. *Madore v. Kennebec Heights Country Club*, 2007 ME 92, ¶8, 926 A.2d 1180, 1183-84 (due to the two reasonable yet different interpretations of a contract, the court could use extrinsic evidence to clarify the intent of the parties); *Fattorusso v. RJR Mech., Inc.*, 16 N.Y.S. 3d 844 (2015). The Court also may look at the entirety of the contract to determine if the ambiguity was resolved elsewhere in the document. *Guilford Transp. Indus.*, 2000 ME 31, ¶18; *Currier, McCabe & Assoc., Inc. v. Maher*, 906 N.Y.S. 2d 129, 131 (2010).

**Repudiation of the Term Sheet**

There has been anticipatory repudiation of a contract when there is "a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." *Wholesale Sand & Gravel, Inc. v. Decker*, 630 A.2d 710, 711-12 (Me. 1993) (quoting 4 Arthur L.Corbin, Corbin on Contracts §973 (1951); RESTATEMENT (SECOND) OF CONTRACTS §250 (1979)); *see Roger Edwards, LLC v. Fiddes & Sons, Ltd*., 387 F.3d 90, 95-96 (1st Cir. 2004); *Lamarche Food Products Corp. v. 438 Union, LLC*, 115 N.Y.S.3d 436 (2019); *Fonda v. First Pioneer Farm Credit, ACA*, 927 N.Y.S. 2d 417, 419 (2011); *Condor Funding, LLC v. 176 Broadway Owners Corp.*, 46 N.Y.S. 3d 99 (2017). Generally, a request or demand to modify a contract does not on its own constitute a repudiation unless the party seeking a modification threatens to completely breach the contract. *Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 776 (Me. 1989); *see*

13

RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. b; *see generally Gen. Valuations Co. v. City of Niagara Falls*, 1 N.Y.S. 2d 880, 882 (1938).

Intent to repudiate a contract may be communicated and made through both the words and conduct of an individual. *Wholesale Sand & Gravel, Inc.*, 630 A.2d 710 at 711-12; *Fonda*, 927 N.Y.S. 2d at 419. However, the words or conduct "evidencing the anticipatory repudiation must be definite, unequivocal, and absolute." *Roger Edwards, LLC v. Fiddes & Sons, Ltd.*, 387 F.3d 90, 95 (1st Cir. 2004); *Wholesale Sand & Gravel, Inc.*, 630 A.2d at 711-12; *Lamarche Food Products Corp.*, 115 N.Y.S.3d 436, 438 (2019) (a party's expression of intent to not perform their duty must be "positive and unequivocal."). Finally, any alleged repudiation "must concern the obligations or promises going to the whole consideration." *Roger Edwards, LLC*, 387 F.3d at 95-96 (citing *Martell Bros. v. Donbury, Inc.*, 577 A.2d 334, 337 n. 1 (Me.1990)).

There, "must be a definite and unequivocal manifestation of intention [not to render performance] . . . [a] mere request for a change in the terms or a request for cancellation of the contract is not in itself enough to constitute a repudiation." *Thermo Electron Corp. v. Schiavone Const. Co.*, 958 F.2d 1158 (1st Cir. 1992) (quoting 4 Arthur L. Corbin, Corbin on Contracts § 973, at 905–06 (1951) (footnotes omitted)); *see Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 921 N.Y.S. 2d 260, 264 (2011).

**<u>Remedies for Repudiation</u>**

If a party repudiated a contract, the repudiation relieves the other party of its duty to perform. *Thermo Electron Corp.*, 958 F.2d 1158 at 1164; *see* RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. b; *Fonda*, 927 N.Y.S. 2d at 419. The Maine Law Court has ruled that a vendor who repudiated the contract excused the purchaser from having to "make a tender of the purchase price" because "[t]he purpose of a tender is to put the other party in violation. When the

other party has already repudiated the agreement, the tender would be a futile act and is not required by law." *O'Halloran v. Oechslie*, 402 A.2d 67, 70 (Me. 1979) (quoting *Dehahn v. Innes*, Me. 356 A.2d 711, 719 (1976)).; *see generally Drake v. Hodgson*, 183 N.Y.S. 486 (1920).

## Statement of Issues

1. Is the 2019 Term Sheet a valid and binding contract?

2. If the 2019 Term Sheet is a binding contract, what are its terms and does it extinguish the arbitration provision in the 2008 Agreement?

3. If the answers to Issues Nos. 1 and 2 are "yes," did Plaintiff McKenzie repudiate the 2019 Term Sheet?

4. If the answer to Issue No. 3 is "no," is the 2019 Term Sheet a violation of public policy?

The parties will submit separately their Joint Stipulation of Facts, their Joint Exhibit List, their Joint Disputed Exhibit List, and their witness lists.

JAMES W. BRANNAN,

By his attorneys,

DATED: July 11, 2022

/s/ Seth W. Brewster
Seth W. Brewster, Esq., Bar No. 3741
Alfred J. Falzone, Esq., Bar No. 6497
Counsel for Defendant James W. Brannan

EATON PEABODY
100 Middle Street
P.O. Box 15235
Portland, ME 04112-5235
(207) 274-5266
sbrewster@eatonpeabody.com
afalzone@eatonpeabody.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 11, 2022, I electronically filed Defendant Brannan's Trial Brief using the CM/ECF system, which will send notification of such filing(s) to all counsel of record.

/s/ Seth W. Brewster<br>
Seth W. Brewster, Esq.