**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| MICHAEL MCKENZIE, individually and doing business as AMERICAN IMAGE ART, an unincorporated dba,<br><br>     Plaintiff,<br><br>v.<br><br>JAMES W. BRANNAN, as personal representative of THE ESTATE OF ROBERT INDIANA, and AARON M. FREY, only in his official capacity as Attorney General of the State of Maine,<br><br>     Defendants. | CIVIL NO. 2:20-cv-00262-NT |

**PLAINTIFF'S TRIAL MEMORANDUM**

## I.     BACKGROUND

### A.  Disputes Arose on the Death of Robert Indiana

Robert Indiana was a prolific artist. Plaintiff Michael McKenzie is a long-time, highly successful art publisher and collaborator operating now though "American Image Art," his *d/b/a.* In the mid-1970's, McKenzie started collaborating with Indiana, who was part of the American "pop art" movement of the 1960s and created many notable and acclaimed works of art including his famous LOVE creation and later his HOPE creation. Thereafter, McKenzie exclusively produced versions of the HOPE sculpture under a 2008 agreement "HOPE Agreement" (Joint Exhibit 1), earning for Indiana fully $10,000,000 between 2008 and when Indiana died in 2018. The HOPE Agreement had an arbitration clause.

On his death in 2018, Robert Indiana left his entire estate, including millions of dollars of cash and many more millions of dollars of his artistic creations, to the Star of Hope ("SOH")—a

Maine-based charity operating from Vinalhaven, Maine, where Indiana had lived for many years. Shortly before Indiana's death, disputes arose between Indiana and another art producer named Morgan Art Foundation ("Morgan"), which had been producing some of Indiana's works, mostly the LOVE works. Morgan sued Indiana, McKenzie, and Indiana's assistant and caretaker, Jamie Thomas. When Indiana died, Morgan then named the Indiana Estate in his place. *See generally Morgan Art Foundation Limited v. Michael McKenzie, American Image Art, et al*, 2018-cv-04438 (S.D.N.Y.) Both the Estate and McKenzie asserted counterclaims against Morgan, and McKenzie asserted crossclaims against the Estate. By Order of October 9, 2019, based on the joint motion of the Estate and McKenzie, the judge in that case referred to arbitration McKenzie's and the Estate's claims against each other.[1]

That arbitration commenced on October 9, 2019, before the American Arbitration Association in New York. It had a very complex, labor intensive and costly planned schedule, with an estimate of legal fees rising to many millions of dollars. The Maine Attorney General intervened in Maine because: the Estate was (and still is) being probated in probate court in Rockland, Maine; the only beneficiary of the Estate is SOH, a Maine-based public charity; and the Attorney General was concerned that the mounting fees of the New York litigation would cost the Estate significant sums of money which would be left to the charity if not spent on litigation.[2] The Attorney General thus urged the parties (the Estate, McKenzie, Thomas, and Morgan) to mediate their disputes. The parties agreed.

---

[1]  The arbitration was based upon the arbitration clause in the HOPE Agreement between Mckenzie and Indiana which, after his death, bound the Estate. The other New York claims between McKenzie and the Estate on the one hand, and Morgan on the other remained in federal court. Morgan settled with the Estate, and thus what is left of the New York case are the claims between Morgan and McKenzie.

[2]  The legal costs to the Indiana Estate because of the sprawling litigation are unreasonably high. As a result, the Estate and its lawyers, under a motion by the Attorney General in probate court seeking return by the Estate of excessive fees, returned over $2,000,000 in fees.

**B. The Mediation Resulted in a Binding Term Sheet**

That mediation was held in Portland, Maine on November 25 and 26, 2019, in the mediation offices of Patrick Coughlan. It resulted in a "Binding Term Sheet" executed between the Estate and McKenzie on November 26, 2019. The Binding Term Sheet (Joint Exhibit 2) is comprehensive, including the following specific terms:

1) exclusive rights for American Image Art ("AIA") (McKenzie's d/b/a) to market the HOPE sculpture;

2) a ten-year term and specific payment (25%) to the Estate of art sales made by AIA;

3) no annual minimum royalty;

4) a limitation as to what is marketed;

5) control to the Estate as to choice of galleries and contractors to make the sculptures;

6) rights of approval vested in the Estate as to aesthetics;

7) quarterly accountings to the Estate;

8) consignment details and a method for recoupment by AIA of its production costs;

9) Transfer to SOH once the estate is probated, of all the rights and obligations conveyed by this agreement to the Estate to SOH;

10) termination of the preexisting agreement between the parties [Joint Exhibit 1];

11) destruction of a previously used signing machine;

12) a method of authenticating the genuineness of previously created sculptures;

13) shipments of certain artworks to AIA from a third-party controlled by the Estate;

14) a 40% - 60% split of past sales proceeds being held by a third party;

15) a method by which AIA can produce other, non-confusingly similar art work using the name HOPE;

16) mutual releases between the parties;

17) "[t]he arbitration between the Estate and AIA will be dismissed with prejudice";

18) indemnification by the Estate of AIA in the New York litigation; and

19) reservation to the Estate of all copyrights.

Resolving all disputes between the parties regarding past and future relations involving the Indiana artwork and its production, it also provides:

> This agreement is subject to normal and customary terms of settlement, including confidentiality and non-disparagement. *This term sheet is intended to be binding* and will be replaced by a more formal Settlement Agreement and Production Agreement. Payments, releases, dismissals and other consideration under this term sheet will be made after a more formal Settlement Agreement and Releases and Production Agreement are executed.

(Emphasis added) As it relates to the New York arbitration between the Estate and McKenzie, so final was this Binding Term Sheet that it provided that:

> The arbitration between the Estate and AIA pending in the AAA will be dismissed with prejudice.

Confirming the clear intent behind both the Binding Term Sheet and the agreement to dismiss the New York arbitration, the Estate's lawyers informed the arbitrators as follows:

> We are pleased to report that the parties have signed a term sheet that resolves all claims and counterclaims in this action.

Email from Estate Counsel to the Arbitrators (November 29, 2019) (Joint Exhibit 14).

### C.     This Action was Brought to Enforce the Binding Term Sheet

Thereafter, the parties began feuding. SOH was at the mediation with counsel but not a party to any litigation and did not sign the Binding Term Sheet, though its counsel was presented with the final version of the Binding Term Sheet before it was signed. Now, SOH has had second thoughts about the provision obligating the Estate to indemnify McKenzie in the related New York litigation and also does not like the authentication requirement. McKenzie contends that when SOH and its lawyers pondered these provisions after they had been signed, they prevailed upon the Estate to wriggle out from under the agreement, with the Estate adding additional, new

terms to the Binding Term Sheet to accomplish that goal, converting the three-page agreement into a document over 30 pages long (with more to follow, as its counsel asserted) and attempted to push McKenzie to agree to and sign off on this unfinished document but provided no indication of how many additions would be proposed, how long those additions might be, or even what the additions may include. (*See, e.g.*, Joint Exhibits 25, 26) The Estate thereafter renounced the Term Sheet, blaming its demise on McKenzie. (Joint Exhibit 56)[3]

Yet, as we will show at trial, McKenzie repeatedly sent emails to all concerned—including Mediator Coughlan, the attorneys for the Estate and the Attorney General—requesting that they hurry to send him a draft of the final settlement agreement so that he could get on with production. They did not do so. Instead, they sought a path out from the deal and a way to blame the deal's demise on McKenzie.

Accordingly, eight months after the parties had entered into the Binding Term Sheet, and after clear indications that it would not be enforced, on July 27, 2020, McKenzie found new counsel, the undersigned, and filed this action seeking a declaratory judgment that the Binding Term Sheet, as its own title states, is indeed binding, that it is subject to specific enforcement, and that it should be specifically enforced. That specific enforcement should include the provision requiring the parties to dismiss the New York arbitration. Initially, another Judge of this Court, the Honorable John A. Woodcock, ruled that whether the Term Sheet was binding was a matter for the arbitrators to decide (Dkt. No. 56) and he therefore dismissed this case without prejudice. On appeal, the First Circuit reversed and remanded, indicating that whether the term sheet was arbitrable depended upon whether it was binding, and thus terminated the

---

[3]     The Estate initially blamed McKenzie for a press release he put out (Joint Exhibit 16) but when he retracted that statement with wording agreeable to the Estate, the Estate resumed negotiations. It then, months later, simply shed pretenses and attempted to renounce the Term Sheet by laying the fault with McKenzie.

2008 Agreement and its arbitration clause, and that these issues were a matter for this Court to

decide. Specifically, the First Circuit Opinion (attached as Exhibit A to McKenzie's Status

Statement at Dkt. No. 86) gave guidance as to "What Comes Next" (*Id.*, Opinion, p. 26):

> Given our reasoning, we remand so the district court can tackle the fact intensive question (whether the parties agreed to arbitrate arbitrability of the merits dispute), which will require resolution of the intertwined concepts driving this case: whether the 2019 Term Sheet is a superseding contract that terminated the 2008 Agreement and extinguished its arbitration provision and the obligation to continue the New York arbitration. *See, e.g., Fid. & Guar. Ins. Co. v. Star Equip. Corp.,* 541 F.3d 1, 5 (1st Cir. 2008) (explaining that a "trial court may summarily enforce [a settlement] agreement, provided that there is no genuinely disputed question of material fact regarding the existence or terms of that agreement"; but, when there are genuine disputes about material facts regarding "the existence or terms of [a settlement] agreement," "the court should hold a hearing and resolve the contested factual issues"); see also *In re Estate of Snow*, 99 A.3d 278, 282, 284 (Me. 2014) ( "[s]ettlement agreements are analyzed as contracts, and the existence of a binding settlement is a question of fact"; so "in circumstances where litigants dispute whether an enforceable settlement was reached outside the presence of the court, findings of fact regarding the terms of the agreement and the parties' intent may be required")

Thus, McKenzie asks this Court to determine the enforceability of the Binding Term Sheet

against the three challenges to it advanced by the other parties. These contentions are:

(1) Whether the 2019 Term Sheet is sufficiently definite to be an enforceable contract—the Estate says no, and McKenzie says yes;

(2) Whether the Term Sheet remains enforceable in light of the Estate's contention that McKenzie somehow repudiated it, which McKenzie denies; and

(3) Whether the Term sheet is enforceable against the assertions of the Attorney General in its Answer and Defenses (Dkt. No. 89) that the Binding Term Sheet is not enforceable as a matter of public policy and because it is a "breach of charitable trust," and supposedly not in the interest of the Star of Hope. (Dkt. No. 89, p. 6).

## II.    MCKENZIE'S LEGAL CONTENTIONS

### A.  The Binding Term Sheet is What It Says It Is—"Binding"—Because the Parties Manifested an Explicitly Stated Intent to Be Bound by its Material Terms

A "party to a settlement agreement may seek to enforce the agreement's terms when the

other party refuses to comply." *Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1, 5 (1st Cir.

2008) (enforcing settlement agreement despite one party's "subjective belief that the agreement was not final"); *see also Concordia Partners, LLC v. Ward*, 2:12-CV-138-GZS, 2014 WL 3378663, at *1 (D. Me. July 9, 2014) (Singal, J.).[4] "A compromise agreement, fairly arrived at, is an enforceable contract both under Maine law and general doctrine." *Penobscot Indian Nation v. Key Bank of Mai*ne, 112 F.3d 538, 557 (1st Cir. 1997). "Settlement agreements are analyzed as contracts, and the existence of a binding settlement is a question of fact." *2301 Cong. Realty, LLC v. Wise Bus. Forms, Inc.*, 106 A.3d 1131, 1133–34 (Me. 2014) (internal citations omitted). For a settlement agreement to be binding, the parties must have mutually intended "to be bound by terms sufficiently definite to enforce." *Id.*

Both McKenzie and the Estate (through Brannan) surely intended to be bound. They both executed the agreement on November 26, 2019. The agreement alone, executed by the parties, establishes "a legally binding agreement" because the parties called it a "Binding Term Sheet" and "mutually assented to be bound by all of its material terms; the assent [is] reflected and manifested in the contract, either expressly or impliedly; and the contract [is] sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liability of the

---

[4]    This is a diversity action, and therefore the law of the forum state (Maine), including its conflict of law rule, governs the construction and enforceability of the Binding Term Sheet. *See Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 41 F.3d 764, 772 (1st Cir. 1994). The conflict of law rule in Maine follows the Restatement (Second) of Conflicts of Laws and the "most significant contacts and relationships approach in determining choice of law." *Long v. Fairbank Farms Reconstruction Corp.*, 199–201 (D. Me. 2011) (Singal, J) (citations omitted). The Restatement directs that in determining which state has the most significant contacts, courts should consider: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the places of incorporation and business of the parties. *Id.*; Restatement § 188(2) (1971). Here, the Binding Term Sheet was executed in Portland, Maine. The Indiana Estate is being probated in Rockland, Maine by Defendant Brannan, who resides there, and the only beneficiary of the Estate is the Star of Hope, located in Vinalhaven, which will receive the assets of the Estate once probate is concluded. Moreover, a substantial part of the artwork production process under the Binding Term Sheet is to be performed in Maine, and the proceeds of artwork sales sent to Maine will have a substantial impact on the Estate/Star of Hope in Maine. Maine thus has a much greater interest in the performance of the contract than any other state.

parties." *See Roy v. Danis*, 553 A.2d 663, 664 (Me. 1989). This Binding Term Sheet is more than adequately definite.

Moreover, after the parties executed the Binding Term Sheet, counsel for the Estate clearly showed its intent to be bound by promptly informing the Arbitration Panel just days after the conclusion of mediation as follows:

> We are pleased to report that the parties have signed a term sheet that resolves all claims and counterclaims in this action.

(Joint Exhibit 14). Compare that communication with, *Concordia Partners, LLC v. Ward*, 2:12-CV-138-GZS, 2014 WL 3378663, at *8 (D. Me. July 9, 2014), holding that, after a report to the court that a settlement was reached:

> the Court cannot countenance a later attempt to recharacterize clear representations that this case was settled into mere requests for more time to negotiate a settlement. Quite simply, counsel and the parties are bound by representations made to the Court, particularly when the record shows—as this record does—that extensive, thoughtful negotiation preceded those representations.

*Id.*; *Forrest Associates v. Passamaquoddy Tribe*, 760 A.2d 1041, 1043 (Me. 2000) (Authorized statements made by the agent to a third person are considered admissions of the principal).

### B. There Was No "Repudiation" or "Breach" of the Term Sheet by McKenzie

### (1) No Repudiation by McKenzie

Any disputes that arose between the parties in the process of reducing the Binding Term Sheet to a more formal document thereafter do not alter the enforceability of the Binding Term Sheet. *See, e.g.*, *Eastwick v. Cate St. Capital, Inc.*, 171 A.3d 1152, 1154–55 (Me. 2017), *modified* (Nov. 30, 2017) (affirming lower court's conclusion that memorandum of understanding was an integrated binding settlement agreement even though it contemplated the execution of further documents); *Muther v. Broad Cove Shore Ass'n*, 968 A.2d 539 (Me. 2009) (where transcript conclusively establishes the existence of a binding settlement agreement as a

matter of law, "subsequent disputes that arose while attempting to reduce the settlement to a stipulated judgment did not affect the authority of the court to enforce the agreement through the entry of a judgment incorporating the terms previously stipulated to by the parties")

McKenzie signed and initialed every page of the term sheet, including the one stating "This term sheet is intended to be binding." Nor did his actions thereafter indicate an intent to walk away. To the contrary, in the days after the term sheet was signed when he had not received the formalized format back from the Estate as expected, he wrote the arbitrator complaining that they were not acting fast enough and he was told to be patient. (Joint Exhibit 17) When the Estate's lawyers did send a draft of the agreement, it differed substantially, imposing new conditions such as a requirement to clear $2,000,000 in sales in any given two-year period (Joint Exhibits 25, 26), which contradicted the Binding Term Sheet's explicit provision that there would be no yearly minimum sales requirement. McKenzie then sent back certain suggested revisions himself. None of this back-and-forth invalidates the detailed Binding Term Sheet:

> As a general rule, a request or demand to modify a contract does not by itself constitute a repudiation unless the party seeking the modification threatens a total breach of the contract.

*Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 775–76 (Me. 1989). Moreover:

> The words or conduct evidencing the anticipatory repudiation must be definite, unequivocal, and absolute and the repudiation must concern obligations or promises going to the whole consideration.

*Roger Edwards, LLC v. Fiddes & Sons, Ltd.*, 387 F.3d 90, 95–96 (1st Cir. 2004). There must be a stated refusal to perform; nothing like that occurred here:

> To constitute an anticipatory breach justifying the Subcontractor's renunciation of the entire subcontract, the Contractor's refusals to perform must have concerned obligations or promises "going to the whole consideration, and [they] must [have been] *distinct, unequivocal, and absolute.*" 17 Am.Jur.2d *Contracts,* § 450 [emphasis added]. *See also Listman Mill Co. v. Dufresne,* 111 Me. 104, 88 A. 354, 355 (1913) (renunciation of an executory contract by one party, to enable the other

party either to accept the contract as entirely rescinded and sue immediately for damages or to wait and bring suit only when time for performance has arrived, must be "distinct and unequivocal," and not simply "an indication of an intention not to perform").

*Martell Bros. v. Donbury, Inc.*, 577 A.2d 334, 336–37 (Me. 1990). McKenzie's suggestions coming when they did as possible counterproposals to the changes proposed by the Estate were not repudiations under Maine law.

### (2) No Breach by McKenzie

Nor was McKenzie's conduct a breach of the Term Sheet. He did not "disparage" the Estate in violation of the Binding Term Sheet's provision that the parties would agree to "normal and customary terms of . . . non-disparagement." He sent a one-line transmission email attaching a description of his continued distribution of HOPE sculptures, and this cover email stated "finally the dirt bags lose." (Joint Exhibit 16) This was not aimed at the Estate, the only party who has standing to assert the Term Sheet's non-disparagement clause. The single disparaging sentence in the cover email was rather aimed at another party in the SDNY litigation (Morgan) who had disparaged McKenzie and his work while (as the Estate itself had alleged in its New York pleadings) cheating Indiana, McKenzie's longtime collaborator and friend.[5] That AIA was going to be able to continue with HOPE productions was a blow—a loss—to Morgan. It was certainly not a loss for the Estate because AIA had made $10 million for Indiana, which the evidence will show. (Exhibits 100, 114) Meanwhile, according to the Estate's assertions in the

---

[5]     As McKenzie alleged in his counterclaim in the New York federal action (Exhibit 65), the damaging claims made against him by Morgan included "factually and legally frivolous copyright, trademark, tortious interference with contract, Visual Artists Rights Act, unfair competition, and defamation claims against McKenzie and his company, American Image Art." New York Action, ECF 91, p. 3. McKenzie alleges that Morgan tried to stifle the sale of new works he published with McKenzie." *Id.*, ECF 91-37. Thus, Morgan were the so-called losers, because McKenzie was continuing with HOPE marketing despite Morgan's wrongdoing. As for the Estate's allegations against Morgan, as will be shown at trial: there were serious allegations of fraud, and that is what McKenzie was referring to when he used the term "dirtbags."

New York action, Morgan had set up a swindling operation by selling Indiana works it produced back to its agent, Simon Salama-Caro, for 10 cents on the dollar, which cheated Indiana by only paying royalties on the ten percent price, before Morgan could then resell that art piece at the real market value, without accounting to Indiana for the large price difference. *See* Estate's New York Counterclaims (Exhibit 104).

It is completely illogical that this "dirt bag" comment would have been made in reference to the Estate because McKenzie had just secured a ten-year right to market HOPE sculptures. More than that, McKenzie attached to that email a glowing press release bragging that he (*d/b/a* AIA) would continue marketing HOPE. It defies all logic and plausibility that McKenzie would call the party gaining from his sales under this new agreement, meaning the Estate, a "dirtbag."

Nor was the press release attached to the "dirtbag" email a breach of "normal confidentiality terms." Compare the Term Sheet's confidential provision ("[t]his agreement is subject to normal and customary terms of settlement, including confidentiality and non-disparagement" see *infra* at 4) to the scant details offered in the press release (Joint Exhibit 16). This hardly spills the beans. It gives no details about the commercial arrangements, normally kept secret for commercial reasons. It announces only those matters that could not really be kept secret—AIA's ongoing marketing of HOPE—which would be a necessity for both parties to announce to avoid distrust in McKenzie's continued marketing efforts after the Estate's claims against him so that both parties could make money. The announcement that a case has settled is almost always a normal disclosure, even if some terms remain undisclosed. The majority of the press release describes the positive working history between McKenzie and Indiana, about which

the term sheet is silent. These threadbare public statements are not the stuff of a material breach under Maine law:

> We apply traditional contract principles to determine if a party has committed a material breach. ... A material breach "is a non-performance of a duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." ... [internal citations omitted]

*Associated Builders, Inc. v. Coggins*, 1999 ME 12, ¶¶ 6–8, 722 A.2d 1278, 1280–81.

> "The manifestation of an intention to repudiate a contract may be made and communicated by either words or conduct. The words or conduct evidencing such refusal or inability to perform, however, must be definite, unequivocal, and absolute."

*Wholesale Sand & Gravel, Inc. v. Decker*, 630 A.2d 710, 711–12 (Me. 1993).

> To constitute an anticipatory breach justifying the renunciation of the entire contract, the refusals to perform must have concerned obligations or promises "going to the whole consideration, and they must have been distinct, unequivocal, and absolute."

*Martell Bros. v. Donbury, Inc*., 577 A.2d 334, 336–37 (Me. 1990). As to other items in the draft press release, McKenzie retracted it. There is no showing of any prejudice here. We expect the evidence to show that the claimed "breach" by the email and press release was the pretext deployed by the Estate to back out of the deal because its beneficiary, SOH, wanted it to do so.

Nor did McKenzie breach by later engaging in arbitration and pursuing other claims against the Estate because as of that point, the Estate had cut off formalizing the settlement as required by the Binding Term Sheet and McKenzie was forced to engage in litigation to avoid defaulting in those proceedings. This is not a repudiation. Indeed we're here because he did not repudiate and still seeks to enforce the Binding Term Sheet.[6]

### C. The Attorney General's Laments about the Term Sheet Do Not Render It Unenforceable

---

[6]     Other than arguing repudiation by McKenzie, the Estate has put forth no argument or evidence to support the other affirmative claims asserted in their Answer (Dkt. No. 88).

While the Attorney General now complains that SOH was not consulted about the Binding Term Sheet, it was not a party to the litigation. Moreover, the Attorney General was present at the mediation through Assistant A.G.s Linda Conti and Christina Moylan. So was SOH, through CEO Larry Sterrs and its attorneys, who were both actually presented with the Binding Term Sheet in its final form *before* it was signed. That they made no attempt to make any changes to it before it was signed truly dispenses with this belated complaint.

The mud that the Estate and the AG now try to throw at McKenzie is truly a pretext. None of it is relevant to the matters the First Circuit has sent to this Court to determine. Simply put: they do not like the deal the Estate struck. That will be shown by the way they have ignored the serious allegations (Exhibit 104) made *by the Estate* against Morgan that dwarf the overblown allegations they now make against McKenzie. The Estate made claims in the New York action that millions of dollars of art sales proceeds that should have been paid to Indiana were instead hidden by Morgan and taken for Morgan's own profits. Despite this serious allegation, SOH is seemingly comfortable honoring the production contract it has now made with Morgan, while it has prevailed upon the Estate to attempt to renege on the Binding Term Sheet.

Yet in contrast to Morgan's fraud on Indiana, during the ten years from 2008 and 2018 that McKenzie worked with Indiana producing HOPE sculptures, he made Indiana $10,000,000. McKenzie wants to keep this going. It will be left for the Attorney General to explain why this history and promise of success is any threat to a charity, particularly when the AG ignores the serious allegations against Morgan of which SOH has been fully aware and claims to now investigate.

The AG also asserts that the Binding Term Sheet is somehow "against public policy." "A contract is unenforceable as violating public policy in Maine only if it violates a well-defined

and dominant policy that may be ascertained from the law and legal precedent." *State Farm Mut. Auto Ins. Co. v. Koshy*, 995 A.2d 651, 665 (Me. 2010) (*citing Court v. Kiesman,* 2004 ME 72, ¶ 11, 850 A.2d 330, 333 ("A contract is against public policy if it clearly appears to be in violation of some well established rule of law, or that its tendency will be harmful to the interests of society")). Nothing in the Binding Term Sheet comes close to this requirement. As *Koshy* also notes in this regard, parties have "considerable latitude" in their freedom to contract. *Id.*

Moreover, the Estate itself raises another issue concerning the Attorney General's standing to assert any challenge. When asked if he believed he put the SOH at risk by entering the Binding Term Sheet, in light of the Attorney General's current challenge to the Term Sheet, Mr. Brannan testified: "No. It was still an estate matter. It doesn't become a Star of Hope matter until I distribute it." Deposition of Brannan, p. 75. Indeed, the Estate argued in the *Morgan* case (Dkt. No. 362) that the SOH does not have any present ownership interest or rights in any specific property that is currently held by the Estate, or that the Estate will receive in the future and will not until it is distributed by the Estate.

The Estate's argument tracks Maine law. *See* Me. Rev. Stat. tit. 18-C, § 3-101; *see also Clark v. Clark*, 219 A.3d 1020, 1022 (Me. 2019). This expectancy interest in an undistributed estate "does not . . . carry with it actual title either in whole or in part to any particular asset of the estate." *Reardon v. Whalen*, 306 Mass. 579, 581 (1940). SOH's expectancy interest does not enable the SOH to bind or limit the Estate; nor can the AG, standing in place of the SOH.

As personal representative, Brannan's powers and responsibilities are governed by the Maine Uniform Probate Code ("Probate Code") under which Brannan is vested with complete "power over title" to Indiana's estate. Me. Rev. Stat. tit. 18-C, § 3-711. Comments to the Probate Code explain that the personal representative "is given the broadest possible 'power over title,'"

which is "conceived to embrace *all possible transactions which might result in a conveyance or encumbrance of assets, or in a change of rights of possession*. The relationship of the personal representative to the estate is that of a trustee." *See id.* Unif. Probate Code cmt. (emphasis added). Brannan may dispose of, "manage, develop, improve, exchange, partition, change the character of, or abandon" Estate assets provided he is acting reasonably "for the benefit of interested persons." *See* Me. Rev. Stat. tit. 18-C, §§ 3-711, 3-709, 3-715(3), (6). Brannan has sole and exclusive authority to prosecute, defend, and settle claims brought by or against the Estate. *See id.* § 3-813 (personal representative "may, if it appears for the best interest of the estate, compromise" any claim "presented" against the estate); *Nevin v. Union Tr. Co.*, 726 A.2d 694, 701 (Me. 1999) (beneficiaries did not have standing to bring a malpractice lawsuit against decedent's estate planning attorneys).

Even if the Attorney General has standing to challenge the Term Sheet on behalf of the SOH and its expectancy interest, Mr. Brannan appropriately determined that approving all terms and executing the Binding Term Sheet at the 2019 mediation to settle litigation with McKenzie and enable McKenzie to continue producing Indiana artwork while paying a percentage of proceeds to the Estate was in the best interest of the Estate. *Cf. In re Est. of Dineen*, 2006 ME 108, ¶ 6, 904 A.2d 417, 420 (affirming record supported lower court finding that the actions of the personal representative were motivated by a desire to benefit the estate and to preserve its assets in accordance with his fiduciary duties and powers).

The Binding Term Sheet should be enforced.

Dated: July 11, 2022                    Respectfully submitted,

                                        /s/ *John J.E. Markham, II*
                                        John J.E. Markham, II (Maine BBO No. 2674)
                                        /s/ *Bridget A. Zerner*
                                        Bridget A. Zerner (*Pro Hac Vice* – MA 669468)

MARKHAM & READ
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax: (617)742-8604
jmarkham@markhamread.com
bzerner@markhamread.com

-and-

908 Maine Street
Waldoboro, Maine 04572
Tel: (207) 790-8049

## CERTIFICATE OF SERVICE

I, John J.E. Markham, II, do hereby certify that on July 11, 2022, I served a copy of the foregoing on all counsel of record via the CM/ECF filing system.


*/s/ John J.E. Markham, II*
John J.E. Markham, II