## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| MICHAEL MCKENZIE, individually and doing business as AMERICAN IMAGE ART, an unincorporated dba, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: 2:20-cv-00262-NT |
| v. | ) ) ) | |
| JAMES W. BRANNAN, as personal representative of THE ESTATE OF ROBERT INDIANA, and AARON M. FREY, only in his official capacity as Attorney General of the State of Maine | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANT ATTORNEY GENERAL'S POST-TRIAL BRIEF

In accordance with the Court's instruction at the close of trial as reflected in the Courtroom Minutes: Trial Proceedings (Doc. 138), Defendant Aaron M. Frey in his capacity as Attorney General of the State of Maine ("Attorney General") hereby submits his post-trial brief. The Attorney General joins in full Defendant James W. Brannan's Post-Trial Brief and submits this supplemental Post-Trial Brief relative to his affirmative defenses.

As the Attorney General outlined in his Pre-Trial Brief, the Confidential and Binding Term Sheet ("2019 Term Sheet" or "Term Sheet") is unenforceable because it is contrary to public policy. *See State Farm Mut. Auto. Ins. Co. v. Koshy*, 2010 ME 44, ¶ 41, 995 A.2d 651, 665 (contract is unenforceable "if it is illegal, contrary to public policy, or contravenes the positive legislation of the state.") In Maine, a contract is contrary to public policy "if it clearly appears to be in violation of some well established rule of law, or that its tendency will be harmful to the interests of society" *Id.* at ¶ 42; (quoting *Court v. Kiesman,* 2004 ME 72, ¶ 11,

850 A.2d 330, 333).  To determine whether a contract is contrary to public policy, the court will "balance the freedom of the parties to contract against the detriment to society that would result from enforcement of that contract." *Id*.  Well-established Maine law reveals a strong public policy in favor of protecting charitable assets and charitable beneficiaries.  This policy is found in statute: "[t]he Attorney General shall enforce due application of funds given or appropriated to public charities within the State and prevent breaches of trust in the administration of public charities," 5 M.R.S.A. § 194(2), as well as common law, *see Fitzgerald v. Baxter State Park Auth.*, 385 A.2d 189, 194 (Me. 1978) ("It is long-established law, coming down from at least as early as Elizabethan England, that 'the community has an interest in the enforcement of (charitable) trusts and the Attorney General represents the community in seeing that the trusts are properly performed.'" (quoting 4 A. Scott, The Law of Trusts, § 391 at 3002 (3d ed. 1967)).

Contracts will be unenforceable if they violate public policies that were intended to protect the interests of third parties who were not directly engaged in the formation of the contracts at issue. *See Riemann v Toland*, 2022 ME 13, ¶ 41, 269 A.3d 229, 241 *("*when the best interest of a child is at issue, the freedom to contract does not outweigh the detriment that could result from enforcement of a premarital agreement's provision waiving attorney fees"); *Court*, 2004 ME 72, ¶¶ 13-14, 850 A.2d at 333-334 (contract between parents that was intended to circumvent the child support modification process violated public policy intended to protect the best interests of the child); *Lehigh v. The Pittston Co.*, 456 A.2d 355, 361 (Me. 1983) (contract between city and private party for sale of municipal airport violated public policy intended to protect the interests of the public for whose use and benefit the airport had been expressly dedicated).

The Star of Hope, Inc. ("Star of Hope"), a Maine charitable corporation and the sole beneficiary of the Estate of Robert Indiana ("Indiana Estate" or "Estate"), was established during Robert Indiana's lifetime for the purpose of promoting Mr. Indiana's artistic legacy. As the sole beneficiary of the Indiana Estate, the Star of Hope will succeed to any surviving contracts to which the Estate is a party when the Estate is closed, including the 2019 Term Sheet that is the subject of this action, if the Court rules that the Term Sheet is an enforceable contract.

Evidence adduced at trial demonstrates that the 2019 Term Sheet is harmful to the Star of Hope and would impose significant burdens on the fledgling charity whose interests were not adequately considered when the Term Sheet was executed by Mr. McKenzie and Personal Representative Brannan. Furthermore, Mr. McKenzie's communications during and following the mediation reinforce the Star of Hope's concerns about the impact of the 2019 Term Sheet if it were implemented and the perils of entering into a business relationship with Mr. McKenzie. Those concerns are further validated by the evidence showing numerous examples of Mr. McKenzie's disregard both for negotiated terms of agreements and for the truth. Those burdens to the Star of Hope and concerns about future dealings with Mr. McKenzie reflect a contract that would be detrimental to the charity, and contrary to the public policy of protecting charitable assets, and thus render the contract unenforceable. The Star of Hope is precisely the type of third-party beneficiary that should be protected against the harms of a contract to which it is not a party and as to which it had no meaningful opportunity for input.

The Court does not need to reach this issue, however, unless it first determines that the 2019 Term Sheet is an enforceable agreement that has eliminated the arbitration requirement of the original Hope Agreement and has not been repudiated by Mr. McKenzie.

3

I. **Enforcement of the 2019 Term Sheet Would Have a Detrimental Impact on the Star Hope, a Maine Charity.**

    A. **The Terms Are a Bad Deal for the Star of Hope.**

Lawrence Sterrs, chairman of the board of the Star of Hope, Tr. 214:19-21, testified that the Term Sheet is a "bad deal" for the Star of Hope.

> The truth of the matter is this – that term sheet, it doesn't matter who authored it or signed it, it's a bad deal for the Star of Hope Foundation, period. And it doesn't matter that it was Mr. McKenzie who signed it or the Estate or -- and there's been a lot of, you know, contention here about the personalities involved. And for me, you know, the agreement was going to go beyond all the personalities. The agreement was going to go to the Star of Hope Foundation and it would have to manage it. And I'm not going to be there; somebody's going to have to manage this thing. And it would have been a very difficult thing for that organization to do given its current condition.

Tr. 245:23-246:10.

Mr. Sterrs has a strong basis for his opinion – he has served for the last 20 years as CEO of nonprofit Unity Foundation, which provides free management consulting to nonprofit organizations, and has a financial background as chairman of the board of Camden National Bank and Camden National Corporation. Tr. 215:23-216:5. He was recruited by the Maine Attorney General's Office to assist with the then-struggling Star of Hope because of his earlier involvement with the Attorney General's Office in turning around a large nonprofit. Tr. 214:25-215:8. Mr. Sterrs, who has received no compensation for his work with the Star of Hope, Tr. 247:14-24, jokingly referred to himself as "the poster child" for the expression "no good deed goes unpunished" due to the litigation affecting the Star of Hope during his tenure. Tr. 216:13-21. Mr. Sterrs described various terms within the 2019 Term Sheet that would impose significant financial and administrative burdens on the fledgling charity, thereby impeding Star of Hope's ability to perform its intended charitable functions for the public's benefit.

4

### 1. Indemnification

Among the specific provisions of the Term Sheet that would have a substantial

deleterious effect on the Star of Hope is the requirement that the Estate will agree to indemnify

and defend Michael McKenzie/American Image Art ("AIA") as to any and all claims against

Michael McKenzie/AIA by Morgan Art Foundation Limited ("Morgan Art") in *Morgan Art*

*Foundation Limited v. Michael McKenzie, American Image Art, Jamie Thomas, and Robert*

*Indiana*, Case No. 1:18-cv-4438-AT-BCM ("the SDNY Action"), Joint Ex. 2.

> the more financially difficult one is the indemnification that the Estate provided to
> Mr. McKenzie for litigation that was going on at the time and is still going on.  It
> has no clarity, it's a big black hole, there's no numbers, there's no limits, there's
> no caps, it doesn't talk about what exactly is being indemnified, which legal fees
> we are talking about.  Does it include judgment?  This could have been – this
> could be a lot of money.  And, again, this deal, while it's written between the
> Estate and Mr. McKenzie, this deal ends up the responsibility of the Star of Hope
> Foundation, and the Star of Hope mission is not – is not expressly cared about in
> this term sheet at all.  And it would be difficult to manage; it would be difficult to
> – to cover legal fees for litigation that has been and still goes on today.

Tr. 239:15-240:5.

The legal fees incurred and yet to be incurred by McKenzie associated with the SDNY

Action are undoubtedly in the multiple millions of dollars.  The litigation has been actively

litigated for four years and a couple of months Tr. 460:8-16, during which time Mr. McKenzie

has been represented by three law firms, Tr. 460:17-19.  While refusing to acknowledge what

"protracted litigation" meant, Tr. 465:12-13, Mr. McKenzie did admit that the case has involved

"[l]ots of nonsense, lots of paperwork, lots of phone calls, lots of emails, lots of everything.  Lots

of taking up valuable time in my life that I could have been making money for the Star of Hope."

Tr. 466:5-8.  Mr. McKenzie would not confirm without consulting his bookkeeper how much he

had paid in fees on the SDNY Action to date, guessing that he paid none of the firms more than

(or had paid less) than half a million.  Tr. 461:4-12; Tr. 461:20-462:6; Tr. 496:22-23.  And while

refusing to characterize the amount he had spent in legal fees over the last four years as a "large number," he did testify that it "would probably make me sick so I try not to think about that." Tr. 463:9-18.  Moreover, the attorneys' fee spigot will remain open if Mr. McKenzie loses the SDNY Action because he would take an appeal if he loses his case, which would generate even more legal fees to be borne by the Star of Hope.  Tr. 466:9-17.

Unlike Mr. McKenzie, Personal Representative Brannan was able to more confidently estimate the amount he had incurred in legal fees on the same litigation, testifying that the fees he incurred were approximately $11 million to date,[1] Tr. 576:20-22, approximately half of which was attributable to the Estate's litigation with Morgan and half of which is attributable to the Estate's case against McKenzie.  Tr. 579:24-580:9.  This frame of reference casts doubt on the accuracy of Mr. McKenzie's speculation about the amount of his total fees in the SDNY Action.

As to the financial exposure from a potential judgment against McKenzie in the SDNY Action, the Court could reasonably infer from the extended litigation with multiple millions in fees incurred by various parties that any judgment would be in the many millions range, otherwise it would not be worth the fight and the cost to date.  And Mr. Brannan himself was concerned about the impact of this indemnification provision on the charity when he entered into it because "if the case was not settled it could be a significant amount of money to the -- that the Star of Hope would lose out on."  Tr. 592:9-13.

### 2.  Authentication.

Another aspect of the Term Sheet that is problematic for the Star of Hope is the term governing authentication of non-HOPE works.  Joint Ex. 2.  Mr. Sterrs, who is not an art expert, came to understand after consulting an expert that the authentication term was not a reasonable

---

[1]  This amount would be reduced by the Attorney General's action in Maine probate court to recover excess compensation, which led to a settlement totaling approximately $2 million, Tr. 222:6-11, still leaving approximately $9 million in legal fees incurred.

investment of time that was going to result in anything beneficial for the charity.  Tr. 237:16-19,
280:3-12.  Mr. Sterrs testified that authentication was "not desirable," had "issues and
problems," that it "could lead to potential litigation," "can be expensive" and, while "doable,"
would have been "difficult to manage."  Tr. 237:17-23.  He called it "risky business," Tr. 237:25,
and not consistent with the mission of the foundation.  Tr. 285:24-25.  Mr. Sterrs also found
McKenzie's inconsistency in agreeing to the authentication term and then saying it was "crazy"
confusing and problematic.  Tr. 285:13-18.

### 3.  No minimum annual royalty payment

Unlike the original Hope Agreement between Mr. Indiana and Mr. McKenzie, the Term
Sheet made no provision for minimum annual royalty payments.  Joint Exs. 1 & 2.  The absence
of such a term was also a concern for Mr. Sterrs on behalf of the Star of Hope.  Tr. 238:25-239:5.
He testified that it would be important for the Star of Hope to have some source of future
revenue.  Tr. 256:1-2.  Mr. Brannan also had some concerns about the lack of a minimum annual
royalty provision in the Term Sheet, testifying "I knew that the Star of Hope was going to need
money and I was concerned about that."  Tr. 591:13-25.

### B.  The Star of Hope Has Legitimate Concerns About Having a Business Relationship with McKenzie.

#### 1.  McKenzie's threatening and disparaging emails during mediation and negotiation periods, which ultimately were directed at the Star of Hope.

Mr. Sterrs expressed concern about numerous emails that Mr. McKenzie sent during and
in the months following mediation.  He was "struck" and "surprised by" emails that Mr.
McKenzie sent during the Maine mediation that ultimately resulted in the Term Sheet.  Tr.
253:21-254:15; Joint Ex. 8 (McKenzie email to Star of Hope counsel and Attorney General: "the
criminally false charges Mr. Lipson authors using conjecture against a granite mountain of facts

can only be viewed as an ill-advised method of keeping a meritless case going at a total risk to

Star of Hope while profiting Lipson, Brannan, et al.") and Joint Ex. 9 (McKenzie email to Star of

Hope counsel accusing Mr. Lipson of "ill-advised bellicose behavior to continue to line his and

Mr. Brannan's pockets").  Mr. Sterrs testified that he was concerned because he believed

everyone was at the mediation to act in good faith, and that this kind of communication "doesn't

appear to me to be something that is greasing the skids of settlement if you're saying these kind

of things about the people you're trying to negotiate a deal with while you're negotiating a deal

with them."  Tr. 254:16-24.

Mr. Sterrs was also concerned when Mr. McKenzie issued a press release about the Term

Sheet within days of the mediation that was "not quite accurate."  Tr. 256:12-257:4.  After seeing

the press release, and some of the other McKenzie communications, in December 2019, Mr.

Sterrs had concerns about a future business relationship with Mr. McKenzie.  Tr. 257:15-19.

And Mr. McKenzie's concerning emails continued.  Later in December 2019, Mr. McKenzie

sent another email to Star of Hope counsel accusing Mr. Lipson and Mr. Brannan of misdeeds

that troubled Mr. Sterrs:

> [W]e're finished with the mediation, we're working on implementation of the
> agreements that we participated in and executed, we're working on the
> negotiations with Morgan.  We're seeing press releases and e-mails that are
> troubling as it relates to the -- to the term sheet and what was actually -- what was
> actually there and what were some of the meanings.  And I -- and I recalled at this
> point, you know, there's a long form agreement that's required by the term sheet,
> and I'm beginning to wonder how that's ever going to happen because there's
> clearly still consternation and anger going on here and accusations which, again, I
> -- I was concerned were not going to lead to a very comfortable negotiation
> settlement process.

Tr. 258:19-259:7; Joint Ex. 21.

Mr. Sterrs also testified about his concern regarding multiple additional emails from Mr.

McKenzie during the timeframe following the November 2019 mediation through February

8

2020. *See, e.g.*, Joint Ex. 24 (December 13, 2019, Mr. McKenzie rant against Lipson, Brannan

and Estate team); Tr. 259:17-21.  Mr. McKenzie sent numerous similar emails in December

2019. *See, e.g.* Joint Exs. 27-32.  As to a December 30, 2019, email from Mr. McKenzie to Star

of Hope counsel (Joint Ex. 32) accusing Estate Attorney Lipson of being "a horrible person and a

liar and everyone hates him," "a dirtbag," "a liar and a swindler," who "even swindles his own

clients and lies under oath," Mr. Sterrs explained his concerns about becoming the target of Mr.

McKenzie's anger:

> I was becoming concerned that -- whether or not Mr. McKenzie would be able to perform
> on an agreement if one was ever reached with the Estate and then handed off to us.  There
> seemed to be a lot of anger; there seemed to be a lot of resentment; there seems to be a lot
> of accusations.  You know, I guess I imagined us falling victim to that as well if we
> pursued some sort of relationship with Mr. McKenzie.  And frankly it -- you know,
> businesses love consistency, whether they're nonprofit or for profit.  They love things
> they can count on, and relationships with people who provide funding to the foundation
> are important relationships to be stable and clear.  And I was afraid that this was going to
> be difficult between the Star of Hope and AIA.

Tr. 261:8-21.

Beginning in January 2020, Mr. McKenzie's threats became more explicitly aimed at the

Star of Hope and its representatives.  Joint Ex. 49 (McKenzie email of January 27, 2020: "Unless

I hear back from Venable and Star of Hope with a response I find reasonable with seven days,

that is by Monday . . . I will proceed against all for various charges, including tortious

interference and fraud in multiple courts.  Further, I will utilize a major PR firm for press

coverage for the same in venues both in print and television to clear my name and the 45-year

reputation of my firm and myself . . . such complaints will be filed jointly, severally, and

personally against Brannan, Lipson, Venable, Star of Hope, and Jamie Thomas.")  Mr. Sterrs

testified that he became concerned because the Star of Hope was being directly threatened by

Mr. McKenzie with claims:

My recollection was this was the first open threat, open and very direct threat to the Star of Hope.  The others I -- I interpreted them that way, but this was very direct and very clear about what his -- what Mr. McKenzie's intentions were. And so, again, I'm concerned about here we go again.  While -- on the one hand Mr. McKenzie over the years has chastised the Estate for costing the Star of Hope countless dollars in unnecessary litigation, and yet here he is prepared to do the exact same thing.  So at this point I became concerned about, again, what that would mean for the Star of Hope, what does that mean for our legal expenses, what does that mean relative to the term sheet, all of the concerns somebody trying to run a nonprofit organization should have had.

Tr. 271:9-23.

In early February 2020, Mr. McKenzie wrote another threatening email to representatives of the Star of Hope that concerned Mr. Sterrs at the time and still concerns him.  Tr. 272:7-273:1, Joint Ex. 53 (McKenzie February 7, 2020, email to Seth Brewster, et al.: "given the massive evidence against Lipson and Brannan, et al., for not merely disgusting fees but destroying federal evidence, hiding federal evidence, tampering with federal witnesses, bribing federal witnesses, sanctions for discovery violations, more sanctions coming and fraud served jointly, personally, and severally your silence is hiding your hiding will be exposed.  Your exposure will put you on the caption and your money won't hold up against the massive damages I will assert.  Perhaps you weren't there when I said in Maine that anyone I found who is just running fees and essentially stealing from Star of Hope I would sell art, real estate, stocks, and whatever it takes to destroy each and every one of them and then chase them through bankruptcy and file criminal charges. I am not letting you free on silence so you better come forward soon or it won't be a pleasant life for you as a defendant.").[2]

---

[2]  Mr. McKenzie's conduct at trial also validates Star of Hope's being reticent about a future business relationship.  At one point, Mr. McKenzie accused cross-examining counsel of lying, Tr. 433:24, and also referred to the questioning of him as "bullshit.  Tr. 449:15 and 21.

### 2.  Mr. McKenzie is not credible or reliable.

Mr. McKenzie's trial testimony included multiple contradictions and other indicia casting doubt on his credibility.  Mr. McKenzie initially testified that his reference to "dirtbags" in an email transmitting the post-mediation press release refers to Morgan.  Tr. 54:20-55:1, 55:22-24, Joint Ex. 16.  Mr. McKenzie testified that he was not attempting to disparage the Estate, but rather to work with them.  Tr. 54:24-25.

Both Estate Attorney Boyle and Personal Representative Brannan had interpreted the reference to "dirtbags" in the email as referring to Mr. Brannan and the Estate lawyers, among other reasons because Mr. McKenzie refused to shake Attorney Lipson's hand at the mediation, saying "I don't touch dirtbags."  Tr. 146:2-5, 540:14-541:7.  Mr. McKenzie did eventually acknowledge that "dirtbag" refers to Estate Attorney Kevin Lipson, Tr. 438:10-20, and repeatedly referred to Mr. Lipson as a dirtbag, *see, e.g.*, Joint Ex. 27, Tr. 442:4-17.

Mr. McKenzie also refused to acknowledge the obvious truth that his press release announcing a settlement with the Estate after the November 2019 mediation was inaccurate.  A plain reading of the press release, Joint Ex. 16, and the Term Sheet it purports to describe, Joint Ex. 2, shows that Mr. McKenzie's press release wrongly indicates that the Estate had awarded Mr. McKenzie's business the worldwide exclusive as publisher, fabricator, and distributor of HOPE, that Jamie Thomas was CEO of Star of Hope, and that Mr. Thomas and the Estate had authenticated BRAT and WINE.  Tr. 146:9-16 ("flatly inconsistent with the term sheet"), Tr. 538:7-16.[3]

Mr. McKenzie testified that there was "nothing in this press release that is false or misleading" and that it is "completely and totally accurate" "until someone tells me differently ... and says you can't do it."  Tr. 119:11-19.  When confronted on cross-examination with the fact

---

[3]  Additional communications were also "just full of falsehoods."  Tr. 153:15-19, Joint Ex. 27.

that the only people who could actually opine on accuracy were Estate representatives who were not included on the distribution list, McKenzie explained "I wasn't up to accuracy yet.  I was still looking for accuracy" and "that was just a quickly written draft." Tr. 420:24-421:18.  Yet, he acknowledged that the document does not indicate that it is a draft, Tr. 422:18, and that it was distributed to members of the press and gallery owners.  Tr. 420:19-22.

Mr. McKenzie attempted to justify his inaccurate representation of the Estate's position on the authentication of BRAT with "[b]ut it's overruled by Thomas" and "Indiana had already been paid," Tr. 116:1-7, and testified that he understood that Mr. Sterrs was the head of Star of Hope while he dismissed the press release's false portrayal of Thomas as Star of Hope CEO with verbal gymnastics: "I didn't indicate he was current."  Tr. 116:8-16.  Mr. McKenzie's actions and testimony reflect a complete disregard for terms that he had just agreed to and lack of concern for whether or not his press release was truthful.[4]

Mr. McKenzie's subsequent incomplete retraction of the inaccurate press release, and insistence that he did completely retract it, further reflect Mr. McKenzie's disregard for the deal that he had just struck and for the truth.  Joint Ex. 20.  Mr. McKenzie testified: "even though I thought it was a stupid thing I did it anyway," Tr. 58:6-7, and that it was "exactly the – to the comma what he [referring to Estate Attorney Mr. Boyle] asked me to send out."  Tr. 58:14-17. However, a comparison of what Estate Attorney Boyle had requested of Mr. McKenzie and what Mr. McKenzie actually sent demonstrates that Mr. McKenzie's testimony that he sent exactly what the Estate requested was false.  Joint Ex. 19.  Mr. McKenzie did not issue the retraction that the Estate had requested because he omitted the part about the original press release being

---

[4]  As discussed in detail in the Estate's Post-Trial Brief, Mr. McKenzie also backed away from multiple key terms in the Term Sheet during the period of negotiating the formal agreements required by the Term Sheet, reinforcing his disregard for the negotiated terms.  This disregard is consistent with Mr. McKenzie's track record of throwing important legal documents in the garbage.  Tr. 32:11-33:2 (relative to the cease and desist letter from Personal Representative Brannan, Joint Ex. 3).

inaccurate and also sent it to fewer than all of the recipients of the original press release.  Tr. 150:1-5, 540:11-13.

Mr. McKenzie's disregard for the terms in agreements he enters into is also reflected in his attitude about the confidential nature of the Term Sheet and the import of its terms.  He admitted that he did not care about the confidentiality requirement.  Tr. 105:24-106:8 (from deposition testimony and not disputed).

Also, Mr. McKenzie testified that he agreed to the Term Sheet provision that the copyrights in the HOPE image were reserved to the Estate even though it was a "meaningless, air-headed provision" that had been placed in the original HOPE agreement "[b]y airheads who wrote it in."  Tr. 109:1-16.  Mr. McKenzie also "couldn't care less" about the authentication provisions, Tr. 107:1-14, that he agreed to and then tried repeatedly to eliminate after the mediation.  *See, e.g.*, Joint Ex. 35 and Tr. 156:17-25; 157:11-14; Joint Ex. 55 and Tr. 75:21-76:24, 168:21-25.  Further, Mr. McKenzie agreed to the requirement in the Term Sheet to enter a new production agreement, even though the term was "written by someone who doesn't understand what they're talking about.  It's problematic," and yet he did not bother to strike it out.  Tr 107:24-108:16.

In short, the evidence shows that Mr. McKenzie has a track record of not respecting or honoring terms or truthfully describing terms he has agreed to, which is a legitimate red flag for the charity who would be saddled with the business relationship if the Term Sheet were deemed enforceable.[5]

---

[5] Moreover, Mr. McKenzie's supposed motive of "saving" Star of Hope, Tr. 444:12-13, 445:15-17, and helping it and preventing it "from committing suicide," Tr. 76:1-8, and making sure it succeeds, Tr. 444:19-445:1, is belied by his confirmation that he is seeking to hold the Estate liable for $500 million. Tr. 446:5-12.

Finally, that Mr. McKenzie takes credit for the Attorney General's charges of excessive compensation resulting in an approximately $2 million repayment truly stretches the bounds of credulity. *See, e.g.*, Tr. 99:4-6 "([T]hey were running up fees that were frightening. And if I hadn't stepped in those fees would still be going as we sit here today."), Tr. 474:11-12. The evidence is clear that neither the Attorney General nor the Star of Hope even responded to Mr. McKenzie, much less engaged with him about this issue. Tr. 283:17-21, 473:25-474:5.

## II.   The Star of Hope Had No Meaningful Opportunity for Input Before the Binding Term Sheet Was Signed.

While the evidence is not entirely consistent on whether representatives of the Star of Hope actually saw a signed or unsigned version of the ultimately signed Term Sheet, it is undisputed that the Star of Hope did not participate in the drafting of, or even learn of the existence of, the Term Sheet until it was essentially a done deal. *See, e.g.*, Tr. 233:18-234:1.

It is also unrefuted that Mr. Sterrs first became aware of the Term Sheet late in the afternoon on the second day of mediation. Tr. 228:18-24. It is unrefuted that the Term Sheet was circulating for signature when Mr. Sterrs first saw it. Tr. 229:15-16, 229:21-230:2.

And while he could not recall definitively whether the Term Sheet was signed when he and his lawyer first saw it, Tr. 229:15-16, 230:1-4, Mr. Sterrs did recall that there was a question about the status of the Term Sheet the response to which was: it was done and Mr. Brannan could not talk about it because he was concerned he was no longer represented. Tr. 230:6-10. Both Attorneys Lipson and Boyle had to leave the mediation before the term sheet drafting was completed. Tr. 529:18-530:3. Attorney Boyle testified that he believed that he showed the Term Sheet to Star of Hope lawyer Nat Putnam while in the Estate's room, who provided one or two comments, and that Attorney Boyle was "pretty" confident it was the McKenzie Term Sheet,

14

though he qualified that recollection with "it's possible that I'm remembering comments on the Jamie Thomas term sheet." Tr. 326:16-327:1.

When reminded of his deposition testimony that the Term Sheet had not been signed when it was passed across the table to his attorney, Mr. Sterrs responded, in part: "we weren't parties to it, we weren't asked about it, so I don't know what value it would have been for me to – nobody was interested in hearing what we had to say about it, so I don't know what value it would have been for me to pipe up about it." Tr. 230:12-231:3. When asked whether he attempted to find someone to ask more about the terms, Mr. Sterrs replied:

> I -- I think -- I think maybe I need to clarify the timing for you. We didn't even know there was a conversation going on, let alone a term sheet, until it was a done deal. So -- and that was late in the day on the second day, so there was no -- in my view there was no time to be -- to go seek out parties and find out what was going on. It was made clear to me that this was a done deal and that was that. So there wasn't any effort to engage us to, here it is, take a look at it before we signed it or anything like that.

Tr. 233:16-234:1.

Mr. Sterr's impression that his input would be futile is borne out not only by the timing of his first look at the Term Sheet – late in the second day when Personal Representative Brannan's New York lawyers were on their way out the door – but also by Mr. Brannan's informing Mr. Sterrs at the mediation "that he did not need our permission to do what he was doing." Tr. 242:3-10. Mr. Brannan himself admitted telling Mr. Sterrs, whom he believed was talking down to him, that Mr. Brannan did not come to ask for his permission. Tr. 594:2-4. Mr. Sterrs also agreed with an earlier declaration of Attorney Brewster to the same effect. Tr. 244:21-245:5. So whether or not the Term Sheet was actually signed when Mr. Sterrs and his lawyers saw it at the mediation bears little relationship to whether they had a meaningful opportunity for input.

Had the Star of Hope had a seat at the table, the terms would likely have been much less onerous for the charity:

> I think the Star of Hope's involvement would have been very helpful to everybody in what I will call the operational areas. You know, it's pretty easy to write something down when you don't have to do it. So we would have been able to lend some credibility and some – express some concern about how the Star of Hope would or would not be able to manage the term sheet and all the pieces of it.
>
> It was not -- it is not part of the foundation's mission, and I don't think it ever will be, to get into the manufacturing or the supervision of manufacturing or anything like that. We already spoke about the authentication. You know, I just think the Star of Hope would have been – even though the Estate had the authority to do it, it would have been good form to ask us because we were the ones who were going to have to manage it and implement it.

Tr. 251:25-252:14.

In conclusion, for the reasons discussed above, the 2019 Term Sheet is in contravention of public policy and unenforceable on that basis. The Court does not need to reach this issue, however, unless it first determines that the 2019 Term Sheet is an enforceable agreement that has eliminated the arbitration requirement of the original Hope Agreement and has not been repudiated by Mr. McKenzie. As shown in Defendant James W. Brannan's Post-Trial Brief, those issues should be decided against the Plaintiff.

<div style="margin-left: 40%;">

AARON M. FREY
ATTORNEY GENERAL OF THE
STATE OF MAINE

</div>

DATED:  August 18, 2022          /s/ Christina M. Moylan
                                             Christina M. Moylan
                                             Assistant Attorney General
                                             Office of the Attorney General
                                             6 State House Station
                                             Augusta, ME 04333-0006
                                             Tel. (207) 626-8800
                                             christina.moylan@maine.gov

                                             Counsel for Attorney General Aaron M. Frey

16

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2022, I electronically filed Defendant Attorney General's Post-Trial Brief using the CM/ECF system, which will send notification of such filing(s) to all counsel of record.

/s/ Christina M. Moylan
Christina M. Moylan