## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| MICHAEL MCKENZIE, individually and doing business as AMERICAN IMAGE ART, an unincorporated dba, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: 2:20-cv-00262-NT |
| v. | ) ) | |
| JAMES W. BRANNAN, as personal representative of THE ESTATE OF ROBERT INDIANA, and AARON M. FREY, only in his official capacity as Attorney General of the State of Maine | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### DEFENDANT JAMES W. BRANNAN'S POST-TRIAL BRIEF

Pursuant to the Court's Order, Defendant James W. Brannan ("Defendant," "the Estate," or "Brannan") hereby submits its post-trial memorandum as follows:

## I.   SUMMARY

The First Circuit summarized the issue for this Court as follows:

> [D]oes the 2019 Term Sheet supersede the 2008 Agreement and specifically extinguish the arbitration provision; or is it an unenforceable writing that could not have terminated either the 2008 Agreement or its arbitration agreement?

Opinion (dated November 22, 2021), at 29-30. The core issue therefore is: what is the current status of the 2008 original HOPE Agreement ("2008 HOPE Agreement") and its arbitration clause? After three days of testimony (and receiving numerous exhibits), Defendant Brannan submits that the Court should reach the following factual/legal conclusions.

1.    Based on Michael McKenzie's own testimony, the 2008 HOPE Agreement is still in effect, which includes its arbitration provisions. Tr. 81:19-21; 82:19-23; 90:23-91:2; 96:17-21; 436:13-437:10.

2.    The 2019 Term Sheet is an unenforceable "agreement to agree," which by its own terms,

required further negotiations on both a Settlement and a Production Agreement.

3. After November 26, 2019, the conduct of both parties reflected that there was not a final agreement because they continued to negotiate both terms on the Production Agreement and the Settlement Agreement as well as terms in the 2019 Term Sheet.

4. By his conduct after November 26, 2019, McKenzie rejected and repudiated the terms of the 2019 Term Sheet.

5. By his filings in the Southern District of New York Action, as well as statements in the Arbitration, and in his other post-mediation, conduct, McKenzie should be barred from asserting that there is an enforceable settlement agreement.

## II.     FACTUAL STATEMENT

### A. Background

Robert Indiana was a painter, sculptor, and visual artist who died on May 19, 2018. Joint Stipulation of Facts ("J. Stip.") ¶ 1. Prior to his death, Robert Indiana resided on the island of Vinalhaven, Maine. J. Stip. ¶ 2.

Defendant James Brannan is an attorney licensed to practice in the State of Maine. His principal place of business is in Rockland, Maine. J. Stip. ¶ 3. On May 7, 2016, Indiana executed a Last Will and Testament that had been prepared by James Brannan at Indiana's direction. *Id.* ¶ 4. Robert Indiana's Last Will and Testament named Star of Hope, Inc. ("Star of Hope") as the sole beneficiary of Indiana's estate. Star of Hope is a Maine charitable corporation formed at Indiana's direction during his lifetime. Its mission includes the promotion of Indiana's artistic legacy. *Id.* ¶ 5. On May 25, 2018, the Probate Court for Knox County, Maine appointed James Brannan as the Personal Representative of Indiana's estate ("Brannan" or "the Estate"). *Id.* ¶ 7.

Michael McKenzie is an art publisher doing business as American Image Art. J. Stip. ¶ 8. Michael McKenzie's residence and principal place of business is in Katonah, New York. *Id.* ¶ 9. American Image Art ("AIA") is a sole proprietorship having no have corporate form. *Id.* ¶ 10.

B. **The 2008 HOPE Agreement**

On or about August 11, 2008, McKenzie and Robert Indiana entered an Agreement for Art Editions ("the 2008 HOPE Agreement"), J. Stip. ¶ 11, which contained the following arbitration provision:

> Any disputes will be settled by arbitration through the American Arbitration Association, governed by the laws of the State of New York.

Joint Exhibit 1, at 6 ("J. Ex."). The 2008 HOPE Agreement granted McKenzie the right to produce and sell certain two- and three-dimensional artworks based upon the *HOPE* design, in colors, media, sizes, and editions specified by Indiana. J. Stip. ¶ 12. In addition to the original HOPE Agreement, on or about September 28, 2010, McKenzie and Indiana both signed an agreement titled "Robert Indiana/American Image: Addendum to Hope Contract"; on or about September 1, 2011, McKenzie and Indiana both signed an agreement titled "Addendum to Hope Contract"; on or about October 4, 2011, McKenzie and Indiana both signed an agreement titled "Hope Wine"; and on or about March 31, 2012, McKenzie and Indiana both signed an agreement titled "Addendum to Agreement." *Id*. ¶ 13. Except for the agreements identified in Joint Exhibit 1, there were no other signed, written agreements between Indiana and McKenzie from August 11, 2008 to Indiana's death on May 19, 2018. *Id*. ¶ 14.

C. **Litigation History**

On May 18, 2018, Morgan Art Foundation Ltd. filed an action in the U.S. District Court for the Southern District of New York against Michael McKenzie, American Image Art, Jamie Thomas, and Robert Indiana entitled *Morgan Art Foundation Limited v. Michael McKenzie, American Image Art, Jamie Thomas, and Robert Indiana*, Case No. 1:18-cv-4438-AT-BCM ("the SDNY Action"). J. Stip. ¶ 15. After Robert Indiana's death, James Brannan, as personal representative of the Estate of Robert Indiana, became a defendant in that case. *Id*.

On August 3, 2018, McKenzie and AIA filed cross-claims against James Brannan in the SDNY Action. J. Stip. ¶ 16. On October 9, 2018, the court in the SDNY Action ruled that the claims between Michael McKenzie/AIA and James Brannan should proceed in arbitration, and an arbitration was commenced in New York entitled *James W. Brannan v. Michael McKenzie and American Image Art*, Case No. 01-19-001-9789 ("the AAA Arbitration"). *Id*. ¶ 17. In the AAA Arbitration, which was filed in 2019, both the Estate and McKenzie/AIA asserted claims against each other; McKenzie/AIA filed their counterclaims on August 22, 2019. *Id*. ¶ 18.

**D.  Estate's Notice of Termination to McKenzie**

On May 9, 2019, Brannan (in his capacity as Personal Representative of Indiana's Estate) sent by email and first-class mail, and McKenzie received, a notice of termination letter stating that all agreements between Indiana and McKenzie had been terminated. J. Stip. ¶ 19. As set forth in Joint Exhibit 3, the Estate's termination was based on McKenzie's "multiple material breaches." J. Ex. 3, at 2. Trial Transcript 125:17-126:7 ("Tr."). The Estate did not get a response to this termination notice from McKenzie. Tr. 126:13-15. After receiving no response to the notice or to the follow-up letters, Mr. Brannan instructed his attorneys to "commence an arbitration against Mr. McKenzie and American Image Art in the AAA, consistent with the terms of the arbitration agreement and the HOPE Agreement." Tr. 127:7-10.

**E.  Mediation on November 25 and 26, 2019**

The Maine Attorney General has oversight authority over Maine charitable institutions and non-profits, including the sole beneficiary of Indiana's will, Star of Hope. J. Stip. ¶ 20. In its oversight capacity for Star of Hope, the Attorney General expressed concern that the mounting costs of the SDNY Action and the AAA Arbitration could impair the future of Star of Hope and urged the parties to mediate their disputes. *Id*. ¶ 21.

4

On November 25 and 26, 2019, McKenzie and Brannan attended a mediation conducted by Patrick Coughlan in Portland, Maine. J. Stip. ¶ 22. Also present at this mediation were personnel and legal counsel representing Jamie Thomas, Morgan Art Foundation Ltd., Star of Hope, and the Attorney General of the State of Maine. *Id.* McKenzie's attorney, John Simoni, was not present at the mediation. *Id.* The mediation was conducted at the Preti Flaherty offices in Portland, Maine. Tr. 131:22-25.

From the Estate's perspective, there were three different opposing parties at the mediation: the Morgan Art parties, McKenzie/AIA, and Jamie Thomas. Tr. 132:14-133:1. As Attorney Edward Boyle, prior counsel for the Estate, described it, "[t]here were three different groups that [the Estate] would have been negotiating with separately from each other." Tr. 133:12-13.

### F.  <u>Mediation – Day One (November 25, 2019)</u>

As Attorney Boyle testified "not much" happened on the first day of the mediation. Tr. 132:1-5. Mr. Brannan testified similarly as follows:

> Mr. Coughlan was the mediator. He gathered us together in a conference room at Preti Flaherty. He introduced himself and told us that . . . we would be in break-out rooms and that he would be meeting with us and that – gave us a pep talk . . . . [a]nd I don't think I saw Mr. Coughlan again that day. We might have seen him just for a few minutes.

Tr. 526:23-527:5.

Later in the evening of November 25, 2019, after the first day of the mediation, <u>before</u> the Estate even started to negotiate with him, McKenzie wrote an email to the mediator entitled "Kevin Lipsom [sic] is a lying swindling dirtbag holding this up to make money." J. Ex. 7. This email, sent at 9:02 p.m., contains a cascade of disparaging remarks about both Kevin Lipson, the Estate's then-attorney, and James Brannan, its personal representative. *See* J. Ex. 7, at 1-2.

### G.  Mediation – Day Two (November 26, 2019)

In fact, McKenzie continued to send his caustic, disparaging emails about both the Estate and the Estate's attorneys at approximately noon of November 26, 2019, which were sent before the negotiations between McKenzie and the Estate even commenced. *See* J. Exs. 8, 9.

Starting at 1:00 p.m. on November 26, 2019, Mr. Brannan told the Estate's attorneys, Kevin Lipson and Ed Boyle, to find Jamie Thomas and try to settle with him. Tr. 527:10-13. Approximately two hours later, the Estate had resolved a term sheet with Jamie Thomas. Tr. 527:19-21. Brannan testified that the Thomas term sheet was done before 4:00 p.m. Tr. 529:2-3. It is important to note that, as Brannan testified, the Thomas term sheet "was a framework of what was going to be the final agreement . . . . [I]t was going to require more work to be done, . . . and it was done . . . . [I] think it was like Christmas Eve we executed the . . . final agreement." Tr. 528:10-14.

Afterward, Brannan similarly instructed his then-attorneys to "see if they could have any luck with Michael McKenzie." Tr. 528:16-18. Starting at 4:17 p.m. on November 26, 2019, a draft term sheet was circulated between the Estate's attorneys and John Simoni, McKenzie's then-attorney, who did not attend the mediation in person. J. Ex. 10. Both Kevin Lipson and Ed Boyle had to leave the mediation before the term sheet was completed. Tr. 529:18-530:3. One of the Estate's other then-attorneys, Sig Schutz, continued the drafting process. *Id.* There were additional term sheet drafts circulated at 5:48 p.m. and 5:52 p.m. on November 26, 2019. *See* J. Exs. 11 and 12.

### H.  Presence of the Mediator

As Attorney Boyle testified, while the mediator had arranged for the Estate and McKenzie to meet, Mr. Coughlan neither participated in nor was present for the actual

negotiations. Tr. 134:14-18. Rather, there were direct discussions between the Estate's attorneys and Oz Gonzalez, who was McKenzie's representative at the mediation. Tr. 134:19-21. Mr. Brannan also testified that "I was told that there was no sign of Mr. Coughlan." Tr. 531:6-7.

## I.  **The Term Sheet**

On November 26, 2019, near the conclusion of the mediation session in Portland, Maine, Brannan and McKenzie memorialized certain terms of a prospective settlement in a "Confidential and Binding Term Sheet Between Michael McKenzie, individually, and as agent of American Image Art (together "AIA") and the Estate of Robert Indiana (the "Estate")." J. Stip. ¶ 23. As both Mr. Boyle, the attorney who negotiated the Confidential and Binding Term Sheet ("2019 Term Sheet" or "Term Sheet"), and Mr. Brannan, the personal representative of the Estate who executed the Term Sheet, testified, they believed that it was an "agreement to agree," not a final agreement. Tr. 138:1-3; Tr. 532:9-19. Attorney Brannan testified as follows:

> It was . . . the framework for an agreement with the highlights, bullet points placed in it, and those issues would be part of the final agreement. But there was work to be done. It was an agreement to negotiate in good faith to get to the end of this case.

Tr. 532:15-19. Attorney Boyle elaborated as follows:

> Well, so if you look at the first bullet point here it says AIA, which is a defined term meaning Mr. McKenzie and American Image Art, AIA and the Estate will enter into a new agreement called a production agreement. That – and then describes what the terms will be in that production agreement. So there's a – there's an executory component here. The parties have to negotiate, draft, finalize, and execute a production agreement. And these are some of the terms. These are what I would call the key terms. But then if you look at what these key terms are, they themselves are not final. For example, if you look at the fifth sub bullet point it says, the Estate will retain certain control and information rights, including.

> So the reason that we wrote including is because we certainly wanted these, but between the time that this term sheet was drafted and the time that we put together the final production agreement, we wanted to make sure that we had enough time to reflect and think about what are the other controlling information rights that the Estate would need for this – for this deal. So this was an open-ended concept in a

7

sense. It says here are control and information rights that will be included, but there may be others as well. So that's one example.

If you move through – down through the document, the last sub bullet point, and this is near the top of Page 2, says that the production agreement will include other appropriate terms from the original HOPE agreement. So, again, it doesn't specify what those terms would be. That would have to be developed through further negotiations, but this is a marker that makes clear that these sub bullet points are not it. There will be other terms that go into this production agreement.

And then – and this is – this is probably I think where it's set forth the most clearly – the last bullet point, and this is at the bottom of Page 3, says this term sheet is intended to be binding and will be replaced by a more formal settlement agreement and production agreement. And then says payments, releases, dismissals, and other consideration under this term sheet will be made after a more formal settlement agreement and releases and production agreement are executed. And this is our way of making clear that none of the consideration that the parties have set forth in this term sheet was going to pass until we had that final settlement agreement and that final production agreement signed.

Tr. 138:21-140:15. Attorney Boyle also noted that the term sheet language "subject to normal and customary terms of settlement" was "a marker . . . saying that there will be additional terms that go into a settlement agreement, and we call them normal and customary terms, but there will be additional terms that we have not spelled out here." Tr. 141:6-10. Finally, Attorney Boyle testified that the provision "AIA agrees that the original HOPE Agreement is terminated," is "part of the consideration that would pass upon the execution of the settlement agreement and production agreement." Tr. 142:11-14. Mr. Brannan also testified that there needed to be two new future agreements: a production agreement and a settlement agreement, that needed to negotiated, drafted, and executed. *See* Tr. 533:10-534:7.

Furthermore, McKenzie also clearly admitted the termination of the original HOPE agreement was "pending the two or three days they were supposed to take to finish the document, which they never did. I never got a finished document." Tr. 433:6-8.

**J.** __The Day After The Mediation__

On the next day (November 27), Attorney Boyle, then-counsel for the Estate, wrote to the AAA and stated: "We are pleased to report that the parties have signed a term sheet that resolves all claims and counterclaims in this action. The parties request a one-month adjournment of the December 6 telephone conference with the Panel, to allow time for the preparation and execution of the settlement agreement and related documentation." J. Ex. 14. Attorney Boyle testified that his November 27, 2019, email was consistent with his view that the 2019 Term Sheet was <u>not</u> a final contract because, if it were, he "would have told the case manager that the action could be dismissed." Tr. 144:1-2. Moreover, Attorney Simoni, who was McKenzie's attorney, also agreed to the one-month adjournment. *See* J. Ex. 14.

**K.** __Evidence Demonstrating That the Term Sheet Was Not a Final Contract__

- On December 6, 2019, in response to McKenzie's email about the Term Sheet and the finality of the settlement agreement, the mediator wrote as follows:

> My records indicate that you, AIA and the Estate of Robert Indiana signed a "CONFIDENTIAL AND BINDING TERM SHEET" at the mediation which contemplated the preparation of a more "formal" Settlement Agreement and Production Agreement. These documents take time, and I would expect both parties to make a good faith effort to prepare such documents in a timely fashion.

> To the extent BOTH parties want me to assist in mediating any disagreements over such documents, I would be pleased to do so.

> I suggest the parties take a step back, and start drafting the necessary papers.

J. Ex. 17, at 1. In response to McKenzie's protests that he was told that the Term Sheet "was the final agreement," the mediator instructed him to "[p]lease review the agreement with your lawyer." *Id.*

- On December 12, 2019, McKenzie wrote an email, stating as follows:

"[Y]ou wrote the entire document in 10 minutes, made a series of corrections at 5

> minutes a clip and all that was left was the few here in red – how does this take 17 days????????"

J. Ex. 13. To this email, McKenzie attached a draft of the Term Sheet with red edits, which was different than the executed version of the Term Sheet, as depicted in Joint Exhibit 2. *See* J. Ex. 13, at 2-4. As Attorney Boyle testified, "the changes that were made by hand on this document . . . changed material terms that were in that final version of the term sheet, and my understanding from those changes was that Mr. McKenzie was trying to renegotiate." Tr. 152:8-12.

- On December 13, 2019, McKenzie wrote another email in which he made a number of statements asserting that the Term Sheet was not final, including the following:

  o "[The Estate's attorneys] purposely fail to complete a contract which as of November 26 was approximately 18 red inked in words away from completion and while delaying this likely looking to incite a problem." J. Ex. 24, at 2.

  o "I'm setting a deadline of December 17 to have this document – which gives three weeks to write 18 words, less than a word a day. At that point, I . . . will . . . continue to follow the only agreement legally signed and sanctioned by a judge in Supreme Court." J. Ex. 24, at 2.

  o McKenzie testified that he was referring here to the 2008 HOPE Agreement, which is the agreement that he would continue to follow. Tr. 96:17-21.

- On December 17, 2019, Attorney John Simoni expressly advised McKenzie as follows: "I wish you would wait until the relationship begins . . . instead of trying to convince the AG and Star of Hope now before you sign and get the indemnity protection and hopefully the Rosenbaum money and the proper chance for 10 more years of income." J. Ex. 27, at 1. Attorney Simoni was involved, albeit remotely, in the drafting the Term Sheet. *See* J. Exs. 10, 11, 12.

- On December 26, 2019, Attorney Simoni informed McKenzie as follows: "my guess is Morgan has agreed with the Estate to wait until the settlement is finalized or collapses." J. Ex. 31, at 2.

- On January 9, 2020, there was a telephone conference between both counsel and

parties about the Term Sheet (and changing the provisions of the Term Sheet). *See* J. Ex. 35, at 2-3; Tr. 157:4-19. On January 15, 2020, Attorney Boyle wrote an email that summarized the points of the January 9 call, in which he concluded: "We hope this helps bring us back to negotiating a Settlement Agreement and Production Agreement, consistent with the signed term sheet, so the dispute between our clients can be resolved as was agreed. We look forward to your response." J. Ex. 41, at 2.

- On January 21, 2020, Attorney Simoni wrote a letter to Attorney Boyle, in which he stated: "I am following up on the January 17, 2020, email exchanges attempting to resolve the impasse on terms needed for a prosperous continuing Star of Hope Foundation." In the same email, McKenzie makes discovery demands of the Estate, despite the provisions of the Term Sheet. J. Ex. 45. Attorney Boyle admitted that the parties were at an impasse, Tr. 160:25-160:4, and testified that such discovery demands were inconsistent with the existence of a settlement agreement. Tr. 160:11-14.

- On January 22, 2020, John Simoni wrote an email to Assistant Attorney General Moylan stating that "[w]e are at a serious impasse with the Estate." J. Ex. 46, at 3. On the same day, Attorney Boyle responded and outlined the impasse, stating that "Mr. Simoni's client is now trying to back out of these terms." J. Ex. 46, at 1.

- On January 27, 2020, McKenzie wrote another email and a letter to Matthew McLaughlin, who was the partner in charge of the Venable law firm's New York Office. J. Ex. 49. In this letter, McKenzie demanded discovery and threatened to bring additional claims against the Estate, Venable, and Star of Hope, among others. *See* J. Ex. 49, at 4938-4939. Attorney Boyle testified that "[t]his letter was incredibly inconsistent with the concept that there was a settlement by this point." Tr. 164:6-9.

- On January 28, 2020, Attorney Simoni wrote another letter to Attorney Boyle demanding discovery and threatening that, "if the demanded items are not provided by February 5, 2020, AIA advises it will have no choice but to proceed aggressively with its multiple plenary actions against Kevin Lipson, James Brannan and possibly Jamie Thomas." J. Ex. 51.

- On February 3, 2020, Attorney Boyle responded and stated "[t]he Estate understands these communications to be a repudiation of the Binding Term Sheet by Mr. McKenzie and American Image Art, and will act accordingly. If our understanding is incorrect, then please respond to that effect in an unequivocal writing." J. Ex. 52. Attorney Boyle testified that he never received the required unequivocal writing that McKenzie was not repudiating the Term Sheet. Tr. 165:16-18.

- On February 14, 2020, nearly two months after receiving the draft Settlement Agreement and Production Agreement, Attorney Simoni forwarded proposed changes to the drafts. *See* J. Ex. 55. As Attorney Boyle testified, these proposed changes were inconsistent with the provisions of the Term Sheet. Tr. 166:14-169:23.

- Also on February 14, 2020, Attorney Boyle responded, stating that "[y]our draft deviates in extreme ways from the settlement term sheet that your client McKenzie/American Image signed." J. Ex. 56, at 1-2. Attorney Boyle concluded: "Based on this draft and your client's other communications and actions since the term sheet was signed, the Estate understands that McKenzie/American Image has repudiated the signed settlement term sheet. The Estate sees no option but to proceed with the Arbitration." J. Ex. 56, at 2.

**L. McKenzie's Press Release**

On December 5, 2019, only nine (9) days after the execution of the 2019 Term Sheet, Michael McKenzie issued a press release entitled "Estate of Robert Indiana Names American

Image Art Exclusive Worldwide Publisher, Fabricator and Distributor of HOPE."[1] The press release provided, in pertinent part:

> The Estate of Robert Indiana has awarded American Image Art, Robert Indiana's longtime collaborator, the worldwide Exclusive as Publisher/Fabricator and Distributor of Hope. The Estate and Star of Hope CEO, Jamie Thomas, has authenticated the monumental Indiana sculpture BRAT, as well as the seminal work WINE, two important projects Robert Indiana collaborated with American Image Art on which continue his legacy of four letter words.
>
> * * *
>
> This settlement retracted American Image Art's $30,000,000 lawsuit against The Estate and continues the collaboration between The Artist and Publisher conceived to be Art History's most powerful production ever including books, films, sculptures, prints, multiples, events, museums shows, products, licenses and international media coverage. The 25 year collaboration included numerous works of Indiana's most famous masterpieces, LOVE and HOPE, which are well positioned to be remembered as Art's most powerful messages in two different centuries.

J. Ex. 16, at 2-3. In his emails to the various recipients of the press release, including journalists, McKenzie's email subject lines were "finally the dirtbags lose" and "finally the truth comes out." *Id.*, at 1. At trial, Attorney Boyle articulated numerous concerns and inaccuracies in the press release, including a violation of confidentiality, disparagement of the Estate, and misrepresentations about the provisions of the Term Sheet. Tr. 145:3-147:3. Attorney Brannan also testified that it had a number of false statements. Tr. 538:1-539:3. Almost immediately, on December 6, 2019, Attorney Boyle contacted to Attorney Simoni to seek a retraction of the press release. J. Ex. 18, at 4. At 5:27 p.m. on December 6, 2019, Attorney Boyle wrote the following to Attorney Simoni:

> To be clear, if a retraction email satisfactory to the Estate is not sent to all recipients of Michael's press release by 7 p.m. ***today***, the term sheet is revoked. Your client's violation of his confidentiality obligations, his mischaracterizations of the term sheet, and his refusal to correct these errors in a timely way, are

---

[1] Although McKenzie testified that it was a "draft" or a preliminary letter, Tr. 118:8-12, 119:17, Mr. Brannan testified that he received a phone call from either the *New York Times* or the *Portland Press Herald*, and the reporter asked for Brannan's comments on the press release. Tr. 537:13-18.

> substantial and material breaches. What's more, they have led to the Estate and Star of Hope, Inc. to doubt whether any future relationship with American Image is possible. In addition, please note that the Estate will be forced take its own corrective action if your client does not.

J. Ex. 18, at 2. There was no retraction on December 6, 2019. Tr. 148:8-13; Joint Ex. 18, at 1.

Almost three (3) days later (on December 9), McKenzie sent the following: "The press release I sent you last week was premature and I am retracting it. Please disregard it. I will update you accordingly." J. Ex. 20. As Attorney Boyle testified, McKenzie had taken out the word "inaccurate" from Attorney Boyle's proffered retraction, which "from a substantive perspective that was the most important thing." Tr. 150:2-3. Moreover, the retraction "only went to some of the recipients of the December 5 press release." Tr. 150:4-5; Tr. 540:11-13 (Brannan testifying that "[w]e never did get a complete retraction.").

## M. **The Production Agreement and Settlement Agreement**

As set forth in the Term Sheet, the parties were required to draft both a Production Agreement and a Settlement Agreement. J. Ex. 2, at 3. On December 16 and 17, 2019, Attorney Boyle circulated a draft settlement agreement and a draft production agreement for McKenzie's comments. *See* J. Exs. 25, 26. In fact, Attorney Simoni stated on December 20, 2019, "I thought that I would be sending over comments [on the draft agreements] today but I am not." See J. Ex. 102, at 2. As an explanation, McKenzie had instructed Attorney Simoni to get the mediator involved. Tr. 429:10-12.

## N. **McKenzie's Representations to the Arbitration Panel**

On April 7, 2020, there was a preliminary hearing before the Panel in the AAA Arbitration. Attorneys Boyle and John Vazquez participated in the hearing on behalf of the Estate; Attorneys John Simoni and Beverley Baek participated on behalf of McKenzie/AIA. J. Ex. 57, at 39; Tr. 171:5-15. At the hearing, McKenzie's counsel confirmed that the Arbitration

Panel had jurisdiction to decide all claims and defenses. J. Ex. 57, at 39; Tr. 171:16-172:5. In fact, McKenzie's counsel did not even mention that there was a settlement agreement that precluded the arbitration. Tr. 172:2-5 (Boyle testifying "I don't recall that.").

**O.  McKenzie's Representations to the Court in the SDNY Action**

Later, on April 23, 2020, McKenzie filed documents in the SDNY Action seeking to amend his claims against the Estate to add claims of slander of title, tortious interference with contract, and prima facie tort. *See* J. Ex. 58, at 5; J. Ex. 59, at 74-77; J. Ex. 60; J. Ex. 61. Those filings occurred approximately five (5) months after the Term Sheet was executed. As Attorney Boyle testified, these filings were inconsistent with both the provisions of the Term Sheet and the notion that there was a final settlement. Tr. 173:7-14. Moreover, Attorney Boyle also testified that the Complaint in the above-captioned Action (filed on July 26, 2020) was inconsistent with McKenzie's position asserted only three months earlier in the SDNY Action. Tr. 173:19-25.

**P.  The Status of the New York Arbitration**

Regarding the amount of work left to do in the AAA Arbitration, as Attorney Boyle testified, "it's almost done, until it was stayed because of the First Circuit decision." Tr. 174:3-4. Closing argument is "the only thing that has to happen before the panel could get the case." Tr. 174:15-20.

**Q.  Performance/Non-Performance Under the Term Sheet**

Attorney Boyle was unequivocal: neither McKenzie nor his attorney ever offered to perform under the Term Sheet. Tr. 402:14-16; *see* Tr. 549:2-6 (Brannan's testimony that he was not aware of any such communication.).

Indeed, McKenzie testified that, after November 26, 2019, he continued to both make and sell HOPE artwork. Tr. 435:9-17. However, he did not perform any of his obligations under the

Term Sheet to notify the Estate of such sales. Tr. 436:13-437:2; 437:11-13. As McKenzie testified quite clearly, the Term Sheet was not in effect yet. Tr. 436:23-437:13.

### R. **McKenzie's Claims Against the Estate and the Star of Hope**

At trial, McKenzie also testified that the Estate and James Brannan are liable to him for the amount of $500,000,000.00.[2] Tr. 446:5-12. McKenzie, however, produced no evidence (or even a framework that would support any evidence) that could justify this allegation.

## III.     DISCUSSION[3]

### A. **The 2008 HOPE Agreement, and Its Arbitration Provision, Is Still in Effect.**

Again and again, McKenzie testified that the 2008 HOPE Agreement is still in effect:

Q.     Now, Mr. -- Mr. McKenzie, you understand in the term sheet there is a phrase or a clause in there or a term in there that says that AIA agrees that the original HOPE agreement is terminated, right?

A.     Yes, as soon as we sign the agreement.

Q.     Is that it -- and so it's your testimony that the – as of -- as of November 26, 2019, that that was terminated; is that correct?

A.     No, I don't understand that.

Q.     Is that you -- you understand there was a clause in there that says AIA agrees the original HOPE agreement is terminated.

A.     Yeah, pending the two or three days they were supposed to take to finish the document, which they never did. I never got a finished document.

Q.     And you –

---

[2] This alleged damage amount of $500,000,000.00 is considerably higher than the $90 million damage amount in McKenzie's November 2019 mediation statement, J. Ex. 5, at 16-18; Tr. 129:5-14, or the $30 million amount in his December 2019 press release. See J. Ex. 16, at 2.

[3] The choice-of-law issue is governed by whether the 2008 HOPE Agreement, which provides that "[a]ny disputes will be . . . governed by the laws of the State of New York," is still in effect. If the Original HOPE Agreement is still operative, New York law controls; if not, the Court should rely on Maine law. However, from a practical perspective, on the relevant contract law principles, New York law and Maine law are similar, and Defendant has provided citations to the laws of both states.

A.      I got a lot of jabberwocky but no finished document.

Q.      Mr. McKenzie, you believed -- you understood that that term meant that it was only going to be renewed, the original HOPE agreement was only going to be renewed, for 10 years, correct?

A.      Yes -- well, yes, something like that.

Q.      So, therefore, when the -- the clause in the term sheet that says that the original HOPE agreement is terminated, you understood that to mean that the original HOPE agreement was going to be renewed for 10 years.

A.      Yes, that's different than terminated; am I right?

Q.      That's correct.

A.      Yeah.

Tr. 432:19-433:22.

Indeed, McKenzie repeated his insistence that the 2008 HOPE Agreement was still in effect to justify his continued printing and fabrication of Robert Indiana art as well as sales after Robert Indiana's death as follows:

Q.      And you continue to print and fabricate Indiana art, correct?

A.      Yes.

Q.      And you continue to sell that art.

A.      Yes. Well, no, not selling -- I haven't sold it for over a year.

Q.      And you're doing all of that currently pursuant to the original HOPE agreement, correct?

A.      Whether it's the original one or 10 years of it, it's the same agreement.

Trial Tr. 453:17-454:1.

It is important to note that, in McKenzie's red-lined markup of the draft Settlement Agreement (set forth in J. Ex. 55), McKenzie deleted the proposed language terminating the

Original HOPE Agreement, and inserted the following:

> AIA agrees that so long as the Estate substantially and materially performs all the terms under this Agreement, that AIA shall not claim any right under the HOPE Agreements, and shall not contend that the HOPE Agreements or any other agreements with Indiana remain in full force and effect.

J. Ex. 55, at PR004956. In fact, McKenzie testified that he intentionally made these changes to the draft Settlement Agreement. Tr. 73:25-75:15.

Moreover, McKenzie testified that, after November 26, 2019, he continued to make and sell new HOPE artwork, Tr. 435:9-17, but he refused to perform—as a party to a contract would—under the provisions of the Term Sheet by providing the Estate either with notice of production and/or sale of such artwork. See Tr. 436:13-437:13. Thus, there can be no dispute that the Term Sheet never gave effect to any contract. Tr. 436:23-24 (McKenzie testifying "[w]hen it went into effect, which wasn't yet.").

Therefore, as McKenzie clearly testified, the 2008 HOPE Agreement, including its arbitration clause, remains in effect, and this action must be referred to the New York Arbitration. *See* Tr. 81:19-21; 82:19-23; 90:23-91:2; 96:17-21; 436:13-437:10.

### i.    The Arbitration Provision Is Severable From the 2008 HOPE Agreement.

Even if the Term Sheet had created a contract, a possibility unsupported by any evidence adduced at trial, the Supreme Court has held that Section 2 of the Federal Arbitration Act ("FAA") requires courts to "treat an arbitration clause as severable from the contract in which it appears and enforce it according to its terms unless the party resisting arbitration specifically challenges the enforceability of the arbitration clause itself, . . . or claims that the agreement to arbitrate was '[n]ever concluded.'" *Granite Rock*, 561 U.S. at 300-01 (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444, n. 1 (2006)). The First Circuit also recognized this fundamental principle in *Biller*. *See Biller v. S-H OpCo Greenwich Bay Manor, LLC*, 961 F.3d

502, 512 (1st Cir. 2020) (stating that "unless the parties provided otherwise, an arbitration provision is severable from the remainder of the contract." (quoting *Buckeye*, 546 U.S. at 445)). This position is consistent with both Attorney Boyle's testimony and the parties' conduct; even after the Estate's May 9, 2019, termination of the 2008 HOPE Agreement, the parties continued to pursue arbitration as the appropriate conflict resolution forum.

Not only has McKenzie failed to challenge the enforceability of the arbitration clause itself, he has repeatedly stated, from the weeks following the 2019 mediation all the way up until his testimony at trial, that the 2008 HOPE Agreement remains in effect. *See* J. Ex. 24, at 2; Tr. 81:19-21; 82:19-23; 90:23-91:2; 96:17-21; 436:13-437:10.

### ii. McKenzie Failed To Make A Targeted, Independent Challenge To the Arbitration Clause.

Similar to McKenzie in the matter at bar, the *Biller* plaintiffs argued that the termination of the underlying agreement eliminated their obligation to arbitrate. *See* 961 F.3d at 505. But, the *Biller* court disagreed, stating that "[e]ven if the rest of the parties' contractual rights and obligations ended . . . that would not mean their duties to arbitrate their contract-related disputes ended, too." 961 F.3d at 513. The First Circuit held that the plaintiffs "had to mount an 'independent' challenge to the arbitration agreement itself . . . for example, by identifying evidence that the parties intended not only the residency agreement but *also* their *arbitration obligations* to lapse . . . ." *Id*. at 514. The *Biller* plaintiffs did not meet that "burden." *Id*; *see also Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49, 53 (1st Cir. 2002) ("[A] federal court must not remove from the arbitrator [ ] consideration of a substantive challenge to a contract unless there has been an independent challenge to the making of the arbitration clause itself.") (citing

*Unionmutual Stock Life Ins. Co. v. Beneficial Life Ins. Co.,* 774 F.2d 524, 529 (1st Cir. 1985)).[4]

In this case McKenzie has not challenged at all the validity of the underlying arbitration clause in the 2008 HOPE Agreement, nor the "making of the arbitration clause itself." *Large*, 292 F.3d at 53. Quite to the contrary, as stated above, McKenzie has testified that—and conducted himself since 2019 as though—the 2008 HOPE Agreement remains the only contract between the parties. *See* J. Ex. 24, at 2; Tr. 96:13-97:5; *supra* 16-17. Specifically, McKenzie produced no evidence that the parties intended their arbitration obligations to lapse if the 2008 Agreement were eventually terminated. Not only does the Term Sheet require that it would eventually be replaced by a more formal Settlement Agreement and Production Agreement," but it also specifies that these formal Settlement and Production Agreements would contain "other appropriate terms from the [2008 Agreement]." J. Ex. 2, at 2.

McKenzie will likely rely on the Term Sheet's provision that "[t]he arbitration between the Estate and AIA pending in the AAA will be dismissed with prejudice." J. Ex. 2, at 3. However, the future tense construction of this provision cannot be interpreted as a targeted, independent challenge under *Biller*. *See* 961 F.3d at 514. Like the other provisions of the Term Sheet, this provision hinges upon the final clause, stating unequivocally that all "consideration under this term sheet will be made after the more formal Settlement Agreement and Releases and Production Agreement are executed." J. Ex. 2, at 3. All of this evidence underscores the unassailable fact that the parties did not intend to extinguish their arbitration obligation. *See* Tr. 142:11-14 (Boyle testifying that termination of the 2008 HOPE Agreement was part of the consideration that would pass upon the execution of the final agreements.).

---

[4] In the First Circuit the party resisting arbitration bears the burden of establishing that the arbitration provision in question "cannot be interpreted to cover [the] dispute." *Unionmutual*, 774 F.2d at 529. The First Circuit in *Unionmutual* went on to state that "a federal court must not remove from the arbitrators consideration of a substantive challenge to a contract unless there has been an independent challenge to the making of the arbitration clause itself. The basis of the underlying challenge to the contract does not alter the severability principle." *Id.*

In summary, McKenzie was required to produce specific evidence that the parties intended to terminate their arbitration obligation, and he has failed to do so. Thus, McKenzie has not satisfied the targeted, independent challenge standard set forth in *Granite Rock* and *Biller*. He has, however, testified surely and clearly that the 2008 HOPE Agreement and, by extension, its arbitration provision remain in full effect.

## B.  Elements of a Binding Contract

McKenzie, as the party seeking to enforce the Term Sheet, has the burden to prove any contract's existence. *Butler v. Hardy*, 576 A.2d 202, 204 (Me. 1990); *see Amica Mut. Ins. Co. v. Kingston Oil Supply Corp.*, 21 N.Y.S. 3d 318 (2015); *Kramer v. Greene*, 36 N.Y.S. 3d 448 (2016). In order to establish a contract, there must be a meeting of the minds, and an offer, promise of performance, or application from one side and an acceptance "conforming to the terms of the offer" on the other side and, in some cases, the contract must be in writing. *Tourtlott v. W. Bangor & Hermon Mut. Fire. Ins. Co.*, 136 A. 481, 482 (1927); *see Kasowitz, Benson, Torres & Friedman, LLP v. Reade*, 950 N.Y.S. 2d 8, 9 (2012); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 24. When courts are tasked with analyzing settlement agreements as contracts, "the existence of a binding statement is a question of fact." *Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, ¶6, 968 A.2d 539, 541-42 ; *see also McClare v. Rocha*, 2014 ME 4, ¶16, 86 A.3d 22 ("Whether a contract exists . . . [is a] question [ ] of fact."); *Jabczynski v. Advanced Drying & Restoration*, 32 N.Y.S. 3d 407, 408 (2016).

## C.  Distinction Between "Agreement to Agree" and Binding Agreement

Courts have recognized the "distinction between a preliminary 'agreement to agree' and a binding settlement agreement." *In re Estate of Snow*, 2014 ME 105, ¶12, 99 A.3d 278, 282 (quoting *Muther*, 2009 ME 37, ¶6, 968 A.2d 539); *see generally Trolman v. Trolman, Glaser &*

*Lichtman, P.C.*, 981 N.Y.S. 2d 86 (2014); *Pittsford Canalside Prop., LLC v. Vill. of Pittsford Zoning Bd. of Appeals*, 120 N.Y.S. 3d 533 (2020). In particular, the parties' preliminary negotiations about the terms in a future agreement do <u>not</u> constitute a contract. *McClare v. Rocha*, 2014 ME 4, ¶20, 86 A.3d 22; *Carr v. Sheehan*, 51 N.Y.S. 3d 293, 295 (2017). But, "[w]hether the parties are merely negotiating the contract, or entering into a present contract, is purely a question of intention." *McClare*, 2014 ME 4, ¶20, 86 A.3d 22*; see also Gator Hillside Vill., LLC v. Schuckman Realty, Inc.*, 73 N.Y.S. 3d 86, 87-88 (2018) (existence of a binding contract depends on the "objective manifestations of intent of the parties" rather than subjective intent of the parties).

When considering the intention of parties to enter into a binding contract, the court may consider "the language of any agreement, viewed in the light of the circumstances under which it was made, including the words 'offer' and 'acceptance.'" *In re Estate of Snow*, 2014 ME 105, ¶12, 99 A.3d 278, 282 (quoting *McClare*, 2014 ME 4, ¶21, 86 A.3d 22); *see generally Zheng v. City of New York*, 950 N.Y.S. 2d 301, 307-08 (2012) (court considers the language of program documents to ascertain the parties' contractual intent). The court may also consider

> the extent to which an express agreement has been reached on all terms to be included; whether the contract is a type that is usually put in writing; whether it needs formal writing for its full expression; whether it is a common or unusual contract; whether a standard form of contract is widely used in similar transactions; and whether either party takes any action in preparation for performance.

*McClare*, 2014 ME 4, ¶21; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. c.

Ample evidence was adduced at trial that the 2019 Term Sheet was an "agreement to agree," and not a final settlement agreement. *Estate of Snow*, 2014 ME at ¶ 12. The prospective language and overwhelming use of the future tense in the Term Sheet clearly establishes that it was the result of the parties' preliminary negotiation of the terms in a future contract. *See*

*McClare*, 2014 ME at ¶20; J. Ex. 2 *passim*. Indeed, the testimony of the parties to the Term Sheet and the individuals involved in its drafting cements their "objective manifestations of intent." *Gator Hillside Vill.*, 73 N.Y.S. 3d at 87-88. *See supra* at 7-8, 9-12. The plain language of the Term Sheet fails to satisfy *McClare's* focus on whether "an express agreement has been reached on all terms." 2014 ME at ¶ 21. As was acknowledged by all parties at trial, the Term Sheet required "other appropriate terms" from the 2008 HOPE Agreement and such terms were not defined at the time of the Term Sheet's execution. *See* J. Ex. 2, at 2; Tr. 81:22-24; 138:21-140:15; 532:9-19.

Indeed, the parties' history between November 26, 2019, and February 14, 2020, supports that the parties never reached a "meeting of the minds" on a final contract. *See supra* at 9-13. From McKenzie's assertion that there was never a final contract, *supra* at 10, to McKenzie's attempts to renegotiate the provisions of the Term Sheet, *supra* at 11-13, to McKenzie's unwavering assertion that the 2008 HOPE Agreement is still in effect, *supra* at 16-19, there can be little dispute that the parties believed that the Term Sheet was, at best, a tentative "agreement to agree," not a final contract.

The Law Court's analysis in *McClare* is of further note because Plaintiff failed to enter any evidence that he took "action in preparation for performance" under the purported contract that he claims the Term Sheet created. 2014 ME at ¶ 21. In fact, Defendants put forward evidence quite to the contrary, demonstrating that Plaintiff never unequivocally stated that he was ready, willing, or able to perform under the terms of the purported contract, as required to form any contract. *See* Tr. 549:2-6; RESTATEMENT (SECOND) OF CONTRACTS § 24. In fact, McKenzie flatly testified he was <u>not</u> performing under the Term Sheet because it was not in effect, and that he only performed according to the 2008 HOPE Agreement. *See* Tr. 435:9-17,

436:13-437:13; 436:23-24; 453:17-454:1.

### D. **Proof of a Binding Contract**

Plaintiff must establish that there was a "meeting of the minds between the parties—or 'mutual assent to be bound by all the material terms' of the contract." *Tobin v. Barter*, 2014 ME 51, ¶9, 89 A.3d 1088 (quoting *Sullivan v. Porter*, 2004 ME 134, ¶13, 861 A.2d 625); *DCR Mortg. VI Sub I, LLC v. Peoples United Fin., Inc.*, 50 N.Y.S. 3d 986, 987-88 (2017). A court might not find a settlement agreement binding if there is not a "mutual intent of the parties to be bound by terms sufficiently definite to enforce." *In re Estate of Snow*, 2014 ME 105, ¶ 11, 99 A.3d 278 (quoting *Muther*, 2009 ME 37, ¶6, 968 A.2d 539); *see Reznick v. Bluegreen Resorts Mgmt., Inc.*, 62 N.Y.S. 3d 460, 463 (2017). Specifically, in situations where litigants dispute the enforceability of a settlement reached outside of court, findings of fact regarding the agreement's terms and the intent of the parties is required. *Muther*, 2009 ME 37, ¶6, 968 A.2d 539, 541-42.

"A manifestation of mutual assent, express or implied, is essential to the formation of a contract." *McClare*, 2014 ME 4, ¶20, 86 A.3d at 29 (quoting *Forbes v. Wells Beach Casino, Inc.*, 307 A.2d 210, 216 (Me.1973)); *DCR Mortg. VI Sub I, LLC v. Peoples United Fin., Inc.*, 50 N.Y.S. 3d 986, 987-88 (2017). A contract is considered enforceable if each party communicated a "distinct and common intention" to the other. *Barr v. Dyke*, 2012 ME 108, ¶13, 49 A.3d 1280, 1286 (quoting *Stanton v. Univ. of Me. Sys.*, 2001 ME 96, ¶13, 773 A.2d 1045).

As considered by the Law Court *In re Estate of Snow*, the provisions of the Term Sheet are not "sufficiently definite to enforce" as a contract. 2014 ME 105, ¶ 11, 99 A.3d 278. As Attorney Boyle testified, the "other appropriate terms from the original HOPE agreement" were not specified by the Term Sheet, and "would have to be developed through further negotiations." Tr. 139:21-24. *See* Tr. 138:2-140:15. Additionally, the Settlement and Production Agreements

24

were yet to be even negotiated, never mind executed. *See supra* 7-8, 9-12.

### E. <u>Ambiguous Terms in Contracts</u>

The determination of whether a contract's language is ambiguous is a question of law for the Court to consider. *See Portland Valve, Inc. v. Rockwood Sys. Corp*., 460 A.2d 1383, 87 (Me. 1983); *Ames v. County of Monroe*, 80 N.Y.S. 3d 1724, 1725-26 (2018) (quoting *South Rd. Ass'n LLC. v. Int'l Bus. Machs. Corp.*, 793 N.Y.S. 2d 835 (2005)). Once the contract's terms have been found to be ambiguous, the meaning of ambiguous terms is a question of fact for the factfinder to determine. *InfoBridge, LLC v. Chimani, Inc*., 2020 ME 41, ¶13, 228 A.3d 721, 725; *Scott v. Fall Line Condominium Ass'n*, 2019 ME 50, ¶6, 206 A.3d 307; *Pozament Corp. v. Aes Westover, LLC*, 812 N.Y.S. 2d 154 (2006).

A court must find a contract's language ambiguous when it is "reasonably susceptible of different interpretations." *Scott v. Fall Line Condominium Ass'n*, 2019 ME 50, ¶6, 206 A.3d 307 (quoting *Farrington's Owners' Ass'n v. Conway Lake Resorts, Inc.*, 2005 ME 93, ¶9, 878 A.2d 504); *Williams v. Village of Endicott*, 936 N.Y.S. 2d 759 (2012); *New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc.*, 809 N.Y.S. 2d 70 (2006). According to the Restatement, courts interpret the language of a contract by "its generally prevailing meaning." RESTATEMENT (SECOND) OF CONTRACTS § 202(3)(A); *see Guilford Transp. Indus. v. Pub. Util. Comm'n*, 2000 ME 31, ¶16, 746 A.2d 910; *Edwards v. Poulmentis*, 763 N.Y.S. 2d 677, 679 (2003).

It is clear from the evidence adduced at trial that certain portions of the Term Sheet are "reasonably susceptible of different interpretations." *Scott v. Fall Line Condominium Ass'n*, 2019 ME 50, ¶6, 206 A.3d 307. Beyond the unspecified and plainly ambiguous "other appropriate terms" considered by the Term Sheet, discussed in detail *supra* at 7-8, 9-12, and 21-24,

McKenzie himself testified that he was not sure what certain of the terms, including the confidentiality and non-disparagement provisions, meant. *See* Tr. 104:8-11 ("I'm not sure what I understood."). Because there is ambiguity in the provisions of the Term Sheet, the court may consider extrinsic evidence to show the intention of the parties. *Madore v. Kennebec Heights Country Club*, 2007 ME 92, ¶8, 926 A.2d 1180, 1183-84 (due to the two reasonable yet different interpretations of a contract, the court could use extrinsic evidence to clarify the intent of the parties; *Fattorusso v. RJR Mech., Inc.*, 16 N.Y.S. 3d 844 (2015). The Court also may look at the entirety of the contract to determine if the ambiguity was resolved elsewhere in the document. *Guilford Transp. Indus.*, 2000 ME 31, ¶18; *Currier, McCabe & Assoc., Inc. v. Maher*, 906 N.Y.S. 2d 129, 131 (2010).

If any provision of the Term Sheet serves to clarify the ambiguity inherent in its other portions, it is the final clause, which clearly requires that the Term Sheet "be replaced by a more formal Settlement Agreement and Production Agreement," and that "consideration under this term sheet will be made after a more formal Settlement Agreement and Releases and Production Agreement are executed." J. Ex. 2, at 3. The prospective nature of this clause can only be interpreted, reasonably, to mean that the Term Sheet would result in a future settlement agreement, and therefore requires that the Term Sheet be interpreted as an "agreement to agree."

## F. **Repudiation of the Term Sheet**

Even assuming *arguendo* the Court finds that the Term Sheet created a contract between the Estate and McKenzie, it is clear from the evidence set forth at trial that McKenzie repudiated any such contract. The Law Court has found anticipatory repudiation of a contract when there is "a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives."

*Wholesale Sand & Gravel, Inc. v. Decker*, 630 A.2d 710, 711-12 (Me. 1993) (quoting 4 Arthur L. Corbin, Corbin on Contracts §973 (1951); RESTATEMENT (SECOND) OF CONTRACTS §250 (1979)); *see Roger Edwards, LLC v. Fiddes & Sons, Ltd*., 387 F.3d 90, 95-96 (1st Cir. 2004); *Lamarche Food Products Corp. v. 438 Union, LLC*, 115 N.Y.S.3d 436 (2019); *Fonda v. First Pioneer Farm Credit, ACA*, 927 N.Y.S. 2d 417, 419 (2011); *Condor Funding, LLC v. 176 Broadway Owners Corp.*, 46 N.Y.S. 3d 99 (2017). Generally, a request or demand to modify a contract does not on its own constitute a repudiation unless the party seeking a modification threatens to completely breach the contract. *Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 776 (Me. 1989); *see* RESTATEMENT (SECOND) OF CONTRACTS § 250 cmt. b; *see generally Gen. Valuations Co. v. City of Niagara Falls*, 1 N.Y.S. 2d 880, 882 (1938).

Intent to repudiate a contract may be communicated and made through both the words and conduct of an individual. *Wholesale Sand & Gravel, Inc.*, 630 A.2d 710 at 711-12; *Fonda*, 927 N.Y.S. 2d at 419. However, the words or conduct "evidencing the anticipatory repudiation must be definite, unequivocal, and absolute." *Roger Edwards, LLC v. Fiddes & Sons, Ltd.*, 387 F.3d 90, 95 (1st Cir. 2004); *Wholesale Sand & Gravel, Inc.*, 630 A.2d at 711-12; *Lamarche Food Products Corp.*, 115 N.Y.S.3d 436, 438 (2019) (a party's expression of intent to not perform their duty must be "positive and unequivocal."). Finally, any alleged repudiation "must concern the obligations or promises going to the whole consideration." *Roger Edwards, LLC*, 387 F.3d at 95-96 (citing *Martell Bros. v. Donbury, Inc*., 577 A.2d 334, 337 n. 1 (Me.1990)).

There, "must be a definite and unequivocal manifestation of intention [not to render performance] . . . [a] mere request for a change in the terms or a request for cancellation of the contract is not in itself enough to constitute a repudiation." *Thermo Electron Corp. v. Schiavone Const. Co.*, 958 F.2d 1158 (1st Cir. 1992) (quoting 4 Arthur L. Corbin, Corbin on Contracts §

973, at 905–06 (1951) (footnotes omitted)); *see Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 921 N.Y.S. 2d 260, 264 (2011).

In both words and conduct, McKenzie has positively and unequivocally repudiated any contract created by the Term Sheet. *See* Tr. 352:25-353:11. Despite the general release provision in the contract that he claims exists, McKenzie has attempted to file new claims against the Estate and its attorneys. *See* Tr. 84:25-85:14. Despite the dismissal provision, he has issued discovery demands to the Estate. *See* J. Exs. 45, 49, 51, 53; Tr. 163:11-164:18; 546:17-547:5. Despite the requirement that he cooperate with the Estate in the Morgan Art case, McKenzie has steadfastly refused to do so. *See* Tr. 86:19-87:14. Despite being asked to confirm that he was not repudiating the Term Sheet, he refused to respond. *See* J. Ex. 52; Tr. 165:10-18; 353:18-354:13; 354:22-355:20. Despite the confidentiality and nondisparagement provisions, McKenzie issued a press release to no less than twenty-eight parties, including the *New York Times*, the *Washington Post*, and the *Portland Press Herald*. *See* J. Ex. 16; Tr. 114:14-115:11.

Each of these actions alone would satisfy the Law Court's repudiation standard. Taken together, it is clear that McKenzie either has no comprehension of what signed, or has no interest in abiding by the Term Sheet.

## G.  McKenzie's Breach Precludes Resurrection of the Term Sheet's Provisions

If a party repudiates a contract, the repudiation relieves the other party of its duty to perform. *Thermo Electron Corp.*, 958 F.2d 1158 at 1164; *see* Restatement (Second) of Contracts § 250 cmt. b; *Fonda*, 927 N.Y.S. 2d at 419. The Law Court has ruled that a vendor who repudiated the contract excused the purchaser from having to "make a tender of the purchase price" because "[t]he purpose of a tender is to put the other party in violation. When the other party has already repudiated the agreement, the tender would be a futile act and is not

required by law." *O'Halloran v. Oechslie*, 402 A.2d 67, 70 (Me. 1979) (quoting *Dehahn v. Innes*, Me. 356 A.2d 711, 719 (1976)).; *see generally Drake v. Hodgson*, 183 N.Y.S. 486 (1920).

Because McKenzie breached or repudiated the contract purportedly created by the 2019 Term Sheet, the Estate was relieved of any obligation to perform under the Term Sheet. Thus, whether the Estate continued its efforts to negotiate a resolution with McKenzie after his breach has no effect on the enforceability of the Term Sheet. Finding that the Estate's efforts to resolve McKenzie's case after his breach require the resuscitation of the Term Sheet would lead to inequitable and absurd results. In any case involving a breach of a similar term sheet, the parties' only options would then be 1) to sue under the terms of the breached term sheet, or 2) abide by the term sheet and include the provisions of that term sheet—provisions with which one party knows the breaching party will not comply—in a final settlement agreement. This would place the non-breaching party at a severe and inequitable disadvantage.

## H. **Due to McKenzie's Conduct, Equitable Principles Preclude His Enforcement of Any Contract**

From his filings in the SDNY Action in April, 2020, *see supra* at 15, to his representation to the Panel in the New York Arbitration, *see supra* at 14-15, to his many statements rejecting the provisions of the Term Sheet, *see supra* at 9-14, equitable principles of law, including waiver, estoppel, and laches, bar McKenzie from the enforcement of any purported contract.[5]

McKenzie's misleading conduct surrounding the Term Sheet has caused significant damage to the Estate, and has been prejudicial to its position in the above-captioned action, as well as the Morgan Art Action. *See supra* at 14-15; 27-28. Furthermore, not only did McKenzie never offer to perform any contractual obligations under the provisions of the Term Sheet, but when asked by the Estate to confirm that he was not repudiating those provisions, he remained

---

[5] The Estate does not concede that the Term Sheet created a final enforceable contract between itself and McKenzie, this analysis is presented *arguendo*.

silent. *See supra* at 12, 15. Despite McKenzie's alternating positions between the AAA Panel, the Southern District, and this Court, the Estate relied on McKenzie's misleading conduct and McKenzie benefited by the Estate's reliance. Thus, if there were a contract, finding in McKenzie's favor, in light of his behavior, would offend the equitable principles that underpin the legal system.

JAMES W. BRANNAN,

By his attorneys,

DATED:  August 18, 2022

/s/ Seth W. Brewster
Seth W. Brewster, Esq., Bar No. 3741
Alfred J. Falzone, Esq., Bar No. 6497
*Counsel for Defendant James W. Brannan,*
*as personal representative of the Estate of*
*Robert Indiana*

EATON PEABODY
100 Middle Street
P.O. Box 15235
Portland, ME  04112-5235
(207) 274-5266
sbrewster@eatonpeabody.com
afalzone@eatonpeabody.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2022, I electronically filed Defendant Brannan's Post-Trial Brief using the CM/ECF system, which will send notification of such filing(s) to all counsel of record.

/s/ Alfred J. Falzone III

Alfred J. Falzone III, Esq.
