**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| MICHAEL MCKENZIE, individually and doing business as AMERICAN IMAGE ART, an unincorporated dba,<br><br>     Plaintiff,<br><br>     v.<br><br>JAMES W. BRANNAN, as personal representative of THE ESTATE OF ROBERT INDIANA, and AARON M. FREY, only in his official capacity as Attorney General of the State of Maine,<br><br>     Defendants. | CIVIL NO. 2:20-cv-00262-NT |

**PLAINTIFF MICHAEL MCKENZIE'S POST-TRIAL BRIEF**

**Table of Contents**

Table of Authorities ...................................................................................................................ii

The Star of Hope Has No Valid Complaint ....................................................................... 1

The Term Sheet is Certainly Specific Enough to be a Binding Contract...........................7

The Intent of the Parties Was to Be Bound .....................................................................10

There was No Repudiation by McKenzie .........................................................................12

McKenzie's Complaints About Venable's Attorneys' Fees ............................................13

The "Disparagement" of Venable ....................................................................................14

McKenzie's Supposed "Breach" of Confidentiality .......................................................14

McKenzie Did Not Otherwise Repudiate but Repeatedly Sought to Finalize the
        Term Sheet ............................................................................................................17

The BRAT Sculpture…………………………………………………………......................23

The Estate and SOH Attorneys' Attempt to Avoid the Binding Term Sheet ..............................25

## Table of Authorities

**Cases**

*Associated Builders, Inc. v. Coggins*, 1999 ME 12, 722 A.2d 1278 ...................................... 12, 16

*Briggs v. Briggs*, 1998 ME 120, 711 A.2d 1286 ............................................................. 1

*Carpenter v. Massachusetts Bonding & Ins. Co.*, 161 Me. 1, 206 A.2d 225 (1965) .................... 16

*Concordia Partners, LLC v. Ward*, 2:12-CV-138-GZS, 2014 WL 3378663
    (D. Me. July 9, 2014) ........................................................................ 10, 11

*Court v. Kiesman*, 2004 ME 72, 850 A.2d 330 .............................................................. 3

*Crowe v. Bolduc*, 365 F.3d 86 (1st Cir. 2004) ............................................................. 10

*Dep't of Hum. Servs. v. Brennick*, 597 A.2d 933 (Me. 1991) ............................................15

*Drinkwater v. Patten Realty Corp.*, 563 A.2d 772 (Me. 1989) ...................................... 21

*In re Estate of Snow*, 2014 ME 105, 99 A.3d 278........................................................10, 11

*Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1 (1st Cir. 2008) ......................... 1

*Fleet Bank of Maine v. Zimelman*, 575 A.2d 731 (Me. 1990) ......................................... 2

*Forrest Associates v. Passamaquoddy Tribe*, 760 A.2d 1041 (Me. 2000) ................................ 11

*Interstate Indus. Unif. Rental Serv., Inc. v. Couri Pontiac, Inc.*, 355 A.2d 913 (Me. 1976) ......... 15

*Lehigh v. Pittston Co.*, 456 A.2d 355 (Me. 1983) ......................................................... 3

*Martell Bros. v. Donbury, Inc.*, 577 A.2d 334 (Me. 1990) ...................................... 12, 14

*Nevin v. Union Tr. Co.*, 726 A.2d 694 (Me. 1999) ....................................................... 2

*Penobscot Indian Nation v. Key Bank of Mai*ne, 112 F.3d 538 (1st Cir. 1997) ........................... 1

*Riemann v. Toland*, 2022 ME 13, 269 A.3d 229 ........................................................... 3

*Roy v. Danis*, 553 A.2d 663 (Me. 1989) .................................................................... 9

*Snow v. Bernstein, Shur, Sawyer & Nelson, P.A.*, 2017 ME 239, 176 A.3d 729 ......................... 3

*Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*, 832 F.2d 214 (1st Cir. 1987) ................... 1

*Walsh v. Zurich Am. Ins. Co.*, 853 F.3d 1 (1st Cir. 2017) ................................................ 1

*Wholesale Sand & Gravel, Inc. v. Decker*, 630 A.2d 710 (Me. 1993) ................................... 12, 17

**Statutes**

Me. Rev. Stat. tit. 18-C, § 3-813 ........................................................................ 2

### The Star of Hope Has No Valid Complaint

This is a contract dispute[1] The interpretation of contracts is not a popularity contest. It cannot depend on whether the parties to it like each other, or at least it seemed that way to Larry Sterrs, CEO of the Star of Hope ("SOH"):

> There seemed to be a lot of anger; there seemed to be a lot of resentment; there seems to be a lot of accusations. You know, I guess I imagined us falling victim to that as well if we pursued some sort of relationship with Mr. McKenzie. . . . I was afraid that this was going to be difficult between the Star of Hope and AIA.

Tr. V2, p. 261. Nor can it depend upon Mr. Sterrs' after-the-fact remorse about the merits of the Binding Term Sheet:

> The truth of the matter is this -- that term sheet, it doesn't matter who authored it or who signed it, it's a bad deal for the Star of Hope Foundation, period.

Tr. V2, pp. 245-246.[2]

Mr. Sterrs' sentiment that a contract is a "bad deal" is simply not a defense. Contracts simply cannot be discarded based on such sentiments. Even if a party later believes a contract is unfair or a bad deal, a freely entered contract is enforceable. *See*, *Briggs v. Briggs*, 1998 ME 120, ¶ 11, 711 A.2d 1286, 1290 ("it is not our function to rewrite the parties' contract by enlarging or diminishing its terms"); *Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*, 832 F.2d 214, 220–21 (1st Cir. 1987) ("it is far wiser for a court to honor the parties' words…")*; Walsh v. Zurich*

---

[1]        "A compromise agreement, fairly arrived at, is an enforceable contract both under Maine law and general doctrine." *Penobscot Indian Nation v. Key Bank of Mai*ne, 112 F.3d 538, 557 (1st Cir. 1997) A "party to a settlement agreement may seek to enforce the agreement's terms when the other party refuses to comply." *Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1, 5 (1st Cir. 2008)(enforcing settlement agreement despite one party's "subjective belief that the agreement was not final"). The latter is particularly so when one party to it obviously thought the Term Sheet was binding and later says it was "an agreement to agree" when it changes its mind.

[2]        McKenzie refers herein to the trial transcripts docketed in this case as follows: "Tr. V1" for Volume I (Trial Day 1, 7/20/22) at Dkt. No. 145; "Tr. V2" for Volume II (Trial Day 2, 7/21/22) at Dkt. No. 146; and "Tr. V3" for Volume III (Trial Day 3, 7/22/22) at Dkt. No. 147.

*Am. Ins. Co.*, 853 F.3d 1, 13 (1st Cir. 2017)("Parties generally are bound by the terms of an agreement freely and openly entered into, and courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably." [applying NH law]) *Consider also, Fleet Bank of Maine v. Zimelman*, 575 A.2d 731, 734 (Me. 1990) ("any advantage gained by the Bank…was freely bargained for at the time the agreement was reached…[and] there is no reason not to enforce the unambiguous language of the mortgage, entitling the Bank to the appointment of a receiver" [rejecting lower court's refusal to enforce contract term on basis it gave an unfair advantage])  Likewise, the Term Sheet was freely bargained for "freely and openly" by the Estate which had the authority to do so.

Moreover, SOH has no standing to complain. As personal representative of the Indiana Estate, James Brannan, had the sole and exclusive authority to prosecute, defend, and settle claims brought by or against the Estate. *See,* Me. Rev. Stat. tit. 18-C, § 3-813 (personal representative "may, if it appears for the best interest of the estate, compromise" any claim "presented" against the estate); *Nevin v. Union Tr. Co.*, 726 A.2d 694, 701 (Me. 1999) (beneficiaries did not have standing to bring a malpractice lawsuit against decedent's estate planning attorneys). And Brannan testified that entering the Term Sheet did not put the SOH at financial risk because of the significant assets of the Estate that would be distributed to the SOH, currently estimated to have a value of $180 million. Tr. V3, p. 518; pp. 589-590.

This testimony was not contradicted. The Attorney General ("AG") offered no testimony that this settlement was some sort of breach of faith by Brannan. It should have ended the costly, cash-draining litigation and left SOH with very significant assets. That was Brannan's judgment at the time. And it should be credited against the AG's bald contention that the settlement was

2

some sort of breach of trust or "against public policy," a term that the AG nowhere defines.  And whatever that term means it certainly cannot be shown by Mr. Sterrs' dislike of the Binding Term Sheet, much less his dislike of McKenzie. The cases cited by the AG in its Pre-Trial Brief are not appliable to this private contract between businesspeople and their lawyers. The law is completely against what the AG invokes as a public policy ground for discarding this Binding Term Sheet. To begin with, "[b]ecause nullifying a private, written contract provision should not be undertaken lightly, we look carefully at the argument that a provision contravenes an important public policy." *Snow v. Bernstein, Shur, Sawyer & Nelson, P.A*., 2017 ME 239, ¶ 12, 176 A.3d 729, 734–35. It must be a clearly discernable public policy. [3]

The AG's only argument is that the Term Sheet imposes significant financial burdens on SOH which the AG claims will impede its ability to perform its intended charitable functions for the public's benefit. Here, the AG relies only on the testimony of Sterrs who said the Term Sheet is a "bad deal," in his opinion, because of the authentication provision, the indemnification

---

[3]    Each of the cases relied on in the AG's trial brief (Dkt. No. 111) show just such a public policy lacking in this case*. See, Court v. Kiesman*, 2004 ME 72, ¶¶ 13-14, 850 A.2d 330, 333–34 (parents agreed that, in exchange for the father relinquishing all rights to visit the child, the mother would release him from his child support obligation" where "law remains clear: parents may not barter away their obligation to make payments intended for the support of a child"); *Snow v. Bernstein, Shur, Sawyer & Nelson, P.A.*, 2017 ME 239, ¶ 18, 176 A.3d 729, 736 (attorney violated policy that to enforce a contractual provision that prospectively requires a client to submit malpractice claims against the law firm to arbitration, an attorney must have first obtained the client's informed consent as to the scope and effect of that provision.); *Lehigh v. Pittston Co.*, 456 A.2d 355, 361 (Me. 1983) (contract void because it attempted to convey to a private party an airport which, by virtue of its 1942 and 1959 agreements with the federal government, the local city expressly dedicated to the use and benefit of the public, and thus the challenged contract would absolutely abrogate that public dedication in violation of public policy); *Riemann v. Toland*, 2022 ME 13, ¶ 41, 269 A.3d 229, 241 (the best interest of a child outweighs freedom to contract thus the parties' waiver in their premarital agreement of the right to seek an award of attorney fees is unenforceable as against public policy)

Nobody is a child in this case, and they all came to the mediation, which was the time for them to speak up. See next below.

provision, and because there is no required annual minimum payment required of McKenzie. As to authentication, as shown further below, the SOH itself demanded that the term remain in the agreement when an effort was still being made to formalize the Term Sheet. *See,* Ex. 41.[4]  That alone should be enough to preclude the AG from now, on behalf of the SOH, claiming that it violates public policy even if the AG could show a public policy that it violates. Moreover, despite his problems with authentication as testified to at the trial, Sterrs still testified "it would have been doable" just difficult. Tr. V2, p. 237. And of course, McKenzie repeatedly expressed his willingness to delete that term.

As to indemnification, Sterrs could only say "this could be a lot of money." Tr. V2, p. 239. However, both Sterrs and the AG can only speculate as to that risk as no judgment has been entered in the Southern District of New York case, and McKenzie is vigorously defending against the Morgan Art Foundation ("MAF") claims, so that the AG failed to prove that this provision puts the SOH at such financial risk that as a matter of public policy, the agreement must be enforced. Nor are the costs of McKenzie's attorney fees prior to the mediation[5] relevant as they are not covered by the clear terms of that Term Sheet. And with Brannan's uncontradicted testimony that the Estate has $180,000,000 worth of assets, and with no actual proof that either the authentication or the indemnity provision would financially upend the SOH or drain its considerable assets once they were distributed, this argument is completely unsupported even if it rose to the level of violating a public policy. At best it is in the bad deal category if Mr. Sterrs' opinion is to be credited.

---

[4]      All exhibits cited herein are Trial Exhibits admitted into evidence. *See,* Dkt. No. 139, Exhibit List.

[5]      The AG brought out in the cross-examination of McKenzie the attorneys' fees of Raymond Dowd and John Simoni charged prior to the Binding Term Sheet.

Nor did the AG establish that, just because there was no minimum royalty payment specified in the Term Sheet, McKenzie would not be earning sufficient proceeds payable to SOH. After all, the Estate stipulated that McKenzie had earned $10,000,000 for Indiana over the ten years the HOPE Agreement was in effect. *See,* Ex. 1 (2008 HOPE Agreement at p. 3 requiring $1,000,000 a year); Ex. 114, para. 18 (stipulated payments of about $8,000,000 from 2011-2018); Tr. V3, pp. 591-92; p. 617 (Brannan testifying that McKenzie "had been making an awful lot of money" for Indiana).

Even were the law welcoming of the AG's effort to discard contracts, and it is not, SOH and the AG, as its claimed protector, really have no basis to now complain about the fully executed Binding Term Sheet. The time to express their concerns for the Estate to consider was at or before the November 2019 mediation. And SOH was certainly at that mediation in force. *See,* Ex. 6, the mediation sign-in sheet, showing attendance by two lawyers for SOH (Seth Brewster and Nathanial Putnam), its CEO (Larry Sterrs), and two attorneys for the AG (Linda Conti and Christina Moylan) – the AG attorneys urging this mediation out of concern that the interests of SOH were not being well served by the huge legal fees being spent by the Estate's New York lawyers.  As Mr. Sterrs described the very reason for the mediation:

> I think the Attorney General's Office was hopeful that a meeting of the minds among all the parties was possible and to avoid what has actually happened, some long and protracted and expensive litigation. . . . Millions of dollars.

Tr. V2, p. 217; *see also*, Tr. V1, p. 128. And later, Sterrs testified:

> Let's see. I -- total fees I believe were in the $8 million range, I believe, at the time. I can't tell you for sure without reviewing the Estate accounting.

Tr. V2, p. 227. Given the litigation cost concerns, at least one of the five of them should have spoken up when they got to the mediation. Yet Mr. Sterrs acknowledged that during the entire two days involved:

> Q. While you were there during the two-day period, did you ever see Mr. Brewster or Mr. Putnam, your attorneys, seek out anyone to learn of the terms of the term sheet?
>
> A.  I don't think so.

Tr. V2, p. 233.

Yet SOH and the AG want this Court to now decide this matter crediting their claim that they were not consulted and that this deal was bad. However, even if a contract can be voided because in hindsight someone does not like its terms, in this case a non-party at that, those attending the mediation for SOH (all five of them) had an opportunity to review the deal *before* it was signed. After first telling this Court at trial that he could not recall whether it was signed or not when he first saw the Binding Term Sheet on the second day of the mediation (Tr. V2, p. 230), Mr. Sterrs was confronted by his prior deposition testimony where he admitted that it was not signed when it was handed by attorney Schutz (an Estate attorney) to SOH's attorney Nate Putnam:

> Q. All right. And do you recall that I asked you this question [at Sterrs' prior deposition] and you gave the following answer?
>
> Question: All right. Now, let's get to when you first saw the binding term sheet. As I understand your testimony, you said you saw it but it hadn't been signed yet.
>
> Answer: That's correct.  Well, let me be clear. I saw the -- you know, I didn't review it in detail when . . . Mr. Schutz -- who's Mr. Schutz?
>
> A. He was one of the attorneys for the Estate.
>
> Q. Okay. Mr. Schutz had passed it to Mr. Putnam. Is that Nate Putnam, your lawyer?
>
> A. That's correct.

Tr. V2, p. 231-32. It is thus simply not accurate for Mr. Sterrs to have told this Court that: "I never actually saw it, I never reviewed it, *it was never provided to us." Id.*, p. 229.

The Term Sheet having been presented to one of his lawyers and with the AG representatives and his other lawyer, Mr. Brewster, present and having the clear opportunity to review the Term Sheet before it was signed, they all now want this Court to believe that they were later "disappointed" when they read its terms. Tr. V2, p. 236-37. That defies the very purpose that brought all of them to the mediation – millions of dollars and counting. Yet Sterrs tells this Court that, in spite of their presence at the mediation and access to the bargaining process and even to the final draft of the Term Sheet itself, "I think what I -- what I wanted to say was that I put little energy into reviewing the term sheet." Tr. V2, p. 233. Lack of energy cannot now take Michael McKenzie's rights away by claiming that the Binding Term Sheet's provisions are a disappointment to SOH. And frankly, to the extent that the AG tells this Court that its function is to look after the interests of charities, it certainly took its eye off the only ball that mattered to the charity here involved, and it is too late now to impose its after-the-fact concerns on McKenzie.

### The Term Sheet is Certainly Specific Enough to be a Binding Contract

All the terms necessary to become a binding contract were included in the Term Sheet. Ed Boyle, for the Estate, wrote an email to McKenzie's then current lawyer stating that "the key terms of this agreement to resolve the disputes between the Estate and American Image are outlined in the November 26 signed agreement." Ex. 41. We certainly agree. These "key" terms included all the following specifics:

1) exclusive rights for American Image Art ("AIA") (McKenzie's d/b/a) to market the HOPE sculpture;

2) a ten-year term and specific payment (25%) to the Estate of art sales made by AIA;

3) no annual minimum royalty;

4) a clear limitation as to what is marketed;

5)  control to the Estate as to choice of galleries and contractors to make the sculptures;

6)  rights of approval vested in the Estate as to aesthetics;

7)  quarterly accountings to the Estate;

8)  consignment details and a method for recoupment by AIA of its production costs;

9)  transfer all rights to SOH once the estate is probated, of all the rights and obligations conveyed by this agreement to the Estate to SOH;

10) termination of the preexisting "HOPE" agreement between the parties [Ex. 1];

11) destruction of a previously used signing machine;

12) a method of authenticating the genuineness of previously created sculptures;

13) shipments of certain artworks to AIA from a third-party controlled by the Estate;

14) a 40% - 60% split of past sales proceeds being held by a third party;

15) a method by which AIA can produce other, non-confusingly similar art work using the name HOPE;

16) mutual releases between the parties;

17) "[t]he arbitration between the Estate and AIA will be dismissed with prejudice";

18) indemnification by the Estate of AIA in the New York litigation; and

19) reservation to the Estate of all copyrights.

Binding Term Sheet, Ex. 2.

Only three matters were left to be drafted by the Binding Term Sheet, all of which involved readily retrievable wording and did not allow for any substantive breakdown between the parties. The first two were "subject to normal and customary terms of settlement, including confidentiality and disparagement" (see Ex. 2, page 3), which have commonly accepted boilerplate wording that will surely not result in any real disagreement. The last of the three, the "production agreement" (*see*, Ex 2, p, 1) is likewise not subject to any genuine contention. As

McKenzie testified, after the death of an artist, his or her production methods for their artwork cannot be changed without voiding the ability to produce or market it as the work of the artist. No evidence was offered contradicting this testimony.

Mr. McKenzie is an extremely knowledgeable producer of high-end artwork. *See,* Ex. 5, p. 2[6] "Who is Mike McKenzie/American Image Art," and *id.,* p. 3, "AIA Development of Artist Promotion Business," and *id.,* p. 4, "AIA Promotion of Artists," attesting to a wide and impressive array of artists whose work has been produced by McKenzie. These are impressive credentials that were never challenged at trial. Nor was he challenged on cross-examination on his testimony about not changing production methods after the artist dies and there was no contrary testimony offered by the Estate or the AG, much less from anyone having experience in the art world. Therefore, the production method specified in complete detail in the original HOPE agreement (Ex. 1, pp. 4 and 5) is the only method that could be used in the new agreement. That did not leave open any potential dispute that could unravel the deal were it being implemented by those who really wanted to keep the deal after learning of Mr. Sterrs' dislike of its terms.

Even if this Court were to reject McKenzie's uncontradicted testimony about the production agreement, and there was no basis offered at trial by the opposition to do so, the Binding Term Sheet, executed by the parties, establishes "a legally binding agreement" because the parties called it a "Binding Term Sheet" and "mutually assented to be bound by all of its material terms; the assent [is] reflected and manifested in the contract, either expressly or impliedly; and the contract [is] sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liability of the parties." *See, Roy v. Danis,* 553 A.2d 663, 664

---

[6]    Exhibit 5 was invoked by the Estate, *see,* Tr., V1, p. 128

(Me. 1989); *In re Est. of Snow*, 2014 ME 105, ¶¶ 11-15, 99 A.3d 278, 282–83 (ample evidence

that the parties intended to enter into an enforceable settlement agreement to be subsequently

memorialized in writing). This Binding Term Sheet is not, as attorney Boyle's position morphed

for convenience from the pre-dispute email when he told McKenzie's attorney that it included all

the "key terms" (Ex. 41) to his trial testimony which was:

> Q. With respect to the term sheet itself, did you believe it was a final agreement or
> an agreement to agree?
>
> A. It was an agreement to agree.

Tr. V1, p. 138. *See e.g.*, *Concordia Partners, LLC v. Ward*, 2:12-CV-138-GZS, 2014 WL

3378663, at *8 (D. Me. July 9, 2014), in reasoning that applies equally here:

> . . . the Court cannot countenance a later attempt to recharacterize clear
> representations that this case was settled into mere requests for more time to
> negotiate a settlement. Quite simply, counsel and the parties are bound by
> representations made to the Court, particularly when the record shows—as this
> record does—that extensive, thoughtful negotiation preceded those
> representations.

There is no language in the Term Sheet suggesting that it is "an agreement to agree."

### The Intent of the Parties Was to Be Bound

Moreover, the parties who executed the Binding Term Sheet manifested their intent to be

bound by it. The document itself is called a "Binding Term Sheet." It unreservedly states that

"[t]his term sheet is intended to be binding." Ex. 2, p. 3. *See*, *Crowe v. Bolduc*, 365 F.3d 86, 97

(1st Cir. 2004) ("we are not so struthious as to ignore plain language, nor are we at liberty to

disregard terms purposefully inserted into an agreement by experienced businessmen") Indeed,

Counsel for the Estate clearly showed its intent to be bound by promptly informing the

Arbitration Panel, just days after the conclusion of mediation, as follows:

> We are pleased to report that the parties have signed a term sheet that *resolves all
> claims and counterclaims* in this action.

Ex. 14.[7] (emphasis added) "Resolving all claims and counterclaims" is quite a bit farther down the road than an "agreement to agree." Had Mr. Boyle truly thought the parties had only reached an agreement to agree, he would not have told the arbitrators that the claims had been resolved.

Moreover, McKenzie testified that the mediator warned him the Term Sheet was binding before he signed it as reflected in McKenzie's emails. Tr. V1, pp. 40-41; Ex. 17 ("In that we finished what I was told was the final agreement I thought we could act on this accordingly"); Ex. 28 ("How does a two page agreement that purports to be a 'binding agreement' become 31 pages with more to come?"); Ex. 29 ("the problem I have with this is there is MUCH change to what I was sold on a final/binding agreement"); Ex. 30 ("…even in a binding agreement you struggle for weeks to turn a two page finality into a 31 page and counting snakepit").  James Brannan acknowledged that the specific terms in the Term Sheet were not to be renegotiated, specifically acknowledging, for example, he would not renegotiate the ten year term or the gross proceeds percentage or the no annual minimum royalty or dismissal of arbitration. Tr. V3, pp. 566-68.

Attorney Ed Boyle also acknowledged "terms in the term sheet were material terms" not to be changed and were the "key terms.". Tr. V2, p. 329 and Ex. 41; *see also*, Tr. V1, p. 138. *See, Snow*, *supra,* 2014 ME 105, ¶11 ("A contract exists when the parties mutually assent to be bound by all its material terms, the assent is either expressly or impliedly manifested in the contract, and the contract is sufficiently definite.") The Term Sheet does not reflect mere "preliminary

---

[7]    *See*, *Forrest Associates v. Passamaquoddy Tribe*, 760 A.2d 1041, 1043 (Me. 2000) (authorized statements made by the agent [attorney Boyle] to a third person are considered admissions of the principal) While Boyle testified at trial that he would have told the case manager to dismiss the arbitration if the Term Sheet was a final agreement, this is yet another "later attempt to recharacterize clear representations that this case was settled into mere requests for more time to negotiate a settlement." *See, Concordia Partners, supra.*

negotiations" and the "absence of a formalized contract does not affect the binding nature of a potential contract if the parties intended to close the contract prior to a formal writing." *Id*.

In addition to the clear and specific terms in the Term Sheet, both parties took "action in preparation for performance." *Id*. *See,* Ex. 14 (counsel reported to AAA that disputes were resolved); Ex. 15 (McKenzie 11/29/19 email to SOH to open communication as a partner to assist going forward); Ex. 25 (Estate's draft formal agreement at p. 6 stating "as a result of mediation, the Estate and AIA have agreed to resolve all disputes between them…").[8]

### There was No Repudiation by McKenzie

The party asserting repudiation must show it clearly:

> "The manifestation of an intention to repudiate a contract may be made and communicated by either words or conduct. The words or conduct evidencing such refusal or inability to perform, however, must be definite, unequivocal, and absolute."

*Wholesale Sand & Gravel, Inc. v. Decker*, 630 A.2d 710, 711–12 (Me. 1993).

> To constitute an anticipatory breach justifying the renunciation of the entire contract, the refusals to perform must have concerned obligations or promises "going to the whole consideration, and they must have been distinct, unequivocal, and absolute."

*Martell Bros. v. Donbury, Inc*., 577 A.2d 334, 336–37 (Me. 1990). To show that McKenzie materially breached the Binding Term Sheet, the burden is on the Estate to show:

> We apply traditional contract principles to determine if a party has committed a material breach. ... A material breach "is a non-performance of a duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." ... [internal citations omitted]

*Associated Builders, Inc. v. Coggins*, 1999 ME 12, ¶¶ 6-8, 722 A.2d 1278, 1280–81. The Estate threw against the wall various attempts to show that McKenzie repudiated or breached the

---

[8]     McKenzie's testimony on cross-examination that he did not yet get to fully perform under the contract (such as reporting to the Estate on the sale of artwork) does not change this.

Binding Term Sheet and none of them can stick under the above cited law. We discuss them
separately.

### McKenzie's Complaints About Venable's Attorneys' Fees

Much was made at trial of McKenzie's warnings that excessive, already billed attorneys'
fees and Venable's desire for more were derailing this Settlement. However, that is not a basis to
show repudiation. McKenzie directly and shrilly expressed his concerns to the AG, the Estate,
and to SOH about excessive and unnecessary fees. *See, e.g.*, Ex. 21 (12/8/19 McKenzie to SOH
counsel and AG) raising concerns about attorneys "milking this multiple lawsuit thing" and:

> I would feel much more comfortable knowing what the fees are so far as I literally
> envisioned Star of Hope Museum with Bob over a long period going back to 1993
> or so. I am hating seeing every penny I made for him go to people he never met
> and nothing to star of hope. Is there any way to support Star of Hope NOW or
> must all the money go to a poorly conceived lawsuit likely to go three more years
> – then to appeal.

*See also*, Ex. 24 (McKenzie's 12/13/19 email to SOH counsel and AG warning about attorney
Venable and other attorneys possibly swindling Estate and SOH); Ex. 32 (and his 12/30/19 email
to SOH counsel warning about Venable).

Indeed, it later turned out, although quite late in the game, that the AG *agreed* that the
Estate attorneys had charged excessive fees, pursued such a claim in the Probate Court and
achieved a *voluntary* settlement involving repayment of $2 million (in cash and credits). Tr. V2,
pp. 226-227. A reasonable inference can be drawn from that amount that these lawyers were
caught red-handed overcharging by Ms. Conti and Ms. Moylan, otherwise a settlement coughing
up that amount of money would not have happened voluntarily.[9] McKenzie's warnings about
fees can hardly be considered any repudiation.

---

[9]     Thereafter, the Venable firm was terminated by the Estate along with Kevin Lipson and
replaced by Eaton Peabody, the same counsel representing the SOH. Tr. V3, p. 580-81.

**The "Disparagement" of Venable**

As discussed just above, the emails relied upon by the Estate for this claimed "breach" by disparagement mostly criticized Venable's attorneys representing the Estate, but not the Estate itself which was the only party to the Term Sheet. Likewise, any criticisms of Brannan were not disparagement of the Estate itself. McKenzie's complaints were clear that he thought Venable and possibly Brannan were harming the Estate by the huge legal fees being charged. Nor did McKenzie make his laments about excessive fees public but rather emailed counsel for the Estate, SOH, and AG directly. His complaints certainly caused no damage even to Venable. The Estate kept using that firm as its lawyers despite what McKenzie said. And the managing partner at Venable blew off McKenzie's email to him about the overbilling. *See,* Ex. 50; Tr. V2, pp. 342-344 (testimony that the managing partner took no action in response to McKenzie's complaints).

**McKenzie's Supposed "Breach" of Confidentiality**

Nor did McKenzie disclose any confidential terms by the press release.[10] Disclosing the fact that he and the Estate agreed to continue an art publishing relationship was not a fact that possibly could be kept confidential. And to the extent McKenzie inaccurately described terms, as the Estate contends, then he literally did not disclose the terms. In any event, his press release can hardly sustain a finding that this action qualified as repudiation because it clearly was not "going to the whole consideration, and they must have been distinct, unequivocal, and absolute." *Martell Bros., supra.*

Even if McKenzie did breach the Binding Term Sheet by his press release, quite a stretch under the law, the Estate waived this breach claim. Waiver is the "voluntary and knowing

---

[10]     And McKenzie's "finally the dirtbags lose" (Ex. 16) reference was not to the Estate or its attorneys but to MAF, the party that had sued McKenzie and sought to interfere with McKenzie's rights to publish Indiana artwork. Tr. V1, pp. 54-55.

relinquishment of a right" and it "may be shown by a course of conduct signifying a purpose not to stand on a right, and leading, by a reasonable inference, to the conclusion that the right in question will not be insisted upon." *See, Dep't of Hum. Servs. v. Brennick*, 597 A.2d 933, 935 (Me. 1991)(internal citations omitted). "If one in knowing possession of a right does something inconsistent with the right or of his intention to rely upon it, he is deemed to have waived that right and is estopped from asserting that right if renunciation of the waiver would prejudice the party who has relied upon it." *Interstate Indus. Unif. Rental Serv., Inc. v. Couri Pontiac, Inc.*, 355 A.2d 913, 919 (Me. 1976) "To bar enforcement of a known contractual right, the waiver, however established, must have induced a belief in the party who is claiming reliance on that waiver that the waiving party intended voluntarily to relinquish his rights." *Id*. This Court should therefore look not only to the conduct of the party alleged to have waived but also to the effect of those acts on the party who now claims it was thereby lulled into a false security. *Id*.

The Estate's continued actions for months after this press release (and the retraction of it by McKenzie) to finalize the Term Sheet by attempts thereafter to arrive at a formal Settlement Agreement (Exs. 25, 26)[11] are inconsistent with its claim now that the draft press release was a material breach ending the enforceability of the Binding Term Sheet. There was no evidence that the draft press release was published or disclosed to the public. Rather, attorney Boyle wrote to McKenzie's lawyer instructing him on the wording that McKenzie had to use in the retraction email and that, only if that email went out with that language "I [Boyle] can confirm that upon receiving those emails, Venable and the Estate will resume work in drafting the Settlement papers." (Ex. 19, Boyle's Email to McKenzie's attorney). Such a retraction was sent using the

---

[11]     *See also,* Ex. 35 (emails of 1/7/20) and testimony re parties' conference call on January 9, 2020 to continue discussions of formalizing Term Sheet.

15

wording the Estate's lawyers insisted upon. And as Boyle testified, the Estate moved forward with drafting the settlement papers thereafter. *See,* Tr. V1, p. 195 where he admits that: "Q: Okay. But you said if he doesn't retract it you're not moving forward, right? A. Yes. / Q. And you moved forward after he sent that retraction. A. We did."

McKenzie clearly relied on the Estate's conduct indicating his retraction of the draft press release was sufficient because he continued operating under the Term Sheet including thereafter repeatedly requesting the formal version of the agreement be sent to him, by a attending a teleconference with the parties (Ex. 35) and by sending back a redlined draft settlement agreement on February 14, 2020 (Ex. 55). *See, Carpenter v. Massachusetts Bonding & Ins. Co.*, 161 Me. 1, 6, 206 A.2d 225, 228 (1965) (where parties continued to work together after one party's technical breach of contract obligation and the other party did not apply available remedies in response to breach and was not damaged, breach found to be immaterial); *contrast, Associated Builders, Inc. v. Coggins*, 1999 ME 12, ¶¶ 6-8, 722 A.2d 1278, 1280–81 (A material breach "is a non-performance of a duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end.")

There is another telling point about McKenzie's acquiescence to Mr. Boyle's demand that a retraction be sent out using Boyle's exact wording, or else. McKenzie, far from being the least contentious persona, promptly using nearly *verbatim* the language dictated to him by Boyle sent out the retraction.[12] Had McKenzie really wanted out of the Term Sheet, this was his open door to do so. Yet he sent it out.

---

[12]     The Estate argued that McKenzie did not send the retraction they demanded because Boyle's proposed retraction stated "The press release I sent you last week was premature and inaccurate, and I am retracting it. Please disregard it. I will update you if there is any future news." (Ex. 19) while McKenzie's retraction stated "The press release I sent you last week was premature and I am retracting it. Please disregard it. I will update you accordingly." (Ex. 20) But

**McKenzie Did Not Otherwise Repudiate but Repeatedly Sought
to Finalize the Term Sheet**

Neither the Estate nor the AG presented words or conduct by McKenzie establishing "definite, unequivocal, and absolute" refusal to perform under the terms of the Term Sheet. *See, Wholesale Sand & Gravel, Inc. v. Decker*, 630 A.2d 710, 711–12 (Me. 1993) (and the case law cited in McKenzie's Pre-Trial Brief) To the contrary, McKenzie's emails show that he wanted to perform under the Term Sheet. *See,* Ex. 13[13] ("you are holding up sales which provide money to Estate/SOH"); Ex. 24 ("The estate should continue making money with American Image an[d] stop interfering with its prime income source"); Ex. 30 ("One of my partners is a top Historical Renovator and I need to repair the relationships with large corporations who can contribute to the Star of Hope…"); Ex. 54 ("AIA will deliver high quality production that has given the estate/Robert Indiana $10,000,000"); Ex. 63 ("I still do not understand how this 'binding final agreement' is burned with no real explanation? We never walked away from the agreement in fact signed it, agreed to the terms and only questioned the sanity of The Estate attempting to 'authenticate' art which every important estate has shown is a very bad thing to do costing huge money, and attracting lawsuits with not positive benefit to the estate")

McKenzie repeatedly sought to finalize the existing Term Sheet. *See,* McKenzie Emails at Ex. 17 (12/6/19: "I can't imagine why ten days later we have no additional final agreement as I was told all that was happening was the paperwork was being corrected for any typos and on handwritten sentence.") [compare to Ex. 2, the executed Term Sheet reflecting one handwritten

---

clearly McKenzie's omission of the language "and inaccurate" did not make a difference to the Estate at that time since they continued to work on the formal version of the Binding Term Sheet.

[13]    Despite Boyle's argument at trial that this particular email of 12/12/19 was an attempt by McKenzie to change settlement terms, the testimony showed that McKenzie was emailing an old draft of the term sheet from the mediation with proposed changes from back then. The real point of McKenzie's email was to prompt the Estate to get the Term Sheet in formal form as agreed.

sentence added to typed text]; Ex. 22 (12/12/19: "how does this take 17 days???????? You are

holding up sales…"); Ex 27 (12/17/19: "taking a two page settlement document, working on

eight words of changes, coming up with a 1 page document, which doesn't even show the eight

words of changes, an[d] still has more pages to come hardly seems like following the two page

settlement…since you added 29 pages do I add 29 pages…."); Ex. 28 (12/17/19: "How does a

two page agreement that purports to be a 'binding agreement' become 31 pages with more to

come? … So we are trying to turn a 2 page document into a 60 page wrestling match, is that the

goal? And that is about 'settling'?"); Ex 29 (12/18/19: "the problem I have with this is there is

MUCH change to what I was sold on a final/binding agreement"); Ex. 30 (12/20/19: "Where's

the final document a month later?"); Ex. 31 (12/26/19: McKenzie's attorney to McKenzie: "I

have not seen any reply to your last request to the estate to rework the proposed settlement

agreement"); Ex. 34 (1/3/20: "I have reviewed and revised the parts of the Settlement Agreement

sent to me by the Estate. I have requested the complete agreement and it has not been provided to

me. I don't know where to turn to have them comply with the term and it is somewhere between

ridiculous, obnoxious and caustic to try to push me to sign [o]r finish a document which arrives

incomplete."); Ex. 36 (1/8/20: "My interest is in seeing the museum thrive and bob get his

rightful place in history which I have worked on to the tune of $10,000,000 to Him/Star of hope,

not taking fees."); Ex. 47 (1/23/20: McKenzie's attorney: "Mr. Boyle misleadingly suggests AIA

is failing to honor a mediation term sheet when it is PR Brannan and the Venable law firm who

are behaving deceptively and in gross breach.")

     Despite all of the above efforts to move the simple finalizing along, Boyle testified that

the Estate was the one "bending over backwards to try to get a settlement agreement and

production agreement signed here that was going to contain the terms of the term sheet" while,

Boyle testified, it was McKenzie trying to change terms. Tr. V2, p. 354. Boyle's testimony ignores that McKenzie's redline changes on February 14, about which the Estate complains, came only after the Estate itself first made material substantive changes to the Term Sheet. Exs. 25, 26. *See, e.g.*, Exhibit 26, Part 5, adding the change of a whopping minimum of $2,000,000 to be paid by McKenzie to the Estate where the Binding Term Sheet provided no annual minimum payment (*compare*, Ex. 2). So much for "bending over backwards." Moreover, at the trial Boyle was disingenuous about this $2,000,000 change:

> Q. You put in there that Paragraph 5 [in Exhibit 26], if you look at the actual second paragraph under that subheading, is where in your draft it says it requires that in any two consecutive calendar years cumulatively, if it totals less than 2 million either party may terminate, in effect.
>
> A. Yes.
>
> Q. All right. And that changes one of the terms in the term sheet, which provided no annual minimum royalty payment to the Estate, correct?
>
> A. I would consider this an additional term. This created some protection for both parties.
>
> Q. Mr. Boyle, I asked you if it changed the term.
>
> A. So --
>
> Q. Mr. Boyle, did it change the term?
>
> A. My answer is that it's not a change of any term. It's an additional term.

Tr. V1, p. 186. This sworn testimony was in the face of the Binding Term Sheet which, at Ex 2, page 1, sub-bullet point 3, explicitly provides for "No annual minimum royalty payment due the estate." This flagrant playing with the facts is about as worthy of belief as was Mr. Boyle's assertion under oath that the Binding Term Sheet was just "an agreement to agree" when it says no such thing but instead calls itself binding, not just in the Term Sheet's title, but also states, at page 3, that "[t]his term sheet is intended to be binding."

19

The Estate's changes to the Binding Term Sheet also added new parties to the release, individuals associated with MAF and MAF itself, the party making false forgery and other claims against McKenzie in the New York federal case and who were not parties to the Binding Term Sheet. Tr. V1, pp. 187-88 and Ex. 25, at ¶11. Adding such an expansive and consequential scope to the release was surely a significant change to the Binding Term Sheet. The Estate also made significant changes to the agreed upon indemnification provision including making the change that the Estate could settle the MAF case against McKenzie in New York without McKenzie's approval or consent of settlement terms and the Estate also cut off the period of time covered by indemnification while the Binding Term Sheet did no such thing. Tr. V1, pp. 188-90. Boyle acknowledged that the Estate got a negative reaction from McKenzie when he received Boyle's draft agreement with proposed changes just as the Estate reacted negatively to McKenzie's later redline draft sent in response. Tr. V2, pp. 372-373. Tellingly he would not answer the next question despite its obvious clarity particularly for an experienced attorney:

> Q. And so when you make proposed changes to a draft to the key terms from the term sheet it's okay, but if McKenzie proposes changes to the key terms it's repudiation.
>
> A. I don't understand the question.

*Id*., p. 373.

When Boyle was asked to point to where exactly McKenzie expressed a refusal to perform, he could not do so. Instead, Boyle first responded that repudiation was shown by attorney John Simoni's failure to respond to Boyle's letter (Ex. 52) in which he claimed to Simoni that McKenzie had repudiated the deal and that Simoni "never said this is not a repudiation. So that was the clearest expression of their intent to repudiate." Tr. V2, pp. 353-54. If that is the best they've got, they simply fail. Simoni did respond thereafter by sending back a

20

redline draft agreement requesting the Estate to review and advise (Ex. 55) and when Boyle repeated his repudiation claim in response that same day, Simoni replied "Your assessment of who repudiated is way off but more importantly, I don't appreciate the lack of deliberation…" and "[t]hink about your client for once and assess the agreement and get back to me with a proper reasoned response." Ex. 56. Boyle's assertion that Simoni did not respond was false.

Boyle then offered as proof of repudiation his view that McKenzie's actions up to February 2020 indicated McKenzie was not going to sign and was going to insist on terms different from the Term Sheet. Tr. V2, pp. 355-56. But he could not point to any refusal by McKenzie to sign a complete, formal agreement that actually reflected the Term Sheet terms. *Id.* So Boyle began to argue his own opinion as to what constitutes repudiation. *Id.* What Boyle ignores is that the law provides "a request or demand to modify a contract does not by itself constitute a repudiation *unless the party seeking the modification threatens a total breach of the contract.*" *Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 775–76 (Me. 1989)(emphasis added) McKenzie made no such threat.[14] Rather, McKenzie's email complaints and building frustration were not a refusal to perform but a reaction to the conduct of the various attorneys for the Estate, their delay in drafting a complete formal agreement, then sending a draft going well beyond the Term Sheet and making material changes to the agreed upon terms imposing new obligations on McKenzie (like adding a $2,000,000 sales minimum when the Term Sheet provided explicitly for no minimum), and their refusal to then consider other term changes that McKenzie proposed, like abandoning the authentication provisions that he warned would be

---

[14]    Boyle complained that McKenzie's redline at Exhibit 55 is "inconsistent" with the Term Sheet (Tr. V1, pp. 166-167) but the Estate itself proposed a draft with clearly inconsistent terms as cited above. And Simoni's cover email does not demand all the redline changes be accepted or there will be no deal, but rather requests "Please review and advise." *See*, Ex. 55.

expensive and created a real possibility for liability and which Sterrs testified that he did not like

at all, calling it "risky business:"

> Q. Did you call it [authentication] risky business?
>
> A. [Sterrs] Yeah, I think it's risky business.
>
> Q. Okay. And you communicated that concern to somebody, I assume.
>
> A. Oh, I must have. I must have.
>
> Q. And were you aware that Mr. McKenzie thought the same?
>
> A. No.

Tr. V2, pp. 237-238.

Despite this testimony, in reality Sterrs had received emails directly from McKenzie

warning him that the authentication provision would be very bad for the SOH. Exhibit 39 is an

email dated January 10, 2020 (after Sterrs said he concluded himself that authentication was a

problem)[15] sent directly to Sterrs, SOH counsel, and AG counsel entitled

"AUTHENTICATION" in which McKenzie expresses how the authentication provision is bad

for the Estate because "authentication returns no money to the estate and conversely ends up

costing a fortune in fees, insurance, and, the worst, legal battles that invariably ensue" sent the

day after a conference call with all these parties discussing the same. But while this email

reflected the very opinion Sterrs now gives to say the Term Sheet is so bad a deal as to be against

public policy, the affront to Mr. Sterrs sensibilities when he received McKenzie's email back in

---

[15]     Sterrs testified that just after the mediation, in December 2019, he got a "good look" at
the McKenzie Term Sheet and concluded that there were certain terms that would be difficult for
SOH including the authentication provision. Tr. V2, pp. 236-37. He said when he first got a grip
on the document, it was his firm conviction that the Term Sheet was a bad deal and that he
openly expressed that concern: "I can't believe there's a human who's been near me that I haven't,
you know, expressed concern to about this." *Id*., p. 246.

January 2020 was that McKenzie was being "inconsistent" by raising problems with a term he signed off on (Tr. V2, p. 285) – anything to be cut lose from the Binding Term Sheet.

Moreover, the head lawyer for the Estate's team, Mr. Boyle, continued writing to McKenzie's lawyer that "the independent expert process for ensuring the authenticity of any works to be sold in the future is critically important to the Estate and the Foundation." Ex. 41. This was truly not just wrong as it referred to SOH, but also quite hollow from a commercial lawyer having no experience in art production. Perhaps McKenzie was wrong to interpret that comment the way he did but this formed part of the basis for McKenzie claiming that Venable was churning fees. More importantly, the fact that McKenzie was warning that authentication was risky is not a repudiation of the Binding Term Sheet.

There is no dispute that McKenzie repeatedly implored the Estate to reconsider the term requiring authentication of Indiana artworks. But he never stated or threatened that if that term was not removed, he would not sign off on a formalized version or go forward under the Term Sheet he had executed. McKenzie explained during his testimony (as reflected in his emails) that he was making every effort to protect Indiana's legacy and the SOH by explaining to attorneys (without art expertise) the problems the Estate/SOH would face with authentication based on his own knowledge and experience in the art world.

### The BRAT Sculpture

McKenzie also repeatedly expressed his frustration with the Estate's refusal to acknowledge the authenticity of the 20-foot-tall BRAT sculpture sitting outside the Johnsonville's main office in Wisconsin. However, McKenzie never refused to go forward with the term related to BRAT agreed upon in the Term Sheet, namely, that the Estate would remain neutral as to its Authenticity. *See* Ex. 2, p. 2. In fact, McKenzie complained that the Estate was

not complying with that neutrality term. *See*, Ex. 47, p. 2 (McKenzie's attorney: "AIA shook hands on the Estate staying neutral on authenticating BRAT…the Estate has COMPLETELY violated that neutral position…").

Moreover, McKenzie's frustration with the Estate's refusal to acknowledge BRAT as an Indiana work is understandable given that Jamie Thomas, who saw Indiana daily and had his power of attorney, was readily available to the lawyers with his knowledge of BRAT's authenticity, including his observations of Indiana working on the piece, receiving payment for the piece, and displaying a copy of the BRAT image in his home as Thomas testified at trial. Tr. V2, pp. 312-313. Furthermore, back in January 2020, McKenzie's counsel (email at Ex. 44) specifically directed Brannan to Thomas' sworn interrogatory responses served in the New York federal case as of that time.

At trial, Brannan first testified on re-direct that he did not know back at the time they were working to formalize the Term Sheet that Thomas could authenticate BRAT:

> …I also went through the transcripts and the discovery that I could get my hands on to find out whether or not there had been any representation by Jamie Thomas -- if he had been asked about whether or not BRAT was authentic. And that was important to me because he was pretty much living in the Star of Hope with Bob Indiana and he would know that answer. I wouldn't.
> And the only thing I found was in the transcript that Ms. Zerner questioned Jamie Thomas just last winter. He then asked Jamie Thomas -- she then asked Jamie Thomas if BRAT was something that Robert Indiana had been working on with -- with Bob -- with Mr. McKenzie. And he answered yes.
> But I didn't have that information for me at the time when this term sheet was being negotiated. I didn't know that. If I had known that then I would have probably had a different opinion maybe about authenticating BRAT. But my attorneys also -- it's in evidence – Ed Boyle suggested to Star -- to Mr. McKenzie's counsel that they just simply go to Jamie Thomas and get an affidavit saying that Robert Indiana worked on this sculpture, and they didn't do that.

Tr. V3, p. 596.  On re-cross, Brannan pointed to Exhibit 41 as the basis for this testimony but that exhibit does not support his claim. *Id*., pp. 600-601.

24

So then Brannan claimed that he had in fact reviewed the sworn Thomas interrogatory answers at the time back when McKenzie's attorney was telling the Estate to do so. Simoni had been urging the Estate to consider the interrogatory answers (and other evidence) when inquiring "what is the basis for the reluctance to get behind confirming BRAT as authentic?" Ex. 44. Brannan testified: "I actually went to Mr. Boyle and asked him for numbers 11 and 12 and I -- and I read them. I see that they don't appear to be attached here. But they just didn't say what this purports they said." Tr. V3, pp. 601-02. And yet when shown those exact same sworn interrogatory responses while he was on the stand during the trial, Brannan acknowledged that Thomas' interrogatory answer stating that: based on photographs and other documents that have been produced in this litigation and Thomas's discussions with Mr. Indiana when Thomas was attorney in fact for Mr. Indiana, Mr. Indiana authorized BRAT," Brannan reacted that Thomas' statement was clear and then switched his previous testimony from stating with certainty that he read the interrogatories and they were not sufficient to "I don't remember seeing that previously. I may have but I don't think so." Tr. V3, pp. 612-13. And yet the Estate and SOH complain repeatedly that it's McKenzie who is inconsistent.[16]

### The Estate and SOH Attorney's Attempt to Avoid the Binding Term Sheet

A fair inference is that once SOH voiced its belated concerns, it was the Estate, not McKenzie who sought to avoid the Binding Term Sheet. Certainly, adding a $2,000,000 floor payment sought sparks as did the rest of the changes made in Exhibits 25 and 26, the draft final documents submitted by the Estate.

---

[16]   And it is these kind of antics by both the Estate and SOH throughout these dealings that engendered McKenzie's frustration, criticisms, and suspicions of foul play (including concerning the discovery obligations of the parties).

Also, Exhibit 103 revealed what was really going on behind the scenes between the Estate and SOH and it was the animus towards McKenzie that motivated that email as shown below. The motivation for that email is that SOH clearly preferred to have no relationship with McKenzie and said so in high dudgeon – and they enlisted the Estate to end the deal by inducing or claiming repudiation by McKenzie. They simply did not like McKenzie, ignored his $10,000,000 success with Indiana's artwork and, as to all the emails from McKenzie flagging the problem of the Estate's attorneys' fees bilking assets and what that meant for SOH, the reaction from Sterrs at the time was not any concern over the content of those emails (repeatedly raising serious warnings that turned out to be true as to excessive fees and authentication) but rather he was put off by the angry tone and misspellings and he failed to interpret any of those email warnings as "advancing the position of the Star of Hope." Tr. V2, pp. 258-59, 261, 275.

Sterrs also bristled that McKenzie might have gotten the idea or envisioned a more involved relationship with SOH such as being a representative or officer of SOH and according to Sterrs "that wasn't going to happen." *See,* Tr. V2, p. 265, Sterrs commenting on Exhibit 38, a McKenzie email about helping SOH. Sterrs also did not like McKenzie's email at Exhibit 40 because he felt McKenzie was lobbying for a position on the SOH board. Tr. V2, p. 266. But there was no demand by McKenzie to be a director of SOH, rather, yet again, McKenzie was making the point that the SOH was severely at risk of the fees being racked up by the Estate in which McKenzie contrasts his own motives and willingness to help SOH against the Estate attorneys saying: "I am here to care about Star of Hope and would work on the board or for the well being for FREE while I also give them Money. Will Brannan or Lipson do that?" Ex. 40. All Sterrs took from that multi-paragraph email about fees and suspect motives of the Estate's attorneys is that McKenzie might want a board position.

Sterrs did not like McKenzie and his tone and so Sterrs sought to kill the Term Sheet deal, a plan the attorneys executed. Before Boyle sent off the Exhibit 41 email to McKenzie's counsel, which rejected any consideration of McKenzie's points, he ran it by SOH counsel and Sterrs, Ex. 103. SOH attorney Putnam unequivocally stated in reaction to Boyle's draft email (which explicitly stated that the SOH wanted the authentication provision in the Term Sheet despite Sterrs' view that authentication was a "risky business"):

> . . . I believe you are trying to prevent the estate from being perceived as repudiating the settlement. Instead, if this is going to be the result, we want it to be clear that it is due to McKenzie's – and not the estate's or SoH's – unwillingness/inability to abide by the terms of the settlement. In other words, McKenzie needs to be the one to repudiate rather than the estate.
>
> If this is in fact your objective, then I believe the e-mail is acceptable. …

And Boyle responded by confirming this objective:

> …You're correct – the Estate is not repudiating the term sheet and is not willing to renegotiate those terms. Any decision to walk away from the term sheet will be McKenzie's.

Ex. 103.

After the draft email was thereafter sent off on January 14, 2020 to McKenzie's attorney (Ex. 41) informing McKenzie that the authentication provision must stay in their agreement, McKenzie still did not refuse to perform as the Estate and SOH hoped. McKenzie's lawyer raised the BRAT issue (Ex. 44), pointing to the Thomas sworn interrogatories and other evidence of its authenticity, but Boyle in response still claimed they had insufficient evidence to determine Indiana was involved in that project and stuck to the plan to make it "clear that it is due to McKenzie's – and not the estate's or S0H's – unwillingness/inability to abide by the terms of the settlement" (Ex. 103). But while the Estate was supposed to remain neutral as to BRAT, McKenzie and his counsel later learned from Johnsonville that someone named "Kevin"

27

contacted them to convince them BRAT was fake. Tr. V3, pp. 480-83. Believing this had to be Kevin Lipson, for the Estate, McKenzie's counsel requested documentation on BRAT, including Estate communications with Johnsonville to address this matter. *See,* Ex. 45. This letter was sent as a "Settlement communication" and opened by indicating it was an attempt "to resolve the impasse on terms needed for a prosperous continuing Star of Hope Foundation" as McKenzie still wanted to go forward with their deal and publish artwork that would ultimately benefit SOH. But Estate counsel used this to support their objective "to prevent the estate from being perceived as repudiating the settlement" and instead make their record to argue McKenzie is the one repudiating. *See,* Ex. 46 (Boyle email at p. 2 "The Estate needs to know whether McKenzie is going to perform on the agreement in the term sheet, or repudiate it. There is no third option."); Ex. 51 (Boyle letter: "The Estate understands these communications to be a repudiation of the Binding Term Sheet by Mr. McKenzie and American Image Art, and will act accordingly."); Ex. 56 (Boyle email: "Based on this draft and your client's other communications and actions since the term sheet was signed, the Estate understands that McKenzie/American Image has repudiated the signed settlement term sheet. The Estate sees no option but to proceed with the arbitration.")[17]

SOH counsel joined in attempting to seek a response from McKenzie's attorney that they could use against McKenzie to escape the deal. *See,* Ex. 48 (Brewster: "…does McKenzie plan to assert claims against the Star of Hope?") But again, McKenzie's attorney's response did not

---

[17]     After this email, McKenzie was forced to engage in the arbitration again. The Estate had declared their deal dead and McKenzie was compelled to defend himself against claims pursued by the Estate to avoid defaulting in these proceedings. Thus, McKenzie did not breach or repudiate the Term Sheet by engaging in arbitration and thereafter pursuing other claims against the Estate.

indicate a walk-away from the Term Sheet deal but rather expressed that they felt the SOH was

working with the Estate against them:

> Hi Seth:
>
> We copy the Star of Hope on big picture discussions with the venable firm, we hear from the AG that we will be hearing from the Star of Hope, and instead of something useful, I get an email from you wondering if the most angry and harmed guy in the room is going to bring claims.
>
> I am sorry Sir but I do not get it.
>
> Do I specifically know if such claims would be brought against Star of Hope? No.
>
> Have you been enabling the estate to squeeze Mr. McKenzie instead of listening to Mr. McKenzie? Absolutely.

Ex. 48.

McKenzie and his attorney were right.

Judgment should enter for McKenzie[18] declaring the 2019 Binding Term Sheet an

enforceable contract that supersedes the 2008 HOPE Agreement and ordering specific

enforcement.

---

[18]     The Estate's motion for a directed judgment arguing that judgment should enter for the Estate and that this case should be sent back to arbitration based on testimony by McKenzie that the HOPE Agreement has not terminated should be denied, as McKenzie's counsel argued during trial, because the Estate's argument mischaracterizes the First Circuit's ruling as to what this Court must decide, McKenzie's testimony was taken out of context, and the argument is unsupported by the evidence, as shown above. *See, McKenzie v. Brannan,* 19 F.4th 8, 21 (1st Cir. 2021)("does the 2019 Term Sheet supersede the 2008 Agreement and specifically extinguish the arbitration provision; or is it an unenforceable writing that could not have terminated either the 2008 Agreement or its arbitration agreement? …Given our earlier analysis, the "conundrum" now falls to the district court to navigate.")

        To the extent the Estate or the AG tries to argue to this Court that the Estate's cease and desist letter allegations (Ex. 3) or the claims by MAF in New York alleging misconduct by McKenzie should be credited and held against McKenzie on the issues in this case, such argument should be rejected. Neither the Estate nor MAF's claims against McKenzie regarding art publishing or discovery conduct have been proven. To the contrary, the testimony of Jamie Thomas and other evidence during this trial discredited many of those claims.

Dated: August 18, 2022                    Respectfully submitted,

                                          /s/ *John J.E. Markham, II*
                                          John J.E. Markham, II (Maine BBO No. 2674)
                                          /s/ *Bridget A. Zerner*
                                          Bridget A. Zerner (*Pro Hac Vice* – MA 669468)
                                          MARKHAM & READ
                                          One Commercial Wharf West
                                          Boston, Massachusetts 02110
                                          Tel: (617) 523-6329
                                          Fax: (617)742-8604
                                          jmarkham@markhamread.com
                                          bzerner@markhamread.com

                                          -and-

                                          908 Maine Street
                                          Waldoboro, Maine 04572
                                          Tel: (207) 790-8049


## CERTIFICATE OF SERVICE

I, Bridget A. Zerner, do hereby certify that on August 18, 2022, I served a copy of the foregoing on all counsel of record via the CM/ECF filing system.


                                          /s/ *Bridget A. Zerner*
                                          Bridget A. Zerner