## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| MICHAEL MCKENZIE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Docket No. 2:20-cv-00262-NT |
| | ) |
| JAMES W. BRANNAN, et al., | ) |
| | ) |
| Defendants. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case, which comes before me on remand from the First Circuit, concerns two agreements governing the use of the late artist Robert Indiana's "HOPE" imagery: one entered into in 2008 (the "**2008 Agreement**") and one entered into in 2019 (the "**2019 Term Sheet**"). The parties here disagree as to whether the latter agreement, the 2019 Term Sheet, is a binding, enforceable contract, and, if so, whether it extinguished an arbitration provision contained in the 2008 Agreement.

In July of 2020, the Plaintiff, Michael McKenzie, sued Defendant James Brannan, personal representative of Indiana's estate, and Maine Attorney General Aaron Frey in this Court seeking an order declaring that the 2019 Term Sheet is binding and specifically enforceable, as well as injunctive relief enjoining the arbitration pursued by the Defendants under the terms of the 2008 Agreement. Compl. ¶ 5 (ECF No. 1).

Without getting to the merits of the Plaintiff's suit, Judge Woodcock held that an arbitrator, not the Court, must decide whether the enforceability of the 2019 Term Sheet is an arbitrable issue. *See McKenzie v. Brannan*, 496 F. Supp. 3d 518, 533 (D.

Me. 2020). Thus, the case was stayed and the issue of arbitrability was sent to the American Arbitration Association ("**AAA**") panel in New York. *See id.* at 541. After reviewing the question, the AAA panel determined that the dispute was arbitrable, meaning that the panel, not this Court, would proceed to the merits issues. Order (ECF No. 63). In light of the AAA's decision, and with the consent of the parties, this Court dismissed the Plaintiff's Complaint without prejudice. Order (ECF No. 67).

Immediately thereafter, the Plaintiff appealed this Court's order directing the question of arbitrability to the AAA as well as the subsequent order of dismissal. Notice of Appeal (ECF No. 69). The First Circuit, confining itself to the "who decides question," reversed and vacated the orders below. *McKenzie v. Brannan*, 19 F.4th 8, 16 (1st Cir. 2021) (internal quotation marks omitted). Specifically, the First Circuit determined that "the court—not the [arbitration panel]—holds the decision-making power to decide whether the parties intended to arbitrate this dispute." *Id.* The First Circuit then remanded the case back to the district court to "tackle the fact-intensive question (whether the parties agreed to arbitrate arbitrability of the merits dispute), which will require resolution of the intertwined concepts driving this case: whether the 2019 Term Sheet is a superseding contract that terminated the 2008 Agreement and extinguished its arbitration provision . . . ." *Id.* at 20.

I held a bench trial from July 20, 2022, through July 22, 2022, to determine these issues (ECF Nos. 130, 133, and 138). Based on the evidence and arguments presented, I make the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

# FINDINGS OF FACT[1]

## I.    The 2008 Agreement

1.   Robert Indiana was a painter, sculptor, and visual artist who, prior to his death on May 19, 2018, lived on the island of Vinalhaven, Maine. J. Stipulation of Facts ¶¶ 1–2 (ECF No. 115).

2.   Michael McKenzie is an art publisher who does business as American Image Art ("**AIA**"). J. Stipulation of Facts ¶ 8.

3.   On or about August 11, 2008, McKenzie and Indiana both signed an agreement (the "**2008 Agreement**"), which granted McKenzie the right to produce and sell certain two- and three-dimensional artworks based upon Indiana's HOPE design. J. Ex. 1, at 1; J. Stipulation of Facts ¶¶ 11–12.

4.   The 2008 Agreement contained the following terms:

- A requirement that McKenzie pay Indiana minimum royalties of $1 million per year for any works governed by the Agreement. J. Ex. 1, at 3.

- Production schedules for the creation and sale of HOPE sculptures, silk-screened canvasses, and prints. J. Ex. 1, at 4–5.

---

[1]      Defendant Brannan filed three motions in limine prior to trial, all of which I reserved ruling on: the Motion in Limine to Exclude Evidence about Morgan Art Foundation (ECF No. 118); the Motion in Limine to Exclude Evidence about Any Alleged Forgery of Artwork or Discussions about Robert Indiana Signing Artwork (ECF No. 119); and the Motion in Limine to Exclude Evidence of Comments Made by the Mediator in the Portland, Maine, 2019 Mediation (ECF No. 120). The Motion in Limine to Exclude Evidence about Morgan Art Foundation is **DENIED** because this evidence is relevant to the issue of McKenzie's alleged breach. The Motion in Limine to Exclude Evidence about Any Alleged Forgery of Artwork or Discussions about Robert Indiana Signing Artwork is **GRANTED** because this evidence is not relevant to any issues before me. And, finally, the Motion in Limine to Exclude Evidence of Comments Made by the Mediator in the Portland, Maine, 2019 Mediation is **DENIED** because the comments were not introduced to prove the truth of the matter asserted.

- A provision stating that "[a]ny disputes will be settled by arbitration through the American Arbitration Association ["**AAA**"], governed by laws of the State of New York." J. Ex. 1, at 6.

## II. The SDNY Action

5. Following Indiana's death, Defendant James Brannan—a Maine attorney— was appointed as the personal representative of Indiana's estate ("**the Estate**"). J. Stipulation of Facts ¶¶ 3, 7.

6. Robert Indiana's last will and testament named Star of Hope, Inc. ("**Star of Hope**") as the sole beneficiary of Indiana's estate. Star of Hope is a Maine charitable corporation formed at Indiana's direction during his lifetime. Its stated mission includes the promotion of Indiana's artistic legacy. J. Stipulation of Facts ¶ 5.

7. On May 18, 2018, Morgan Art Foundation Ltd. filed an action in the U.S. District Court in the Southern District of New York against Michael McKenzie, AIA, Robert Indiana, and another party (the "**SDNY Action**"). After Indiana's death, James Brannan, as personal representative of the Estate, became a defendant in that case. J. Stipulation of Facts ¶ 15.

8. On August 3, 2018, McKenzie and AIA filed cross-claims against Brannan in the SDNY Action. J. Stipulation of Facts ¶ 16.

9. On October 9, 2018, the court in the SDNY Action ruled that the claims between McKenzie/AIA and Brannan should proceed in arbitration pursuant to the 2008 Agreement's arbitration clause, and an arbitration was commenced

in New York (the "**New York Arbitration**"). *See* J. Stipulation of Facts ¶ 14,
17.

### III. The Portland Mediation

10. The Maine Attorney General has oversight authority over Maine charitable
institutions and non-profits, including Star of Hope. J. Stipulation of Facts
¶ 20.

11. In his oversight capacity over Star of Hope, Maine Attorney General Aaron
Frey expressed concern that mounting costs of the SDNY Action and the New
York Arbitration could impair the future of Star of Hope and urged the parties
to mediate their disputes. J. Stipulation of Facts ¶ 21.

12. On November 25 and 26, 2019, McKenzie and Brannan attended a mediation
conducted by Patrick Coughlan in Portland, Maine (the "**Portland
Mediation**"). J. Stipulation of Facts ¶ 22. Also present at this mediation, as is
relevant here, were personnel and legal counsel representing the Estate, Star
of Hope, and the Maine Attorney General. J. Ex. 6. McKenzie's attorney, John
Simoni, was not present at the mediation, but was available by phone. J.
Stipulation of Facts ¶ 22; Trial Tr. Vol. I, at 38:1–6 (ECF No. 145).

13. On the evening of November 25, after the first day of the Portland Mediation,
McKenzie sent an email to the mediator about Kevin Lipson, one of the
attorneys for the Estate, with the subject line: "Kevin Lipsom [sic] is a lying
swindling dirtbag holding this up to make money." J. Ex. 7, at 1. In the email,
McKenzie voiced his concern that Lipson was going to derail the settlement
process by refusing to acquiesce to the authentication of a sculpture entitled

BRAT, which McKenzie had sold to Johnsonville, a sausage company, as a Robert Indiana piece. J. Ex. 7, at 1; Trial Tr. Vol. III, at 475:24–476:24 (ECF No. 147). McKenzie accused Lipson of trying to drive up legal fees and "swindle[ ]" Star of Hope. J. Ex. 7, at 1. McKenzie threatened that "if BRAT is not authenticated with apologies . . . by 12 [p.m.] tomorrow, I will . . . immediately begin a separate litigation directed personally, jointly and severally against the lawyers for [the Estate]." J. Ex. 7, at 2.

14. The next day, the second day of the Portland Mediation, McKenzie sent two more emails about the BRAT authentication and Lipson's alleged attempts to derail the settlement process. J. Ex. 8; J. Ex. 9.

## IV.   The 2019 Term Sheet

15. On November 26, 2019, near the conclusion of the Portland Mediation, Brannan and McKenzie signed a term sheet titled "Confidential and Binding Term Sheet Between Michael McKenzie, individually, and as agent of American Image Art (together 'AIA') and the Estate of Robert Indiana (the 'Estate')" (the "**2019 Term Sheet**"). J. Stipulation of Facts ¶ 23; J. Ex. 2.

16. As is relevant here, the 2019 Term Sheet contained the following provisions:

- "AIA and the Estate will enter into a new agreement ('Production Agreement') that will permit AIA the exclusive right to publish and sell authorized HOPE prints and sculptures. Features of the Production Agreement will include:

  o Duration of 10 years . . . .

  o No annual minimum royalty payment to the Estate.

  o Only HOPE works will be produced or sold, and only in strict accordance with specifications set forth in the [2008 Agreement] . . . .

6

- o The Estate will be notified: (a) at least ten days before a sculpture or print run is about to begin, (b) within ten days of completion of a sculpture or a print run,[ ] (c) that a work has been consigned to a gallery or dealer, and (d) that a work has been sold.

- o Other appropriate terms from the [2008 Agreement]."

- "AIA agrees that the [2008 Agreement] is terminated."

- "To the extent AIA contends that any unsold non-HOPE works . . . are authentic works of Robert Indiana, such determinations of authenticity shall be made by a neutral art expert with appropriate knowledge of Robert Indiana's work. . . . All authentication to be at the Estate's expense."[2]

- "If the Expert determines that a non-HOPE work is not authentic, or that authenticity cannot be determined, such work may not be sold and must be destroyed or delivered to the Estate."

- "The Estate will take no position regarding the authenticity of BRAT."[3]

- "The arbitration between the Estate and AIA pending in the AAA will be dismissed with prejudice."

- "The Estate will provide an agreement of indemnification and defense of AIA of any and all claims against AIA by Morgan Art in the pending lawsuit . . . . Michael McKenzie and AIA agree to cooperate with the Estate, its counsel, and AIA's Counsel with respect to the lawsuit and related issues and proceedings."

- "This agreement is subject to normal and customary terms of settlement, including confidentiality and non-disparagement."

- "This term sheet is intended to be binding, and will be replaced by a more formal Settlement Agreement and Production Agreement. Payments, releases, dismissals and other consideration under this term sheet will be made after a more formal Settlement Agreement and Releases and Production Agreement are executed."

J. Ex. 2, at 1–3.

---

[2]     I refer collectively to provisions having to do with authenticating non-Hope works as the **"Authentication Provisions**."

[3]     I will refer to this as the "**BRAT Neutrality Provision**."

17. The day after the conclusion of the Portland Mediation, on November 27, 2019, Attorney Edward Boyle, counsel for the Estate, wrote to the administrator of the New York Arbitration that:

> We are pleased to report that the parties have signed a term sheet that resolves all claims and counterclaims in this action. The parties request a one-month adjournment of the December 6 telephone conference with the Panel, to allow time for the preparation and execution of the settlement agreement and related documentation.

J. Ex. 14, at 2. Simoni, McKenzie's attorney, responded to the email: "Ditto for the Respondents-Counterclaimants." J. Ex. 14, at 1.

18. Following the execution of the 2019 Term Sheet, McKenzie continued to make and sell new HOPE artwork without notifying the Estate, as required under a provision of the Term Sheet. Trial Tr. Vol. III, 435:9–20; *see* J. Ex. 2, at 1. At trial, McKenzie testified that he did not notify the Estate of the manufacture or sales of the works because he did not believe that the Term Sheet was in effect yet. Trial Tr. Vol. III, 436:23–437:10.

## V.  The Press Release

19. On December 5, 2019, McKenzie issued a press release entitled, "Estate of Robert Indiana Names American Image Art Exclusive Worldwide Publisher, Fabricator and Distributor of HOPE." J. Ex. 16, at 2.

20. The press release stated, in relevant part:

- "The Estate of Robert Indiana has awarded American Image Art, Robert Indiana's longtime collaborator, the worldwide Exclusive as Publisher/Fabricator and Distributor of Hope. The Estate and Star of Hope

CEO, Jamie Thomas,[4] has authenticated the monumental Indiana sculpture BRAT, as well as the seminal work WINE, two important projects Robert Indiana collaborated with American Image Art on which continue his legacy of four letter words."

- "This settlement retracted American Image Art's $30,000,000 lawsuit against The Estate and continues the collaboration between The Artist and Publisher conceived to be Art History's most powerful production ever including books, films, sculptures, prints, multiples, events, museums shows, products, licenses and international media coverage."

J. Ex. 16, at 2–3.

21. McKenzie distributed the press release via email, with the subject lines "finally the dirtbags lose" and "Fwd: finally the truth comes out." J. Ex. 16, at 1. The email recipients included journalists at the New York Times and Washington Post. J. Ex. 16, at 1.

22. On December 6, 2019, Boyle emailed McKenzie stating that, unless McKenzie sent a retraction email to recipients of the press release by 7 p.m. that day, "the [2019 Term Sheet] is revoked." J. Ex. 18, at 2. The email cited "[McKenzie's] violations of his confidentiality obligations, his mischaracterizations of the term sheet, and his refusal to correct these errors in a timely way" as "substantial and material breaches." J. Ex. 18, at 2.

---

[4]      Jamie Thomas is a Vinalhaven resident who began working for Robert Indiana in various capacities in the late 1980s. Trial Tr. Vol. II, at 299:8–300:18 (ECF No. 146). In 2016, Indiana executed a document authorizing Thomas to act as power of attorney on Indiana's behalf. J. Stipulation of Facts ¶ 6 (ECF No. 115). Although McKenzie's press release states that Thomas was the CEO of Star of Hope, that is not correct—Larry Sterrs was the CEO at that time. *See* Trial Tr. Vol. I, at 116:8–19 (ECF No. 145). Thomas was involved with the foundation, however, and served on the board for a period of time, although that role came to an end at some point during the ongoing litigation. Trial Tr. Vol. II, at 312:2–9.

23. On December 9, 2019, McKenzie sent an email to the recipients of the press release stating, "The press release I sent you last week was premature and I am retracting it. Please disregard it. I will update you accordingly." J. Ex. 20.

## VI.   The Ongoing Negotiations

24. On December 16 and 17, 2019, Attorney Ed Boyle circulated a draft settlement agreement and a draft production agreement (as called for in the 2019 Term Sheet) for McKenzie's review. J. Ex. 25; J. Ex. 26. Boyle's draft settlement agreement maintained the Authentication Provisions but specified that certain people, including, as is relevant here, Jamie Thomas, could not serve as the experts overseeing the authentication process. J. Ex. 25, at RI0004841. In addition, Boyle's draft production agreement provided that the agreement could be terminated by either party should gross revenue dip below $2 million in any two consecutive years (the "**Gross Revenue Provision**"). J. Ex. 26, at RI0004878. In the cover emails accompanying the drafts, Boyle wrote: "We are still working on the draft[s], and will likely have further changes." J. Ex. 25, at RI0004834; J. Ex. 26, at RI0004872.

25. In the following days, McKenzie voiced displeasure about the draft agreements. In one email, dated December 18, 2019, McKenzie wrote:

> [T]he problem I have with this is [that] there is MUCH change to what I was sold on [as] a final/binding agreement. . . . Here it appears that the "binding agreement" can have unlimited changes and no one steps in so that means it has ZERO validity and I need to make my 1200 changes. . . . If it is fine to add anything you want to an agreement, . . . then it is a [work] in progress and I don't really understand why I [went] to Maine.

J. Ex. 29, at 1.

26. In an email to Boyle on December 20, 2019, McKenzie criticized the drafts Boyle had sent, complaining that it had taken four weeks to get even an "incomplete draft." J. Ex. 102, at 2. Through his attorney, McKenzie also declined to provide comments on the drafts and asked to schedule a conference call with the mediator to come up with a "plan to complete the draft." J. Ex. 102, at 2.

27. On January 9, 2020, the parties had a conference call at the request of McKenzie's counsel to discuss the 2019 Term Sheet. J. Ex. 35, at 2. In an email setting the agenda for the call, Simoni proposed several amendments to add to the Term Sheet, including: "resolving BRAT presently and conclusively as it creates barriers in all sales and exhibition efforts" and "drop[ping] the authentication process unless [Star of Hope] or Estate has good faith basis to raise it, then [Star of Hope] can be final arbiter." J. Ex. 35, at 2.

28. The day after the call, January 10, 2020, McKenzie reiterated his belief that the Authentication Provisions of the 2019 Term Sheet should be dropped, explaining that "[e]very powerful artist estate . . . abandoned authentication a long time ago . . . [because] authentication returns no money to the estate and conversely ends up costing a fortune in fees, insurance and, the worst, the legal battles that invariably ensue." J. Ex. 39, at 1.

29. On January 14, 2020, Boyle prepared a draft response to the points McKenzie raised in the January 9 call and sent it to Kevin Lipson and Nat Putnam,

attorney for Star of Hope. J. Ex. 103, at PR003754–PR003755. Putnam, responding to Boyle, first wondered why Boyle was trying to "breathe life back into the settlement terms that were reached at the mediation." J. Ex. 103, at PR003752. He then wrote:

> I believe you are trying to prevent the estate from being perceived as repudiating the settlement. Instead, if this is going to be the result, we want it to be clear that it is due to McKenzie's—and not the estate's or [Star of Hope]'s—unwillingness/inability to abide by the terms of the settlement. In other words, McKenzie needs to be the one to repudiate rather than the estate.
>
> If this is in fact your objective, then I believe the e-mail is acceptable. Given what we have observed in the weeks since the mediation, I can tell you that [Star of Hope] would prefer to have no relationship with McKenzie going forward. While we realize we may be stuck with the HOPE agreement, we feel strongly that McKenzie must be bound by the original restrictions of that agreement.

J. Ex. 103, at PR003752. Boyle responded on January 15, 2020: "Thanks Nat. You're correct—the Estate is not repudiating the term sheet and is not willing to renegotiate those terms. Any decision to walk away from the term sheet will be McKenzie's." J. Ex. 103, at PR003752.

30. Boyle sent his email responding to the points McKenzie raised in the January 9 call to Simoni on January 15, 2020. J. Ex. 41, at 1. In the email, Boyle described McKenzie's proposals—such as dropping the Authentication Provisions—as attempts to "renegotiate" the "key terms of the agreement to resolve the disputes between the Estate and [AIA]," which "are outlined in the [2019 Term Sheet]." J. Ex. 41, at 1. The Estate declined to renegotiate those key terms, but the email explained that "many of the concerns that [AIA]

12

raised in our call can be addressed within the framework of the term sheet." J. Ex. 41, at 1. The email closed with a statement that, "We hope this helps bring us back to negotiating a Settlement Agreement and Production Agreement consistent with the signed term sheet, so the disputes between our clients can be resolved as was agreed." J. Ex. 41, at 2.

31. On January 21, 2020, Simoni sent, by email and by regular mail, a letter to Boyle stating that the parties were at an "impasse" due to the Estate's "resisting without basis authentication of BRAT." J. Ex. 45, at 1. The letter stated that "the only way AIA can even [consider] entering into a settlement agreement is if the Estate provides now, presently, the necessary information for AIA to assess all matters[.]" J. Ex. 45, at 1. The letter went on to demand records possessed by the Estate.[5] J. Ex. 45, at 1–2.

---

[5]     Simoni wrote:

> [W]e require the immediate delivery of the following records, all without redaction and communications including without limit, email, Imail, texting and redacted phone and personal conversations:
>
> 1. All communication with Johnsonville in every form to and from, including all phone calls;
>
> 2. The numerous Indiana drawings the Estate has located and have [sic] not yet revealed in discovery;
>
> 3. All evidence gathered by the Estate on the authenticity of BRAT which prevents the Estate from "conclusively" determining the BRAT sculpture is not approved by Indiana;
>
> 4. The executed settlement agreement with Thomas resulting from the mediation in unredacted form ("Thomas Settlement");
>
> 5. All records of Thomas turned over to the Estate or made available to the Estate as part of the Thomas Settlement or in discovery;
>
> 6. All communications with, to or from Rosenbaum Gallery including redacted phone calls;

32. Simoni's letter on January 21, 2020, was followed up by an email from Simoni to Christina Moylan of the Maine Attorney General's Office on January 22, 2020, with copies to the Estate and Star of Hope's lawyers, stating: "The Estate is pressing an approach that does not enable Mr. McKenzie to help Star of Hope." J. Ex. 47, at 5.

33. In response to Simoni's email to Moylan, Boyle emailed Moylan on January 22, 2020, pointing out that the 2019 Term Sheet provided that "(1) the Estate would take no position on the authenticity of the BRAT work sold to Johnsonville Holdings, and (2) a neutral expert review process would be established to determine the authenticity of any 'non-HOPE' works that McKenzie wishes to sell going forward." J. Ex. 47, at 4. Boyle went on:

> Last night, I asked Mr. Simoni in an email whether or not his client will enter into a settlement agreement consistent with the term sheet. Mr. Simoni has not answered my question. Instead, he wrote his email to you this morning.

---

7. All records provided from Rosenbaum Gallery concerning Indiana, includ[ing] all sales records for the years 2008 through and including 2018;

8. All communications with Larry Steers [sic], the Star of Hope Foundation Board, and the Star of Hope attorneys concerning the mediation and/or settlement or any matter concerning this case, including all records of any meetings or telephone conferences;

9. All documents pertaining to overbilling allegations concerning Kevin Lipson, including with the Hogan Lovells law firm and the DLA Piper law firm as well as the current case.

The above requests apply equally to any communications with a "Jan Lipson" or a "Jay Lipson" or "Kevin Lipsom" where intending to refer to Kevin Lipson of the Venable law firm.

Please get back to me asap.

J. Ex. 45, at 1–2.

> The Estate needs to know whether McKenzie is going to perform on the agreement in the term sheet, or repudiate it. There is no third option. I again ask that Mr. McKenzie answer this question.

J. Ex. 47, at 4.

34. On January 23, 2020, Simoni responded to Boyle's email that the Estate and its lawyers were in violation of the November term sheet by not remaining neutral in the authentication of BRAT by (1) "poisoning the well" by providing Johnsonville with "detrimental information[;]"[6] (2) preventing Thomas from authenticating the BRAT sculpture by "adding 30 pages to the 3 page mediator's settlement"[7] and paying money to Thomas in exchange for his silence; and (3) "hid[ing] numerous preliminary sketches of BRAT found at Star of Hope." J. Ex. 47, at 2. Later that day, in a follow-up email, McKenzie accused the Estate and its lawyers of fraud. J. Ex. 47, at 1.

35. On January 27, 2020, McKenzie wrote an email with an attached letter to Matthew McLaughlin—the partner in charge of the New York office of the firm representing the Estate. J. Ex. 49, at 1. McKenzie once again made discovery demands on the Estate and threatened to bring further charges against the Estate, the law firm, and Star of Hope unless those demands were met. J. Ex. 49, at RI0004938–RI0004939.

---

[6]    This is an apparent reference to a claim made by McKenzie that one of the owners of Johnsonville told him that someone named Kevin had called and written trying to convince Johnsonville that BRAT was fake. Trial Tr. Vol. III, at 481:21–482:3 (ECF No. 147). According to McKenzie, the owner also said that "Kevin" was trying to get Johnsonville to pay him the additional money that Johnsonville owed McKenzie for the sculpture. Trial Tr. Vol. III, at 482:5–23.

[7]    The "30 pages" appears to be a reference to the draft settlement agreement provided by the Estate to McKenzie in December of 2019. *See* J. Ex. 25.

36. Simoni emailed Boyle again on January 28, 2020, reiterating the discovery demands and threatening that, "If the demanded items are not provided by February 5, 2020, AIA advises it will have no choice but to proceed aggressively with its multiple plenary actions . . . ." J. Ex. 51.

37. On February 3, 2020, Boyle responded to McKenzie's January 21, 27, and 28 communications and stated that:

> These communications confirm that Mr. McKenzie and [AIA] have no intention to fulfill their contractual obligation to enter into a final Settlement Agreement that memorializes the terms set forth in the Binding Term Sheet they signed on November[ ] 26, 2019. The Estate understands these communications to be a repudiation of the Binding Term Sheet by Mr. McKenzie and [AIA], and will act accordingly. If our understanding is incorrect, then please respond to that effect in an unequivocal writing.

J. Ex. 52. Attorney Boyle testified that he never received an unequivocal writing that McKenzie was not repudiating the Term Sheet. Trial Tr. Vol. I, at 165:16–18.

38. On February 14, 2020, Simoni shared a revised draft settlement agreement. J. Ex. 55, at RI0004954. The revised draft made several substantial changes. For example, McKenzie struck out portions of the draft that provided for the expert review process described in the Term Sheet. *See* J. Ex. 55, at RI0004968–RI0004971. In addition, although McKenzie left in a provision stating, as was agreed to in the Term Sheet, that "[t]he Estate takes no position on the authenticity of the BRAT work," he also inserted seemingly contradictory language that "BRAT has been authenticated." *See* J. Ex. 55, at

16

RI0004971; J. Ex. 25, at RI0004844. Additionally, McKenzie added the following "whereas" clauses:

> The Estate has purported in writing to be neutral to the authenticity of BRAT but has hidden documents with Thomas and with Johnsonville attempting to harm its authenticity[,]

J. Ex. 55, at RI0004958, and,

> the Estate has willfully hidden vital Discovery Information, purposefully destroyed vital Federal Discovery, tampered with Federal Witnesses and purged [sic] itself in Federal Court with provable lies created tp [sic] willfully defame and discredit AIA while purporting to wanting [sic] to work with AIA as a 'partner,'

J. Ex. 55, at RI0004960–RI0004961; *see* J. Ex. 55, at RI0004835–RI0004839.

39. Boyle testified that he viewed these revisions as "inconsistent" with the terms in the Term Sheet. Trial Tr. Vol. I, at 166:14–18.

40. Boyle responded to McKenzie's draft by email two hours later, writing:

> Your draft deviates in extreme ways from the settlement term sheet that your client McKenzie/[AIA] signed. You have rejected terms that were expressly required under the signed term sheet, and have added terms and language that are totally unacceptable. Based on this draft and your client's other communications and actions since the term sheet was signed, the Estate understands that McKenzie/[AIA] has repudiated the signed settlement term sheet. The Estate sees no option but to proceed with the arbitration.

J. Ex. 56, at 1–2. Simoni wrote back to Boyle that, "[y]our assessment of who repudiated is way off." J. Ex. 56, at 1.

41. The New York Arbitration recommenced in April of 2020. Trial Tr. Vol. III, at 434:18–21. On April 7, 2020, the AAA panel held a preliminary hearing with attorneys for the Estate and McKenzie/AIA. J. Ex. 57, at 39. In an order issued

after the hearing, the AAA panel stated that "counsel for the Parties . . . [c]onfirmed that the Panel has jurisdiction to decide all claims and defenses asserted in this arbitration." J. Ex. 57, at 39.

42. On April 23, 2020, McKenzie filed documents in the SDNY Action seeking to amend his claims against the Estate to add claims of slander of title, tortious interference with contract, and prima facie tort, and to add new claims against Brannan. *See* J. Ex. 58, at 5; J. Ex. 59, at 74–77. McKenzie did not seek approval from the Estate prior to filing these claims, Trial Tr. Vol. I, at 89:1–9, although the 2019 Term Sheet required that "AIA and the Estate mutually release all claims against each other" and cooperate in the SDNY action, J. Ex. 2, at 3. McKenzie testified that he did not believe the 2019 Term Sheet precluded him from asserting those claims because a final agreement was never signed. Trial Tr. Vol. I, at 85:8–87:12.

## CONCLUSIONS OF LAW[8]

There are two central issues in this case: (1) whether the 2019 Term Sheet was a binding agreement, and (2) whether the 2019 Term Sheet remains enforceable in

---

[8] The 2008 Agreement contains a choice-of-law provision, which states that "[a]ny disputes will be . . . governed by laws of the State of New York." J. Ex. 1, at 6. Defendant Brannan asserts that, if the 2008 Agreement is still in effect, New York law controls, but if not, Maine law controls. Def. Brannan's Post-Trial Br. 16 n.3 (ECF No. 153). Brannan clarifies, however, that "from a practical perspective, on the relevant contract law principles, New York law and Maine law are similar, and Defendant has provided citations to the laws of both states." Def. Brannan's Post-Trial Br. 16 n.3. Because Defendant Brannan does not argue that there is a conflict between Maine and New York law that would affect the outcome of the issues before me, I need not decide what law to apply. *Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 158 (1st Cir. 2005) ("[W]hen the resolution of a choice-of-law determination would not alter the disposition of a legal question, a reviewing court need not decide which body of law controls."). Though I could cite to New York and Maine law "interchangeably without affecting the outcome" of this case, "for simplicity's sake" I will refer only to Maine law. *Id.* at 158 n.4.

light of the Estate's allegation that McKenzie repudiated it.[9] I address each of these issues in turn:

## I. Binding Agreement

The parties disagree whether the 2019 Term Sheet is a binding agreement. McKenzie asserts that the 2019 Term Sheet is a binding contract because it contains "[a]ll the terms necessary" and "the parties . . . manifested their intent to be bound by it." Pl. McKenzie's Post-Trial Br. 7, 10 (ECF No. 154). Defendant Brannan responds that the Term Sheet is not a final, enforceable contract but rather an "agreement to agree." Def. Brannan's Post-Trial Br. 22 (ECF No. 153). "Settlement agreements are analyzed as contracts, and the existence of a binding settlement is a question of fact." *2301 Cong. Realty, LLC v. Wise Bus. Forms, Inc.*, 2014 ME 147, ¶ 10, 106 A.3d 1131 (quoting *In re Est. of Snow*, 2014 ME 105, ¶ 11, 99 A.3d 278). The Plaintiff, "as the party seeking to enforce the alleged contract, bears the burden of proving its existence." *Butler v. Hardy*, 576 A.2d 202, 204 (Me. 1990). "In order to be binding, a settlement agreement requires the mutual intent of the parties to be bound by terms sufficiently definite to enforce." *In re Est. of Snow*, 2014 ME 105, ¶ 11, 99 A.3d 278; *see also McClare v. Rocha*, 2014 ME 4, ¶ 16, 86 A.3d 22 ("A contract exists when the parties mutually assent to be bound by all its material terms, the assent is

---

[9]    The Defendants raise two additional issues: (1) whether the 2019 Term Sheet extinguished the arbitration provision in the 2008 Agreement, and (2) whether the 2019 Term Sheet is a violation of public policy. *See* Def. Brannan's Post-Trial Br. 1; Def. Attorney General's Post-Trial Br. 1 (ECF No. 152). My decision here obviates the need to address these issues. Having found that McKenzie repudiated the Term Sheet, I hold that the 2019 Term Sheet has been entirely rescinded and the 2008 Agreement (and its arbitration provision) is once again in effect.

either expressly or impliedly manifested in the contract, and the contract is sufficiently definite." (internal quotation marks omitted)).

Courts "have recognized a distinction between a preliminary 'agreement to agree' and a binding settlement agreement." *Muther v. Broad Cove Shore Ass'n*, 2009 ME 37, ¶ 6, 968 A.2d 539. "It is possible . . . to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then concluded the contract." Restatement (Second) of Contracts § 27 cmt. a (Am. L. Inst. 1981). "On the other hand, if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract." *Id.* § 27 cmt. b; *see also McClare*, 2014 ME 4, ¶ 20, 86 A.3d 22 ("Preliminary negotiations as to the terms of a future agreement do not constitute a contract."). "Whether the parties are merely negotiating the contract, or entering into a present contract, is purely a question of intention." *McClare*, 2014 ME 4, ¶ 20, 86 A.3d 22 (quoting *Masselli v. Fenton*, 157 Me. 330, 336–37, 172 A.2d 728, 731 (Me. 1961)). "The absence of a formalized contract does not affect the binding nature of a potential contract if the parties intended to close the contract prior to a formal writing." *In re Est. of Snow*, 2014 ME 105, ¶ 12, 99 A.3d 278 (quoting *McClare*, 2014 ME 4, ¶ 20, 86 A.3d 22).

To determine intent, courts look to:

20

the language of any agreement, viewed in the light of the circumstances under which it was made, including the use of the words "offer" and "acceptance." Other relevant circumstances include the extent to which an express agreement has been reached on all terms to be included; whether the contract is of a type that is usually put in writing; whether it needs a formal writing for its full expression; whether it is a common or unusual contract; whether a standard form of contract is widely used in similar transactions; and whether either party takes any action in preparation for performance.

*Id.* (quoting *McClare*, 2014 ME 4, ¶ 21, 86 A.3d 22).

Here, there is ample evidence that the parties intended the 2019 Term Sheet to be an enforceable settlement agreement that would subsequently be memorialized in a more formal writing. Most obviously, the title of the document, which is placed in bold letters at the top of the first page, is "**CONFIDENTIAL AND BINDING TERM SHEET**," and the final provision of the Term Sheet reiterates that "This term sheet is intended to be binding, and will be replaced by a more formal Settlement Agreement and Production Agreement." J. Ex. 2, at 1, 3. Although the Defendants now seek to qualify the language of the Term Sheet,[10] I am not at liberty to "ignore plain language[ or] . . . disregard terms purposefully inserted into an agreement by experienced business[ people]." *Crowe v. Bolduc*, 365 F.3d 86, 97 (1st Cir. 2004).

Defendant Brannan points out some aspects of the Term Sheet that he asserts undermine its enforceability: the Term Sheet's use of "prospective language" and the

---

[10] At trial, Mr. Boyle testified that he wanted the term sheet to be called "confidential and binding" because the Defendants "didn't want any backward movement . . . . This was basically supposed to set a marker where any negotiation going forward this was the baseline and there would be fine-tuning, obviously, between this term sheet and the settlement agreement and production agreement, but we wouldn't be moving backwards." Trial Tr. Vol. I, at 185:7–17. This statement indicates that the Estate believed that the 2019 Term Sheet contained the essential terms of the agreement.

"future tense," as well as its reference to undefined terms that would be included in the formal Production Agreement. Def. Brannan's Post-Trial Br. 22–23. I am not persuaded. For example, though the Term Sheet does utilize the future tense, that tense is primarily used to indicate that the terms would be included in the forthcoming Production Agreement. *See* J. Ex. 2, at 1 ("Features of the Production Agreement will include: . . . ."). Moreover, while the Term Sheet does include undefined terms, namely the requirement that "other appropriate terms" from the 2008 Agreement would be included in the Production Agreement, there is no evidence that those undefined terms were material or otherwise indicated the lack of a binding agreement. Indeed, as Mr. Boyle put it in an email to Mr. McKenzie's counsel a few months later, the 2019 Term Sheet contains "[t]he key terms of the agreement to resolve the disputes between the Estate and [AIA]." J. Ex. 41, at 1.

Finally, Defendant Brannan asserts that the Term Sheet is not binding because McKenzie never took "action in preparation for performance." Def. Brannan's Post-Trial Br. 23 (quoting *McClare*, 2014 ME 4, ¶ 21, 86 A.3d 22). While I agree that McKenzie largely continued to conduct himself as if the 2008 Agreement was still in effect, there is also evidence that McKenzie prepared to perform the 2019 Term Sheet by expressing his intention to work toward a finalized agreement and by urging the parties to move more quickly in the finalization process. In addition, the Estate took action in preparation for performance by writing to the administrator of the New York Arbitration that: "We are pleased to report that the parties have signed a term sheet that resolves all claims and counterclaims in this action" and asking for an

adjournment of arbitration proceedings "to allow time for the preparation and execution of the settlement agreement and related documentation." J. Ex. 14, at 2. McKenzie's attorney replied to that email, "[d]itto for the Respondents-Counterclaimants," indicating McKenzie's assent to the Estate's preparation for performance. J. Ex. 14, at 1.

Taking these facts together, I find that the parties intended the 2019 Term Sheet to be binding prior to its terms being memorialized in a more formal writing. As such, the Term Sheet was not a mere agreement to agree, but rather a binding agreement.

## II. Repudiation

Next, the parties disagree about whether either side repudiated the Term Sheet. "An anticipatory repudiation of a contract is a definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." *Wholesale Sand & Gravel, Inc. v. Decker*, 630 A.2d 710, 711 (Me. 1993) (internal quotation marks omitted). "The manifestation of an intention to repudiate a contract may be made and communicated by either words or conduct[,]" but "the words or conduct evidencing such refusal or inability to perform . . . must be definite, unequivocal, and absolute." *Id.* "Moreover, the repudiation must concern obligations or promises going to the whole consideration." *Roger Edwards, LLC v. Fiddes & Sons, Ltd.*, 387 F.3d 90, 95–96 (1st Cir. 2004) (citing *Martell Bros. v. Donbury, Inc.*, 577 A.2d 334, 337 n.1 (Me. 1990)).

In general, "[a] mere request for a change in the terms or a request for cancellation of the contract is not in itself enough to constitute a repudiation." *Thermo Electron Corp. v. Schiavone Const. Co.*, 958 F.2d 1158, 1164 (1st Cir. 1992) (quoting 4 Arthur L. Corbin, *Corbin on Contracts* § 973, at 905–06 (1951)). However, "[a] contracting party's insistence, '[willfully] or by mistake,' on preconditions to performance not stated in the contract, constitutes a breach by anticipatory repudiation." *VanHaaren v. State Farm Mut. Auto. Ins. Co.*, 989 F.2d 1, 6 (1st Cir., 1993); *see also Thermo Electron Corp.*, 958 F.2d at 1164 (explaining that repudiation occurs when a party insists on terms "contrary to those in the [contract], to the point where that insistence 'amounts to a statement of intention not to perform except on conditions which go beyond the contract' " (quoting Restatement (Second) of Contracts § 250 cmt. b)).

Here, Defendant Brannan asserts that, even if the 2019 Term Sheet created a binding agreement, "it is clear . . . that McKenzie repudiated any such contract." Def. Brannan's Post-Trial Br. 26. For his part, the Plaintiff presents his own theories of repudiation that he says establish that it was the Estate, not him, who repudiated the Term Sheet. Pl. McKenzie's Post-Trial Br. 17–29. Below I address the Defendant's repudiation arguments and then turn to the Plaintiff's counterarguments.

## A.    Defendant Brannan's Theories of Repudiation

Brannan contends that McKenzie and AIA repudiated the 2019 Term Sheet in the following ways: (1) by issuing the press release in violation of the confidentiality and non-disparagement provisions; (2) by issuing discovery demands to the Estate despite the dismissal of claims provision; (3) by McKenzie's refusal to confirm that he

24

was not repudiating the agreement while he was insisting upon terms that directly contradicted the Term Sheet; (4) by filing new claims against the Estate and its attorneys in violation of the general release; and (5) by refusing to cooperate with the Estate in the Morgan Art case despite a requirement to do so in the Term Sheet. Def. Brannan's Post-Trial Br. 28.

As for the first instance of alleged repudiation, I agree with Defendant Brannan that McKenzie's issuance of the press release shortly after the signing of the 2019 Term Sheet constituted a breach of the Term Sheet's confidentiality provision. I discredit McKenzie's testimony that it was only a "preliminary press release" to allow select associates to advise him on it. Trial Tr. Vol. I, at 54:8. By my count, the press release was sent to 28 different email addresses, including individuals at the New York Times and the Washington Post. J. Ex. 16, at 1. Nothing suggests that the document was provided on background or solely for comments, and I see nothing that would have prevented any journalist who received it from publishing it.

But even assuming that McKenzie breached the Term Sheet by issuing the press release, Defendant Brannan waived any right to assert that breach by continuing to make attempts at finalizing the Term Sheet for months thereafter. *See Interstate Indus. Unif. Rental Serv., Inc. v. Couri Pontiac, Inc.*, 355 A.2d 913, 919 (Me. 1976) ("A waiver is a voluntary or intentional relinquishment of a known right and may be inferred from the acts of the waiving party. Thus, if one in knowing possession of a right does something inconsistent with the right or of his intention to rely upon

it, he is deemed to have waived that right and is estopped from asserting that right if renunciation of the waiver would prejudice the party who has relied upon it." (internal citations omitted)).

McKenzie's discovery demands and insistence on terms that were contrary to the 2019 Term Sheet, however, lead to a different conclusion. In the beginning of January of 2020, McKenzie and his attorney made several proposed amendments to the 2019 Term Sheet under the guise of finalizing the agreement, including "resolving BRAT presently and conclusively" and "drop[ping] the authentication process." J. Ex. 35, at 2; *see also* J. Ex. 39. As explained above, the proposal of changes to a contract is not a repudiation, *see Thermo Electron Corp.*, 958 F.2d at 1164, and the Estate did not treat McKenzie's proposals as a repudiation. Instead, Boyle wrote back to McKenzie to decline the invitation to "renegotiate" the "key terms of the agreement . . . outlined in the [2019 Term Sheet]." J. Ex. 41, at 1.

On January 21, 2020, however, the tenor of McKenzie's conduct changed. Simoni wrote to Boyle that the parties were at an "impasse" because the Estate refused to authenticate BRAT and he demanded the disclosure of certain discovery materials before he would "even [consider] entering into a settlement agreement" with the Estate. J. Ex. 45, at 1. The next day, Simoni emailed Moylan, with copies to Boyle, that the parties were at a "serious impasse" because "[t]he Estate is pressing an approach that does not enable Mr. McKenzie to help the Star of Hope." J. Ex. 47, at 5. Boyle responded: "The Estate needs to know whether McKenzie is going to

perform on the agreement in the term sheet, or repudiate it. There is no third option. I again ask that Mr. McKenzie answer this question." J. Ex. 47, at 4.

Rather than answer the question of whether he was repudiating the agreement, McKenzie reiterated his discovery demands in an email to other lawyers representing the Estate on January 27, 2020. J. Ex. 49. On top of this, on January 28, Simoni emailed Boyle and threatened that if his discovery demands were not met, AIA would "have no choice but to proceed aggressively with its multiple plenary actions." J. Ex. 51.

On February 3, 2020, the Estate wrote Simoni expressing its understanding that McKenzie was repudiating the 2019 Term Sheet, and stating: "If our understanding is incorrect, then please respond to that effect with an unequivocal writing." J. Ex. 52. McKenzie never provided the Estate with an unequivocal writing to confirm that he was not repudiating. Instead, on February 14, 2020, Simoni sent McKenzie's redraft of the settlement agreement, which struck the Authentication Provisions and added a statement that BRAT had been authenticated—both changes that directly contravened the 2019 Term Sheet. *See* J. Ex. 55, at RI0004954; RI0004968–RI0004971. In addition, McKenzie added a "whereas" clause that stated: "The Estate has purported in writing to be neutral to the authenticity of BRAT but has hidden documents with Thomas and with Johnsonville attempting to harm its authenticity." J. Ex. 55, at RI0004958.

Later that same day, February 14, 2020, Boyle responded by email that, based on provisions in the draft that were incompatible with the 2019 Term Sheet, the

Estate understood McKenzie and AIA to be repudiating the 2019 Term Sheet. J. Ex. 56, at 1–2. Simoni responded that Boyle's assessment of who had repudiated was "way off."[11] J. Ex. 56, at 1.

McKenzie's communications to the Estate on January 21, 27, and 28, and February 14, 2020, constitute a clear and unequivocal repudiation. That is, McKenzie went from making a *mere request* for changes to the agreement to insisting on preconditions to performance that were at odds with the provisions contained in the 2019 Term Sheet. McKenzie stated in no uncertain terms that the Term Sheet could not be finalized until the Estate agreed to authenticate BRAT or provided the documents that would allow McKenzie to authenticate BRAT. The first of these options was in direct contravention of the BRAT Neutrality Provision, and the discovery demand was inconsistent with the Term Sheet's release of claims provision. The 2019 Term Sheet gave no right to McKenzie to demand discovery from the Estate. And by responding on February 14, 2020, with a draft agreement that included terms already clearly rejected by the Estate, McKenzie was insisting on his terms. *See*

---

[11]     The Plaintiff suggests that Simoni's February 14, 2020, email stating that Boyle's "assessment of who repudiated is way off," J. Ex. 56, at 1, constitutes an assurance that McKenzie did not intend to repudiate the Term Sheet, *see* Pl. McKenzie's Post-Trial Br. 21. I disagree. The Estate began seeking assurances from McKenzie weeks earlier, on January 22, and the Plaintiff responded not with an assurance, but rather with another draft agreement including the terms that were contrary to the 2019 Term Sheet and that the Estate had already indicated it would not accept. *See* J. Ex. 55. Then, on February 14, after asking for reassurances repeatedly to no avail, Boyle informed the Plaintiff that the Estate understood McKenzie's actions to be a repudiation, meaning that it viewed dealings between the two parties under the Term Sheet as at an end. J. Ex. 56, at 1–2; *see Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 776 (Me. 1989) ("A party to a contract with reasonable grounds to believe the other party will not perform may demand assurance of performance and may treat as a repudiation a failure to provide adequate assurance within a reasonable time." (citing Restatement (Second) of Contracts § 251 (Am. L. Inst. 1981))). Simoni's February 14 email came *after* this. The email thus came too late for it to constitute an unequivocal writing that McKenzie was not repudiating.

*VanHaaren*, 989 F.2d at 6 ("A contracting party's insistence . . . on preconditions to performance not stated in the contract, constitutes a breach by anticipatory repudiation."); *Thermo Electron Corp.*, 958 F.2d at 1164 (explaining that repudiation occurs when a party insists on terms "contrary to those in the [contract], to the point where that insistence 'amounts to a statement of intention not to perform except on conditions which go beyond the contract'" (quoting Restatement (Second) of Contracts § 250 cmt. b)).

In sum, McKenzie repudiated by mid-February of 2020.[12] I next address the Plaintiff's assertion that it was the Defendant, not McKenzie, who repudiated.

### B.    The Plaintiff's Theories of Repudiation

The Plaintiff contends that, if anyone repudiated, it was the Estate. I address each of the Plaintiff's arguments below, though, ultimately, I am not convinced.

First, the Plaintiff contends that the Estate repudiated first by including a provision in the draft production agreement that required "a whopping minimum of $2,000,000 to be paid by McKenzie to the Estate where the [2019] Term Sheet provided no annual minimum payment." Pl. McKenzie's Post-Trial Brief 19. But even if, as McKenzie suggests, this added provision contravened the Term Sheet, a proposed addition to a contract is not a repudiation. *See Thermo Electron Corp.*, 958 F.2d at 1164. And, there is nothing in the record to suggest that the Estate insisted on the provision.

---

[12]     Because I find that McKenzie repudiated the agreement by mid-February, I need not address Defendant Brannan's claims that McKenzie also repudiated by bringing new claims or by violating discovery obligations.

I also reject the Plaintiff's contention that the Estate repudiated the Term Sheet first by violating the BRAT Neutrality Provision. In his letter to Moylan on January 23, 2020, Simoni asserted that "the Estate has COMPLETELY violated that neutral position" by providing Johnsonville "detrimental information" about BRAT's authenticity; by adding terms in the draft settlement agreement that prevented Thomas from authenticating BRAT and by paying Thomas off to stay silent; and by hiding sketches of BRAT that had been found at Star of Hope and refusing to share them with McKenzie as the 2019 Term Sheet required. J. Ex. 47, at 2. Had the Plaintiff shown that what Simoni said in his letter to Moylan was true, then I would agree that the Estate had violated the BRAT Neutrality Provision.

However, the Plaintiff failed to demonstrate that any of Simoni's claims were true, and some of the claims are demonstrably false. McKenzie's claim that Lipson provided detrimental information about the authenticity of BRAT to Johnsonville was unsubstantiated except for McKenzie's testimony, which consisted of double hearsay, was not credible, and made little sense in light of McKenzie's claim that Lipson also asked Johnsonville to pay him the $700,000 balance due to McKenzie on the sculpture. *See* Trial Tr. Vol. III, at 482:5–12. Why would Lipson disparage the authenticity of BRAT and then demand payment for it? And though Simoni claimed that the Estate prohibited Thomas from authenticating the BRAT sculpture in the "30 pages [added] to the 3 page mediator's settlement" (presumably a reference to the Defendants' draft settlement agreement), J. Ex. 47, at 2, that document only stated that Thomas could not serve as an independent expert and preside over the review

process, J. Ex. 25, at RI0004841. Nowhere in the draft settlement agreement did it state that Thomas could not speak to the independent experts about BRAT's authenticity, nor is there any evidence that Thomas was under a gag order or that he was paid to stay silent. In fact, Thomas testified at trial that he had seen Robert Indiana working on the BRAT design. Tr. Tr. Vol. II, at 312:20–313:9. As for the claim that the Estate was "hiding" sketches, other than the unsupported charges made by Simoni and McKenzie, there is no evidence before me to support the claim that the Estate violated any duty to turn anything over under the 2019 Term Sheet (if such a duty can even be found in the 2019 Term Sheet).

Finally, I address the issue of whether the Estate was baiting McKenzie to repudiate the agreement. *See* Pl. McKenzie's Post-Trial Brief 25. The lawyers for the Estate endured vicious attacks by McKenzie from the first day of mediation. McKenzie challenged their competence, their billing practices, and their honesty at virtually every turn. *See, e.g.*, J. Ex. 7. It is not surprising that the Estate and Star of Hope, faced with such vitriol, were questioning their decision to partner with McKenzie and AIA. And the lawyers may well have adopted a belief that McKenzie would eventually repudiate and sink the deal. That they were secretly hoping that McKenzie would repudiate is irrelevant. What is relevant is whether either side actually did repudiate, and it is clear to me that McKenzie did.

While McKenzie testified at length about why he felt that the Authentication Provisions and the BRAT Neutrality Provision were not in Star of Hope's best

interests,[13] the fact of the matter is that the parties agreed to both provisions when they signed the 2019 Term Sheet. And while McKenzie may have been correct, as Star of Hope's director ultimately agreed, that the business of authentication by an artist's estate was fiscally risky, it was nevertheless a part of the agreement. When the Estate indicated that it would not renegotiate those provisions, McKenzie and AIA could not *insist* that they be changed in a way that directly contradicted the 2019 Term Sheet without repudiating the agreement.

## III.   The Effect of the Repudiation

Having found that McKenzie repudiated the 2019 Term Sheet, I now discuss the effect of that repudiation. "[A] 'distinct and unequivocal' repudiation entitles the injured party to treat the contract as 'entirely rescinded,' and its obligations under the contract as discharged." *VanHaaren*, 989 F.2d at 6 (quoting *Martell Bros.*, 577 A.2d at 337 n.1); *see also Roger Edwards, LLC*, 387 F.3d at 95 ("[W]here one party to a contract repudiates it, the other party is authorized to rescind." (citing *Simpson v. Emmons*, 99 A. 658, 660 (Me. 1917))). Given McKenzie's repudiation, the Estate, as the injured party, was within its rights to view its obligations under the Term Sheet as discharged and to treat the Term Sheet as entirely rescinded. *See Martell Bros., Inc.*, 577 A.2d at 337 n.1.

The parties have not directly briefed the issue of whether an underlying contract is resurrected when a superseding contract is repudiated and rescinded, but

---

[13]     While I have no reason to question McKenzie's altruistic concern, I would also note that he had a financial motive to push for the BRAT authentication. During McKenzie's trial testimony, he revealed that Johnsonville still owes AIA $700,000 for the BRAT sculpture. Trial Tr. Vol. III, at 482:21–23.

they seem to agree that if the 2019 Term Sheet is not in effect, the 2008 Agreement comes back into force. *See* Trial Tr. Vol. III, at 436:23–437:10 (McKenzie testifying that he is still acting pursuant to the 2008 Term Sheet because the 2019 Term Sheet is not in effect); Def. Brannan's Trial Br. 3 (ECF No. 110) ("Even if the 2019 Term Sheet were an enforceable contract, which it is not, Plaintiff has long since repudiated [it] . . . . Thus, the 2008 Agreement's arbitration provision has *not* been extinguished, and this case should be referred back to the Arbitration Panel."). Absent any guidance to the contrary, I simply follow the lead of the parties and conclude that the 2008 Agreement was revived by McKenzie's repudiation. The effect of McKenzie's repudiation was to resurrect the 2008 Agreement—including its arbitration provision.[14]

## CONCLUSION

Accordingly, I find that, although the 2019 Term Sheet was a binding contract, not an agreement to agree, McKenzie repudiated it. Because of that repudiation, the Estate was justified in treating the entire 2019 Term Sheet as rescinded. And, the repudiation and subsequent rescission resurrected the 2008 Agreement and its arbitration provision. Thus, McKenzie's requests for a declaratory judgment that the 2019 Term Sheet is binding and enforceable and for an order enjoining the New York Arbitration are **DENIED**. There being nothing left to rule on, the case is **DISMISSED**.

---

[14]     Because this decision reaches the merits of Defendant Brannan's motions for judgment on partial findings (ECF Nos. 136–37), I now **DENY** those motions.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 1st day of February, 2023.